FILED

2014 DEC 16  AM 11: 48

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>JOEL BARRY GILLIS and<br>EDWARD WISHNER,<br><br>      Defendants. | CR No. 14 **CR 14 00712**<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 1341: Mail Fraud;<br>18 U.S.C. § 1343: Wire Fraud;<br>18 U.S.C. § 1349: Conspiracy;<br>18 U.S.C. § 2: Aiding and Abetting<br>and Causing an Act to be Done] |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. § 1349]

A.  **INTRODUCTORY ALLEGATIONS**

Unless otherwise specified, at all times relevant to this Information:

1.  Nationwide Automated Systems, Inc. ("NASI") was a California corporation that operated out of its principal office in Calabasas, California, within the Central District of California. NASI was incorporated in 1996 and held itself out to the investing public as being in the business of placing, operating, and

PGS/RAK:pgs/rak

maintaining automated teller machines ("ATM"s).  NASI described itself as "an ATM machine provider" that worked with high-traffic retail locations, hotels, casinos, and convenience stores, located throughout the United States.  NASI touted that it operated with over 80 branches and was affiliated with 1000 certified technicians on standby, and further claimed that it serviced more than $1 billion in ATM transactions per month.

2.    Defendant JOEL BARRY GILLIS ("defendant GILLIS") was a resident of Woodland Hills, California, within the Central District of California.  Defendant GILLIS was the founder and president of NASI and a signatory on its bank accounts.  According to press reports issued by NASI, defendant GILLIS was in charge of NASI and was principally responsible for running its business operations.

3.    Defendant EDWARD WISHNER ("defendant WISHNER") was a resident of Woodland Hills, California.  Defendant WISHNER was the treasurer, vice-president, and secretary of NASI and a signatory on its bank accounts.  Defendant WISHNER also prepared NASI's tax returns.

B.    **THE OBJECTS OF THE CONSPIRACY**

4.    Beginning as early as in or about 1999, and continuing to in or about September 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendants GILLIS and WISHNER, together with unindicted co-conspirator NASI, and others known and unknown to the United States Attorney, knowingly combined, conspired, and agreed to commit the following offenses against the United States: (1) mail fraud, in violation of Title 18, United States Code, Section 1341; and (2) wire fraud, in violation of Title 18, United States Code, Section 1343.

2

C.   THE MANNER AND MEANS OF THE CONSPIRACY

5.   The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

a.   Defendants GILLIS and WISHNER, and unindicted co-conspirator NASI, acting in concert with co-conspirators known and unknown to the United States Attorney and through agents of NASI, would solicit funds from victim-investors by purporting to sell them ATMs through NASI's ATM sale/leaseback program, using a standard package of agreements, comprised of the following: (1) an ATM Equipment Purchase Agreement ("Purchase Agreement"); (2) an ATM Equipment Lease Agreement ("Lease Agreement"); and (3) an Addendum to Owner Lease Agreement ("Addendum").  These three agreements were typically provided to victim-investors by NASI and executed at or around the same time by individual victim-investors, with defendant GILLIS signing on behalf of NASI.

b.   Under the terms of the Purchase Agreement, victim-investors paid a flat amount – typically $12,000, but in some cases as much as $19,800 per ATM – to buy one or more ATMs, all of which were to be identified in an exhibit ("Exhibit A") to the contract by both "serial number" and by the name of the location to which the ATMs were purportedly to be delivered.  In exchange for the victim-investors' payments, NASI, as the supposed "seller" of the ATMs, agreed to deliver the ATMs purportedly purchased by the victim-investor to the location specified by the agreement within 60 days.

c.   Under the terms of the Lease Agreement, victim-investors leased the ATMs they had purchased back to NASI for an initial 10-year term.  The Lease Agreement provided that NASI would be responsible for operating and maintaining the ATMs and providing

1  all the services necessary for this purpose, including processing and

2  accounting for all ATM transactions; obtaining, delivering, and

3  loading cash for the ATMs; and repairing, maintaining, and servicing

4  the ATMs.  The Lease Agreement further provided that NASI was

5  obligated to pay a monthly rent to the victim-investor in an amount

6  equal to $.50 for each "approved transaction" produced by the ATMs

7  during the covered month for the term of the lease.

8        d.   The Lease Agreement also included a "non-interference"

9  provision, pursuant to which the victim-investor was required to

10  agree "not to interfere" with the operation of the ATMs by NASI in

11  any manner, including, but not limited to, not contacting the

12  locations where the ATMs were purportedly placed and installed and

13  not contacting any service providers purportedly under contract with

14  NASI to assist in the operation of such ATMs.

15        e.   Finally, the Addendum to the Lease Agreement modified

16  NASI's rent obligation by guaranteeing NASI's payment of a monthly

17  check to victim-investors equal to a 20% annual rate of return on the

18  victim-investors' initial investment.  NASI guaranteed this 20%

19  annual rate of return even if the number of transactions produced by

20  the victim-investor's ATM was insufficient to provide, at the $.50

21  per transaction rate, a 20% annual rate of return.  The Addendum also

22  modified the 10-year lease term provided for in the Lease Agreement

23  by granting the victim-investor the right, after only two years, to

24  sell their ATMs back to NASI at their original purchase price at any

25  time, thereby recovering their original investment in full.

26        f.   In marketing NASI's ATM sale/leaseback program to

27  victim-investors, defendants GILLIS and WISHNER would tout NASI's

28  purportedly lengthy track record of delivering profitable returns for

4

investors through their management, servicing, and collection of transaction fees from tens of thousands of ATMs that NASI either separately owned or had leased back from investors.  Defendants GILLIS and WISHNER routinely claimed that the ATM locations acquired by NASI were strong performers, and that many of the ATMs installed in those areas yielded transaction revenue well in excess of the 20% annual rate of return guaranteed by NASI.  Defendants GILLIS and unindicted co-conspirator NASI also encouraged prospective victim-investors to invest in NASI's sale/leaseback program by periodically representing that NASI had "secured" a new round of favorable ATM store locations, but that because opportunities were limited, interested investors needed to act quickly.  Finally, defendants GILLIS and WISHNER, and NASI sales agents acting at their direction, urged a number of prospective victim-investors to roll their IRA saving accounts into NASI's sale/leaseback program by claiming that investments in NASI's sale/leaseback program would outperform most traditional retirement investment accounts.

g.    Each month, defendants GILLIS and WISHNER would cause monthly transaction reports to be sent to the victim-investors that purportedly detailed the performance of the ATMs that the victim-investors owned.  The reported number of transactions of each of the ATMs supposedly formed the financial basis for the monthly payments that NASI sent to the victim-investors.  In truth and in fact, as defendants GILLIS and WISHNER then well knew, the purpose of these reports was to falsely confirm to the victim-investors that the payments they were receiving from NASI were being generated by the high-yield transaction fees earned by their particular ATMs, and to

1  conceal that the payments were, in fact, Ponzi payments funded by

2  monies received from other victim-investors.

3          h.   As defendants GILLIS and WISHNER then well knew, the

4  Purchase Agreement, Lease Agreement, and Addendum packages that NASI

5  entered into with its victim-investors were a sham, and NASI's

6  promises and representations to its victim-investors in connection

7  with its purported sale and leaseback of ATMs were materially false

8  and misleading.  In truth and in fact, as defendants GILLIS and

9  WISHNER then well knew, NASI typically did not sell and lease back

10  the ATM machines it purported to sell to its victim-investors, and

11  the serial numbers and the installation locations of the ATMs that

12  were specified on the Exhibits A to the victim-investors' Purchase

13  Agreements were fabricated by defendant GILLIS and by NASI to create

14  the false impression that NASI was selling actual ATMs that were

15  installed in favorable locations throughout the United States.  As

16  defendants GILLIS and WISHNER also then well knew, NASI did not own

17  or operate the approximately 31,000 ATMs that it claimed to have sold

18  and leased back from its victim-investors, nor did it generate any

19  transaction fees or revenue from the ATMs it purportedly leased back

20  from investors and supposedly installed in favorable locations.

21          i.   In truth and in fact, defendants GILLIS and WISHNER

22  operated NASI as a Ponzi scheme, in which the vast majority of its

23  incoming revenue was comprised of victim-investor funds, which

24  defendants GILLIS and WISHNER used to pay returns to prior victim-

25  investors, finance NASI's operations, and pay compensation to

26  themselves and to NASI's sales agents and employees.  While NASI did

27  purchase a relatively small number (approximately 240) of ATMs, which

28  generated some net revenue paid to NASI through two ATM service

6

providers, these machines were generally owned by NASI and were not
sold to, or leased back, from investors.  The true purpose of this
part of NASI's business was to maintain the false and misleading
impression that NASI was a legitimate ATM servicer and provider
capable of sustaining the fraudulent sale leaseback model presented
to victim-investors.  In truth and in fact, not only were the tens of
thousands of ATMs that defendants GILLIS and WISHNER purported to
sell to, and lease back from, NASI victim-investors never owned or
operated by NASI, in the vast majority of cases these ATMs never even
actually existed, as defendants GILLIS and WISHNER then well knew.
Indeed, in several instances, NASI purported to sell the same non-
existent ATMs located in a particular location to multiple victim-
investors, notwithstanding that NASI never owned nor leased back any
of the ATMs installed at the locations identified on the Purchase and
Lease Agreements.

          j.    By means of the false and fraudulent pretenses,
misrepresentations, and promises identified above, and others,
defendants GILLIS and WISHNER would cause victim-investors to send
money to NASI using the United States mails and commercial interstate
carriers and by means of interstate wirings, which money the victim-
investors believed was being used to purchase ATMs as part of NASI's
ATM sale/leaseback program.

          k.    In furtherance of their fraudulent investment scheme,
defendants GILLIS and WISHNER would cause co-conspirator NASI to send
to the victim-investors, using the United States mail, false monthly
transaction reports for the ATMs purportedly owned by the victim-
investors.  These monthly transaction reports set out in detail the
fabricated ATM transaction fees supposedly generated by the non-

existent ATMs that NASI had purportedly sold to and leased back from the victim-investors.

1.   In addition, defendants GILLIS and WISHNER would prevent victim-investors from discovering that NASI's sale/leaseback program was a Ponzi scheme by including the "non-interference" provision in the NASI Lease Agreements.  Pursuant to this provision, victim-investors were contractually barred from contacting the locations at which their ATMs had been purportedly installed to determine whether NASI was actually operating the ATMs as represented and in conformity with its obligations under the Purchase and Lease Agreements.

m.   In and about August 2014, NASI bounced approximately $3 million in checks that had been sent by NASI as monthly returns to victim-investors.  By the end of the month, NASI had drained its bank account, drawing it down to a balance of less than $200,000.  In response to hundreds of calls from distressed victim-investors, defendants GILLIS and WISHNER falsely sought to reassure the victim-investors that NASI was only suffering from accounting problems and technical delays relating to system upgrades, and that timely payment of investor returns would likely resume by the beginning of October 2014.  In truth and in fact, as defendants GILLIS and WISHNER then well knew, their Ponzi scheme was collapsing owing to a shortfall in new victim-investor funds.  Nonetheless, between in and about the last week in August and in and about the end of the first week of September 2014, defendants GILLIS and WISHNER, acting in concert with NASI sales agents and employees, continued raising nearly $4 million in additional new victim-investor money and making Ponzi payments to

1  lull existing victim-investors, who were owed returns under NASI's

2  Purchase and Lease Agreements.

3        n.   In executing the fraudulent scheme described above,

4  defendants GILLIS and WISHNER fraudulently obtained custody and

5  control of hundreds of millions of dollars from thousands of victim-

6  investors located throughout the United States.

7  D.   **OVERT ACTS**

8        6.   In furtherance of the conspiracy, and to accomplish its

9  objects, defendants GILLIS and WISHNER, together with unindicted co-

10 conspirator NASI, and other co-conspirators known and unknown to the

11 United States Attorney, aiding and abetting one another, committed

12 and willfully caused others to commit the following overt acts, among

13 others, in the Central District of California and elsewhere:

14       Overt Act No. 1: On or about January 13, 2010, defendants

15 GILLIS and WISHNER caused a person working for defendant WISHNER to

16 deposit into NASI's City National Bank account x4410 (the "NASI CN

17 Bank Account") seven checks received from seven victim-investors for

18 a total deposit of $246,300.

19       Overt Act No. 2: On or about December 1, 2010, defendants

20 GILLIS and WISHNER caused a person working for defendant WISHNER to

21 deposit into the NASI CN Bank Account 19 checks received from 19

22 victim-investors for a total deposit of $1,039,836.

23       Overt Act No. 3: On or about March 29, 2011, defendants

24 GILLIS and WISHNER caused a person working for defendant WISHNER to

25 deposit into the NASI CN Bank Account 28 checks received from 28

26 victim-investors for a total deposit of $1,094,400.

27       Overt Act No. 4: On or about June 6, 2011, defendant

28 GILLIS signed, as President of NASI, a Purchase Agreement, Lease

1  Agreement, and Addendum pursuant to which victim-investor J.F.
2  purchased two ATMs for $19,800 each, for a total of $39,600, and was
3  guaranteed that "If at anytime [sic] the owner's ATM machine fails to
4  make enough transactions [t]o pay the owner a monthly check
5  equivalent to a twenty (20%) percent Annual return on the owner's
6  investment of $19,800," NASI would "pay the owner the difference
7  between what the Owner has received and $4,000 annually.  This is
8  based on a rental fee of $.50 Per transaction."

9        Overt Act No. 5: On or about July 5, 2011, defendants
10  GILLIS and WISHNER caused a person working for defendant WISHNER to
11  deposit into the NASI CN Bank Account 28 checks received from 24
12  victim-investors for a total deposit of $1,107,000.

13        Overt Act No. 6: On or about January 31, 2012, defendants
14  GILLIS and WISHNER caused a person working for defendant WISHNER to
15  deposit into the NASI CN Bank Account 27 checks received from 25
16  victim-investors for a total deposit of $2,219,600.

17        Overt Act No. 7: On or about May 18, 2012, defendants
18  GILLIS and WISHNER caused a person working for defendant WISHNER to
19  deposit into the NASI CN Bank Account 24 checks received from 23
20  victim-investors for a total deposit of $1,215,000.

21        Overt Act No. 8:  On or about August 30, 2012, defendant
22  GILLIS signed, as President of NASI, a Purchase Agreement, Lease
23  Agreement, and Addendum pursuant to which victim-investor M.M.
24  purchased two ATMs for $12,000 each, for a total of $24,000, and
25  received a guarantee of a 20% return on his investment.

26        Overt Act No. 9:  On or about October 26, 2012, defendant
27  GILLIS signed, as President of NASI, a Purchase Agreement, Lease
28  Agreement, and Addendum pursuant to which victim-investor M.M.

purchased two ATMs for $12,000 each, for a total of $24,000, and received a guarantee of a 20% return on his investment.

Overt Act No. 10:  On or about December 25, 2012, defendant GILLIS signed, as President of NASI, a Purchase Agreement and Addendum pursuant to which victim-investor M.M. purchased two ATMs for $12,000 each, for a total of $24,000, and received a guarantee of a 20% return on his investment.

Overt Act No. 11:  In or about January 2013, defendant GILLIS met with victim-investor G.S. at the El Caballero Country Club in Tarzana, California, and explained NASI's purchase/leaseback program to G.S., who subsequently gave defendant GILLIS a check for $1.2 million to purchase 100 ATMs for victim-investor G.S.'s wife.

Overt Act No. 12: On or about February 1, 2013, defendants GILLIS and WISHNER caused a person working for defendant WISHNER to deposit into the NASI CN Bank Account 41 checks received from 33 victim-investors for a total deposit of $1,329,124.

Overt Act No. 13:  On or about February 8, 2013, defendants GILLIS and WISHNER met with victim-investor B.G. at defendant WISHNER's office in Woodland Hills, California, and, when victim-investor B.G. asked to see NASI's tax returns and financial statements, defendant WISHNER said that it was company policy not to show NASI's accounting to anyone and refused to show the tax returns and financial statements to victim-investor B.G.

Overt Act No. 14:  On or about February 8, 2013, defendant GILLIS told victim-investor B.G. that NASI owned 20,000 ATMs.

Overt Act No. 15:  On or about October 7, 2013, defendant GILLIS signed, as President of NASI, a Purchase Agreement, Lease Agreement, and Addendum pursuant to which victim-investor T.H.

1   purchased twelve ATMs for $12,000 each, for a total of $144,000, and

2   received a guarantee of a 20% return on his investment.

3           Overt Act No. 16: On or about November 12, 2010, defendants

4   GILLIS and WISHNER caused a person working for defendant WISHNER to

5   deposit into the NASI CN Bank Account 27 checks received from 24

6   victim-investors for a total deposit of $1,746,200.

7           Overt Act No. 17:  On or about April 2, 2014, defendant

8   GILLIS sent an e-mail to victim-investor A.K. in which defendant

9   GILLIS stated "Up to date you have invested $3,216,000."

10          Overt Act No. 18: On or about April 21, 2014, defendants

11  GILLIS and WISHNER caused a person working for defendant WISHNER to

12  deposit into the NASI CN Bank Account 16 checks received from 15

13  victim-investors for a total deposit of $506,000.

14          Overt Act No. 19:  On or about May 12, 2014, defendant

15  GILLIS sent an e-mail to victim-investor A.K. in which defendant

16  GILLIS stated: "I left you a message.  New supply of locations.  Same

17  return as others.  I am sending a letter out tomorrow.  If you want

18  more locations, call me.  They will go fast."

19          Overt Act No. 20: On or about August 4, 2014, defendants

20  GILLIS and WISHNER caused a person working for defendant WISHNER to

21  deposit into the NASI CN Bank Account two checks received from one

22  victim-investor for a total deposit of $936,000.

23          Overt Act No. 21: On or about August 28, 2014, defendant

24  GILLIS sent a letter to victim-investors in which he stated that the

25  checks for September would be going out late due to "the inordinate

26  amount of time spent on complaints, cleaning up the general

27  accounting and system upgrades"; instructed victim-investors "Please

28

1  do not call us"; and estimated that the September checks "will go out

2  anywhere from the 8th to the 10th."

COUNTS TWO AND THREE

[18 U.S.C. §§ 1341, 2(a)]

7.    The United States Attorney realleges and incorporates by reference paragraphs 1 through 3 and 5 and 6 of this Information as though fully set forth herein.

A.    **THE SCHEME TO DEFRAUD**

8.    Beginning as early as in or about 1999, and continuing to in or about mid-September 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendants GILLIS and WISHNER, together with unindicted co-conspirator NASI, and other co-conspirators known and unknown to the United States Attorney, aiding and abetting one another, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud victim-investors as to material matters, and to obtain money and property from victim-investors, by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

9.    The fraudulent scheme operated, in substance, as set forth in paragraphs 1 through 3 and 5 and 6 of this Information.

B.    **THE USE OF THE MAILS**

10.    On or about the dates set forth below, within the Central District of California, and elsewhere, defendants GILLIS and WISHNER, for the purpose of executing and attempting to execute the above-described scheme to defraud, caused the following items to be placed in an authorized depository for mail matter to be delivered by the United States Postal Service, and to be deposited with and delivered by a commercial interstate carrier, according to the directions thereon:

| COUNT | DATE | ITEM MAILED |
|-------|------|-------------|
| TWO | 10/24/2013 | Check for $468,000 payable to NASI sent by victim-investor D.H. from Santa Monica, California, to NASI in Calabasas, California |
| THREE | 8/26/2014 | Check for $120,000 payable to NASI sent by victim-investor J.H. in Hidden Hills, California, to NASI in Calabasas, California |

COUNT FOUR

[18 U.S.C. §§ 1343, 2(a)]

11. The United States Attorney realleges and incorporates by reference paragraphs 1 through 3 and 5 and 6 of this Information as though fully set forth herein.

A. **THE SCHEME TO DEFRAUD**

12. Beginning as early as in or about 1999, and continuing to in or about mid-September 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendants GILLIS and WISHNER, together with unindicted co-conspirator NASI, and other co-conspirators known and unknown to the United States Attorney, aiding and abetting one another, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud victim-investors as to material matters, and to obtain money and property from victim-investors, by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

13. The fraudulent scheme operated, in substance, as set forth in paragraphs 1 through 3 and 5 and 6 of this Information.

///
///
///
///
///

1    **B.    THE USE OF THE WIRES**

2        14.  On or about July 30, 2013, within the Central District of

3    California, and elsewhere, defendants GILLIS and WISHNER transmitted,

4    caused the transmission of, and aided and abetted the transmission of

5    $1,000,000, for the benefit of victim-investor A.K., from Citibank

6    account number x00089 in New York, New York, to the NASI CN Bank

7    Account in California, by means of wire and radio communication in

8    interstate and foreign commerce.

9

10                                         STEPHANIE YONEKURA
                                          Acting United States Attorney
11

12

13

14                                         ROBERT E. DUGDALE
                                          Assistant United States Attorney
                                          Chief, Criminal Division
15

16                                         RICHARD E. ROBINSON
                                          Assistant United States Attorney
                                          Chief, Major Frauds Section
17

18                                         RANEE A. KATZENSTEIN
                                          Assistant United States Attorney
                                          Deputy Chief, Major Frauds
19                                         Section

20                                         PAUL G. STERN
                                          Assistant United States Attorney
21                                         Senior Litigation Counsel, Major
                                          Frauds Section

22

23

24

25

26

27

28