# EXHIBIT E



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    10/27/2014

JEFF ██████ ("JEFF"), date of birth ██/██/1974, residing at ████████ ████████ Hidden Hills, California for the last seven years, cellular phone number ██████, e-mail address ██████████████████ and his father, RONALD "Ron" ██████ ("RON"), date of birth ██/██/1940, residing at ██████████████████████████, California, cellular phone number ████████████████████, e-mail address ██████ were interviewed at JEFF's residence. After being advised of the identity of the interviewing Agents and the nature of the interview, JEFF and RON provided the following information:

JEFF learned about NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") from ADAM KASOWER ("KASOWER") about a year ago. ADAM told JEFF that ATMs were not always available for purchase from NASI, but when they became available, KASOWER would let JEFF know. JOEL GILLIS ("GILLIS") emailed KASOWER about having 1,500 ATMs that became available for investors to purchase and that the ATMs would sell quickly. KASOWER forwarded the e-mail to JEFF. JEFF emailed GILLIS to say that he was interested in investing with NASI. KASOWER told JEFF that he did his due diligence, and even asked GILLIS for audited financial statements, but GILLIS declined to provide them. However, KASOWER told JEFF that he had been receiving interest checks for the last eight months.

JEFF went to see GILLIS at the NASI office around May 2014. GILLIS mailed JEFF a purchase contract and he brought it to NASI. JEFF grew up with GILLIS' daughter, ALLISON "Ally" GILLIS ("ALLY"), so he did not think anything about the investment was suspicious. GILLIS told JEFF that ALLY remembered him. GILLIS explained that after JEFF purchased an ATM from NASI, JEFF would then lease back the ATM to NASI and earn 50 cents per transaction on the ATM, or at least a 20% return on his investment. JEFF asked if there were salespeople getting new locations for the ATMs, and GILLIS said yes. GILLIS told JEFF his ATMS were going to be located in Kentucky and Georgia. At the end of their meeting, JEFF told GILLIS that

Investigation on  10/16/2014  at  Hidden Hills, California, United States (In Person)

File # ████████████████████                                   Date drafted  10/16/2014

by  WU EUGENE P., Amie C. Stemen

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.


he would think about it before he invested.  JEFF ultimately decided to purchase 20 ATMs for $12,000 each for a total of $240,000 around May 15, 2014.

JEFF made the following additional purchases from NASI: 10 ATMs for $12,000 each for a total of $120,00 around May 30, 2014;  10 ATMs for $12,000 each for a total of $120,000 around July 21, 2014; and 10 ATMs for $12,000 each for a total of $120,000 around August 26, 2014.  JEFF paid for each purchase with a personal check.  JEFF mailed his checks for each purchase except for one check that RON brought into NASI for JEFF's first purchase.  JEFF received an Exhibit A list from NASI listing each ATM, its serial number, and location, except for his last purchase on August 26, 2014.

JEFF met with GILLIS twice.  The second time JEFF met with GILLIS was to purchase more ATMs.  JEFF never received any promotional materials from NASI.  JEFF never called the locations of his ATMs to verify if ATMs existed or if they belonged to NASI.  JEFF looked on Google Maps and saw there were businesses of where his ATMs were supposed to be.  JEFF only received one interest check for $9,947.50 printed on a CITY NATIONAL BANK check.

JEFF went to Kentucky and visited an ATM on July 9, 2014 that he had purchased from NASI.  JEFF took a picture with the ATM.  JEFF did not notice any company logos or phone numbers listed on the ATM.  GILLIS wanted a copy of the picture.  The picture was emailed to GILLIS.  JEFF and RON stated that they did not notice the non-interference clause in the lease-back agreement.

JEFF's August 2014 check arrived a week after when GILLIS said it was going to arrive.  JEFF never received any letters from NASI.  TERRY HELLER ("HELLER") told JEFF that he got a letter from NASI that said not to call NASI about interest checks.  JEFF emailed GILLIS on September 9, 2014 asking about his interest check, and GILLIS responded that a check was going to be mailed out.  GILLIS' e-mail address was j_boss@earthlink.net.  Then everything started to fall apart.  HELLER received a letter from NASI about the SECURITIES and EXCHANGE COMMISSION ("SEC") and he told JEFF and KASOWER.

JEFF went to NASI to look for GILLIS, but the NASI doors were locked.  JEFF, KASOWER, and HELLER went to WISHNER's office the next day on September 16, 2014.  JEFF saw a male who he thought was an investor named ARTY Last Name Unknown ("ARTY") outside WISHNER's office who appeared to be on the cellular phone with GILLIS.  JEFF overheard ARTY say that he felt bad for GILLIS and wanted to give him and GILLIS' wife a hug.  JEFF, KASOWER, and HELLER went into WISHNER's office.  ARTY and an unknown female


("UF #1") also went into WISHNER's office.  JEFF saw female employees working in WISHNER's office.  Everyone began questioning WISHNER.

WISHNER told everyone that he received a subpoena from the SEC. WISHNER was asked for a copy of the subpoena, and he gave a copy to everyone.  WISHNER was told that if it was a securities problem, then NASI should just use their money to fix the problem.  WISHNER was skirting around the issue and said it would take a lot of time and was not able to do that.  WISHNER was asked if NASI had any money and he said NASI only had $300,000, which was moved to GRAND POINT BANK.  WISHNER said if he sold a new type of ATM with new software, he could make everyone whole.  WISHNER was asked if he was basically stealing from other people to pay the current investors, and WISHNER said yes.  WISHNER was asked if he ever sold the same ATM to different people, and he replied that people should not have been sold same ATM as there were so many ATMs.  WISHNER never stated an exact number of ATMs that NASI owned, but he said there was a good amount. WISHNER mentioned there was an offer from MILLIKEN to buy NASI for $500,000,000.

A male appeared during the meeting and he said he was DAVID GLADSTONE ("GLADSTONE").  GLADSTONE said he worked on NASI operations and was working on new software.  JEFF asked GLADSTONE questions about the selling and maintenance of the ATMs, but GLADSTONE could not answer his questions. GLADSTONE became silent and left the office.

WISHNER took his passport out of his desk drawer to show everyone. WISHNER sat down with his family and said he was thinking about leaving the country, but his wife told him to stay because at least his family could see WISHNER on weekends.  KASOWER and HELLER gave WISHNER a hug. WISHNER was asked where GILLIS was and WISHNER called GILLIS on the phone.  GILLIS said he was threatened by someone with a gun.

UF #1 said she bought an ATM for $19,800, and WISHNER replied that it was a high-end ATM.  JEFF did not remember UF #1's name, but HELLER knew the UF #1's name.  During the meeting, another unknown female ("UF #2") came into WISHNER's office to pick up a check.  WISHNER was asked why UF #2 did not get a check, and WISHNER said her check did not go through last month so that was why she could get a check now.  Then an unknown male ("UM #1) came into WISHNER's office with a piece of paper.  UM #1 said in front of everyone that he bought two ATMs from NASI and when he saw another friend's Exhibit A list, it had the same ATM location.  JEFF, HELLER, and KASOWER concluded that this was a Ponzi scheme and got up and left.  They were at WISHNER's office for about two hours.

At the end of the meeting, TERRY took WISHNER's passport in fear that he would leave the country, but he later felt bad for WISHNER and had

KASOWER return it to WISHNER by saying he found the passport outside.

JEFF called GILLIS on his cell phone after visiting WISHNER's office about his concerns that GILLIS sold him the same ATM that was already sold to a different person. JEFF stated that another person had the same serial number as his ATM. GILLIS replied that the serial number was not the actual number on the ATM, but was a transaction number. JEFF was able to get GILLIS' phone number when HELLER watched a female employee at WISHNER's office dial GILLIS' phone number. WISHNER would not provide GILLIS' phone number, but HELLER remembered the phone number that the employee dialed.

JEFF's mom, ELLEN ████ also invested with NASI, but she did not receive any Exhibit A list as she invested in August 2014.

JEFF would not have invested with NASI if he had known that NASI was not profitable, his money was not used to buy his ATMs, or that his money was used to pay other investors.

RON's Statement

RON learned about NASI from JEFF. RON met with GILLIS prior to his initial investment to learn more about NASI. RON saw someone in the front office of NASI. GILLIS told RON that RON was buying ATMs and leasing them back to NASI. NASI was in business for about 17 years. GILLIS said that RON's investment was guaranteed a 20% return, but GILLIS added that the investment would do better and more likely earn 30%. GILLIS explained to RON that NASI received 50 cents, the investor received 50 cents, and the store that had the ATM also got a certain percentage on each ATM transaction. GILLIS told RON that NASI had contracts with Hilton Hotels. RON found out that they had mutual friends. RON asked GILLIS who was going to take over the business, and GILLIS said his daughter ALLY and son-in-law JEFF MORGAN were going to run NASI.

Each time RON stopped at GILLIS' office, GILLIS said there were not any ATMs available, but GILLIS would sell his own ATMs to RON.

RON based his decision to invest with NASI because his CPA and attorney agreed that it was a good investment. Additionally, POLYCOMP TRUST COMPANY said it had been with NASI for the last 10 years, and that NASI had made timely payments.

RON made the following investments with NASI: 25 ATMs for $12,000 each for a total of $300,000 around May 15, 2014, 30 ATMs for $12,000 each for a total of $360,000 around June 18, 2014, 35 ATMs for $12,000 each for a total of $420,000 around July 16, 2014, and 8 ATMs for $12,000 each for a total of $96,000 around August 25, 2014. Two purchases went through RON's


IRA at POLYCOMP TRUST COMPANY: July 16 and August 25, 2014.  RON
hand-delivered the contracts and checks to NASI for the other two
purchases.  RON received one interest check for $8,151.50.

RON brought JEFF's check to GILLIS around May 15, 2014.  RON asked
GILLIS how he made money, and GILLIS responded that he purchased one ATM
for the investor and one ATM for NASI using the $12,000.

RON never called the locations of his ATMs to verify if they existed or
if they belonged to NASI, but he checked on Google Maps and saw there was a
business.  GILLIS told RON that an investor should want their ATMs in
places that were secluded.

GILLIS invited RON for lunch at Monty's restaurant around August or
September 2014 to discuss the new ATMs that were being developed.  GILLIS
told RON that NASI had come up with new software for the ATMs.  GILLIS gave
RON a printed presentation.  GILLIS said he was only showing it to current
investors.  GILLIS said that RON would be able to triple the earnings of
what he currently made on his ATMs.  The new software allowed people to get
airline and hotel points.  A customer using the ATM can get money out as
well as check-in to hotels.  The ATM would produce a constant flow of
money.  GILLIS asked RON if he would be interested in investing in these
new ATMs, and Ron said he was.  RON asked GILLIS if KASOWER knew about it,
and GILLIS said no.  GILLIS said he was going to upgrade RON's current
machines.

RON heard from GILLIS once that there was an offer to buy NASI for
about $300,000,000, but GILLIS said that it was not enough money.  RON met
with GILLIS about three or four times.

RON's August check arrived a little late.  RON's check did not bounce.
RON received a check in September that was for the same amount as August's,
but with no statement.  RON called GILLIS and asked which machines the
interest check was for because he expected a monthly statement.  GILLIS
then asked RON if he called before and claimed to not have received his
check.  RON told GILLIS no.  GILLIS said the check was sent to RON by
mistake.  RON said he would return the check, and he delivered it to a
female at the NASI office.

Around September 2014, RON called GILLIS again. GILLIS told RON that
there was a problem with the accounting, and that checks would go out next
week.  RON never received a check.  RON called GILLIS again and said that
he has not heard anything from GILLIS and heard there were lots of
problems.  GILLIS said he was in some trouble, but RON's investment would
be okay.

14

Continuation of FD-302 of  Interview of JEFF ▓▓▓▓ and RONALD ▓▓▓▓ ,On 10/16/2014 ,Page  6 of 6

RON never met with WISHNER.  RON would not have invested with NASI if he had known that it was not profitable, his money was not used to buy his ATMs, or that his money was used to pay other investors.

JEFF showed Agents a video he took of WISHNER while he was in WISHNER's office.  Agents asked JEFF for a copy of the video and JEFF said he would provide the video at a later date.

JEFF and RON pointed out that some of the ATMs in RON's Exhibit A lists were the same.

The purchase contracts for JEFF, RON, and ELLEN ▓▓▓▓, e-mails from GILLIS to JEFF, and JEFF's picture with his NASI ATM, have been electronically attached to this report.

# NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1762

### ATM EQUIPMENT PURCHASE AGREEMENT

August 26 , 20 14

This undersigned, as BUYER, hereby agrees to purchase from NATIONWIDE AUTOMATED SYSTEMS, INC., ("SELLER"), the automated teller machine(s) ("ATMs") listed and described on "Exhibit A" which will be forth coming within 45 days of this purchase.

The total purchase price to be paid by BUYER to SELLER for the ATMs shall be as follows:

| NUMBER OF ATMs | PRICE PER ATM |
|---|---|
| 10 | |
| | 12,000 |

| | |
|---|---|
| TOTAL PURCHASE PRICE: | $ 120,000 |
| LESS BUYERS DEPOSIT | $ 120,000 |
| BALANCE DUE ON SIGNING: | $ = 0 = |

SELLER shall deliver the ATM(s) to location written on Exhibit A and forwarded to the buyer within sixty (60) days of the date hereof. If SELLER fails to make delivery of the ATM(s) within said sixty (60) day period, BUYER shall be entitled to cancel this contract and to receive a refund of the monies previously paid to SELLER, without interest thereon or deduction therefrom. The refund of BUYER's payments to SELLER shall be BUYER's sole and exclusive remedy hereunder.

SELLER hereby warrants that the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges.

*Never received my list of Atm machines*

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.
A California Corporation

By: *Joel Gillis*

Title: PRESIDENT

By:_____

Title:_____

BUYER:

By: X_____

Title: OWNER

████████████████████████
(Address)
HIDDEN HILLS, CA. 91302
████████████████████████
(Telephone Number)
Social Security Number: ████████████████

-2-

Nationwide Automated Systems, Inc.

## ADDENDUM TO OWNER LEASE AGREEMENT

1) If at anytime the owner's ATM machine fails to make enough transactions
To pay the owner a monthly check equivalent to a twenty (20%) percent
Annual return on the owner's investment of $12,000. Nationwide Automated
Systems, Inc. guarantees to pay owner the difference between what the
Owner has received and $2,400. This is based on a rental fee of $.50
Per transaction. This is done on an annual basis calculating and commencing
with the first month of the lease as stated under paragraph 3 of the "ATM
Equipment Lease Agreement".

2) At anytime after the first two years of ownership, should the owner wish to
.... Sell his or her ATM's, N.A.S.I guarantees it will purchase said ATM's from
Owner for the original sales price of $12,000.

Nationwide Automated Systems, Inc.

By _Joel Gillis_ 8-13-14

Owner

X _____

# NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1762

## ATM EQUIPMENT LEASE AGREEMENT

This agreement ("Agreement") is made as of _8-13_, 2014 by and between NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") and

_Jeff ▓▓▓▓_ ("Lessor").

### RECITALS

A.    NASI is in the business of placing, operating and maintaining automated teller machines ("ATMs").

B.    Lessor is the owner of the ATM(s) listed and described on Schedule A which will be forwarded within 45 days.

C.    NASI desires to lease from Lessor the ATM(s) listed and described on Schedule A on the terms and conditions set forth herein.

D.    Lessor desires to lease such ATM(s) to NASI on such terms and conditions.

NOW, THEREFORE, with respect to the foregoing recitals and in consideration of the following, the parties hereto represent, acknowledge and agree as follows:

1.    **Lease of Equipment.** Lessor hereby leases to NASI, and NASI hereby leases from Lessor, the ATM(s) listed and described on Schedule A which will be forwarded to Lessor within forty five (45) days from the date of this Agreement.

2.    **Term.** The initial term of this Agreement shall be for a period of ten (10) years commencing on the date first written above.   The Agreement shall be automatically renewed for additional three (3) year periods thereafter unless the lessor provides written notice at least sixty (60) days prior to the end of the initial term or any subsequent renewal term of its desire to terminate this Agreement.

3.   Rent.  NASI shall pay to Lessor as rent an amount equal to $0.50 for each "approved transaction" (as defined herein) produced by the ATMs for each calendar month during the term of this Agreement.   For purposes of this Agreement, an "approved transaction" is defined as a transaction produced by the ATMs for which the appropriate ATM system, (i.e. STAR, PLUS, CIRRUS, AMEX, VISA, PULSE, etc.), and federal, state and local laws permit a transaction fee to be charged to ATM users.

Commencing with the first month of this Agreement and continuing during its term, including any extensions thereof, NASI shall provide Lessor with an accounting of the number of approved transactions produced by the ATMs during the previous calendar month.   Concurrently therewith, NASI shall pay Lessor the required rent payments as provided for herein.  All such accounting and rent payments will be due no later than thirty (30) days after the end of each calendar month.

4.   Relocation of ATMs.   During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, may relocate with lessors permission any or all of the ATMs to other location(s) in the United States of America at any time or times; provided, however, that prior to moving or relocating any ATM, NASI shall provide Lessor with a thirty (30) day written notice advising it of the new location(s) of the ATMs. Any ATM owned by Lessor that has been terminated by sale of the location or by destruction whereby the ATM becomes non operational, shall be replaced immediately by Nationwide with one or more of their ATMs which is producing a like amount of transactions.

5.   Operation/Maintenance of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall operate and maintain the ATMs and provide all services relating thereto.  Such services include, but are not limited to, processing and accounting for all ATM transactions, obtaining, the delivering and loading of cash for the ATMs, and repairing, maintaining and servicing the ATMs.

6.   Insurance of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall maintain insurance coverage on the ATMs in an amount not less than the full replacement value of the ATMs. All insurance proceeds on the ATMs shall be payable directly to Nationwide Upon the occurrence of any such insurable event, Nationwide shall immediately replace the ATM.

-2-

20

NASI shall also maintain liability insurance (both public liability and property damage) covering the operation of the ATMs. NASI shall inform Lessor in writing at least fifteen (l5) days in advance of any policy cancellation.

7. **Indemnity.** NASI shall indemnify and hold Lessor harmless from and against any and all claims, actions, suits, proceedings, costs, expenses, damages, and liabilities, (including attorney's fees), arising out of, connected with, or resulting from the possession, use, operation, maintenance, or repair of the ATMs by NASI, to the fullest extent permitted by law.

8. **Authority/Ownership of Lessor.** Lessor has the right, power, legal capacity and authority to enter into, and perform its obligations under this Agreement, without the approval or consent of any other persons. Lessor is the owner of the ATMs, free and clear of all liens, encumbrances, pledges, security interests, claims, charges, and restrictions of any kind. The ATMs is/are and shall at all times remain the sole and exclusive personal property of Lessor, and NASI shall have no right or interest therein except as expressly set forth in this Agreement.

9. **Taxes/License Fees.** During the term of this Agreement, including any extensions thereof, Nationwide shall pay, prior to delinquency, all personal property taxes assessed against and levied upon the ATMs.

10. **Condition of Equipment.** Lessor makes no representation as to the condition of the ATMs and NASI acknowledges and agrees that all of the ATMs listed on Schedule "A" is/are being leased in its/their "As-Is," "Where-Is" condition, without representations or warranties of any kind by Lessor.

11. **Non-Interference.** During the term of this Agreement, including any extensions thereof, and provided that NASI is not in default under the terms hereof, Lessor agrees not to interfere with the operation of the ATMs by NASI in any manner including, but not limited to, contacting the locations where the ATMs is/are installed and/or any service providers under contract with NASI relating to the operation of such ATMs.

12. **Return of ATMs to Lessor.** Upon termination of this Agreement, NASI

-3-

shall, at its sole cost and expense, deliver the ATMs to Lessor's designation or return the initial investment back to Lessor. This is the option of the Lessor.

13.  Miscellaneous Provisions

A.  This Agreement, including any exhibits and schedules, constitutes the entire Agreement between the parties pertaining to the subject matter contained in it and supersedes any and all prior agreements between them. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all of the parties.

B.  All of the parties' rights and remedies hereunder shall be deemed to be cumulative and not exclusive. No waiver by either party to this Agreement of any of the provisions hereof shall be deemed, or shall constitute, a waiver of any other provision, covenant or condition of this Agreement, whether or not similar. No waiver shall be binding unless executed in writing by the party making the waiver.

C.  This Agreement shall in all respects be interpreted, enforced and governed by and under the laws of the State of California.

D.  If any dispute or claim arising out of or related to this Agreement, or the breach or enforcement thereof, results in a legal action or other proceeding, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

E.  All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the second day after mailing if mailed, by first class mail, registered or certified, postage prepaid, and properly addressed as follows:

TO NASI:        Nationwide Automated Systems, Inc.
                5000 No. Parkway Calabasas, Suite 303
                Calabasas, CA. 91302

TO LESSOR:      _____
                _____

F.  This Agreement shall be binding on, and shall inure to, the benefit of the parties to it and their respective heirs, legal representatives,

-4-

successors, and assigns.

G.    The parties hereto each agree to execute, acknowledge and deliver any additional documents and instruments, and to take any other action consistent with the terms of this Agreement that may reasonably be requested by the other party to give effect to the provisions hereof.

H.    This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

I.    If any provision of this Agreement shall be held to be unlawful, void or unenforceable by any court of competent jurisdiction for any reason, such provision or provisions shall be deemed severable from and shall in no way affect the validity or enforceability of the remaining provisions of this Agreement.

J.    ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, OR THE BREACH THEREOF, SHALL BE SETTLED BY ARBITRATION, TO BE CONDUCTED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AT THE REQUEST OF EITHER PARTY, IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION, AND JUDGMENT UPON AN AWARD RENDERED BY THE ARBITRATOR(S) MAY BE RENDERED IN ANY COURT HAVING JURISDICTION THEREOF.

THE PARTIES SHALL HAVE THE RIGHT TO DISCOVERY IN AID OF THE ARBITRATION IN ACCORDANCE WITH CODE OF CIVIL PROCEDURE SECTION 1283.05; PROVIDED, HOWEVER, THAT THE ARBITRATOR'S PERMISSION SHALL NOT BE REQUIRED FOR SUCH DISCOVERY.

EACH OF THE PARTIES RESERVES THE RIGHT TO FILE A JUDICIAL ACTION TO ENABLE THE RECORDING OF A NOTICE OF PENDING ACTION, OR TO APPLY FOR ORDERS OF ATTACHMENT, RECEIVERSHIP, INJUNCTION, OR OTHER PROVISIONAL REMEDIES ON THE GROUNDS THAT THE ARBITRATION AWARD TO WHICH THE APPLICANT MAY BE ENTITLED MAY BE RENDERED INEFFECTUAL IN THE ABSENCE OF SUCH RELIEF. ANY SUCH ACTION BY A PARTY HERETO SHALL NOT CONSTITUTE A WAIVER OF THE RIGHT TO ARBITRATION UNDER THIS PROVISION.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.

-5-

23

A California Corporation

By: _Joe L. Mills_

Title: PRESIDENT


LESSOR:

By:__X_____

Title: LESSOR

# California United Bank

Current Date:      October 14, 2014

Account Number:      ▓▓▓864
Capture Date:      August 28, 2014
Item Number:      5250227187611
Posted Date:      August 28, 2014
Posted Item Number:      52587611
Amount:      120,000.00
Record Type:      Debit
Serial Number:      1056

JEFFREY ▓▓▓▓▓ TRUST
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
HIDDEN HILLS CA 91302-1266

---

THE JEFFREY ▓▓▓▓ IRREVOCABLE TRUST      1056
HIDDEN HILLS, CA 91302      90-4368/1222

8/26/14
Date

Pay to the Order of: Nationwide Automated Systems Inc   $ 120,000 00

One hundred twenty ————————— 00/100 Dollars

CALIFORNIA
UNITED BANK    15821 VENTURA BLVD. SUITE 100 ENGINO, CA 91436

For _____

⑆ ▓▓▓▓▓▓▓ ⑆ 884⑈   ⑈1056

---

090434/000/100

Grandppoint Bank
Los Angeles, CA
>122244566<
9043470007100 08-27-2014



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    10/15/2014

DARYL ▓▓▓▓ ("DARYL"), date of birth ▓▓▓▓1949, social security number ▓▓▓▓▓▓▓ residing at ▓▓▓▓▓▓▓ Santa Monica, California, home phone number ▓▓▓▓▓▓▓ cell phone number ▓▓▓▓▓▓▓, e-mail address ▓▓▓▓▓▓▓, was interviewed telephonically. After being advised of the identity of the interviewing Agent and the nature of the interview, DARYL provided the following information:

DARYL is a landscape contractor. DARYL heard about an investment opportunity with NATIONWIDE AUTOMATES SYTEMS, INC. ("NASI") from DENVER DALE ("DALE"), home phone number ▓▓▓▓▓▓▓ cell phone number ▓▓▓▓▓▓▓ DALE lives in West Lake Village, California. DALE told DARYL he invested in NASI for the last 12 years and that NASI never missed a payment. DALE said that TED SLAVIN ("SLAVIN") also invested heavily with NASI. DARYL worked for SLAVIN once the in mid-1990s on his home in Malibu, California.

DARYL made an appointment with JOEL GILLIS ("GILLIS") and went to meet with him at NASI in March 2013. DARYL saw a female secretary at NASI. DARYL said to GILLIS he wanted to buy 10 ATMs and GILLIS had a purchase contract prepared. GILLIS handed the contract to HOSTA and had him sign it. DARYL then wrote a check for $120,000 to NASI. DARYL remarked that the meeting was less than five minutes.

DARYL stated that he saw an SEC filing in which it said only 2% of NASI's income came from 235 ATMs, while 98% of income came from investors.

DARYL purchased a total of 144 ATMS for $12,000 each for a total of $1,728,000 from NASI; the majority were purchased jointly with his wife, SUSAN ▓▓▓▓"SUSAN"), date of birth 11/13/1956, and some were through SUSAN's IRA. Of the 144 ATMs, three have not been recorded by NASI as DARYL sent a $36,000 check to NASI in August 2014. The check was cashed by NASI, but DARYL never received any confirmation from NASI for the ATMs. The breakdown of ATM purchases from NASI are as follows: 133 jointly with

---

Investigation on   10/03/2014   at   Los Angeles, California, United States (Phone)

File # ▓▓▓▓▓▓▓      Date drafted   10/03/2014

by   WU EUGENE P.

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.


SUSAN, eight through SUSAN's IRA, and three that were never confirmed by NASI.

DARYL mailed his signed contract and check to NASI by regular mail about 95% of the time, and hand-delivered it three times to NASI. DARYL called GILLIS each time he wanted to buy an ATM, and GILLIS would then prepare the contract to include the date, the number of ATMs, and the price of the ATMs on the contract. After DARYL received the contract in the mail, he signed it, and sent it back to NASI. DARYL did not have copies of the envelopes the contracts came in. DARYL received monthly checks on time through August 2014. After DARYL received his first check from NASI for around $5,000, he started selling off his stock portfolio to buy more ATMs.

DARYL and SUSAN are forced to sell their house because of NASI. The money DARYL and SUSAN lost was their retirement money. DARYL plans to apply for permanent residency in Australia and move their with his wife, where she is from.

DARYL wrote checks from his Wells Fargo bank account, and his corporation's line of credit. DARYL received a 1099 from Nationwide.

DARYL, DALE, SLAVIN, and another investor who is a real estate agent and invested over $1 million with NASI, compared their ATMs with each other and found among the 1,900 to 2,000 that they collectively owned, 56 ATMs had the same serials and locations. SLAVIN found the duplicates.

DARYL never called the locations of where he owned ATMs to verify if they existed. There was a clause in the purchase contract that said not to contact the ATM locations.

DARYL would not have invested with NASI if he had known his money was not used to purchase his ATMs, or that his money was used to pay other investors, or his money was used for overhead and commissions. DARYL never interacted with EDWARD WISHNER.

On October 6, 2014, SA Wu picked up documents from DARYL and SUSAN pertaining to NASI, to include purchase contracts, checks written to NASI to purchase the ATMs, and monthly statements from NASI. They have been electronically attached to this report.

While visibly upset and teary-eyed, SUSAN remarked that she was forced to sell the furniture in her home and was taking anxiety medication for the first time in her life because of losing her entire retirement in NASI. SUSAN and DARYL are putting their house on the market for sale next week. SUSAN is moving to Sydney, Australia in January 2, 2015, and DARYL is moving in March 2015. They hope to purchase a home in the countryside with



Continuation of FD-302 of  Interview of DARYL ▓▓▓ & SUSAN ▓▓▓▓ , On  10/03/2014 , Page  3 of 3

the proceeds of the sale of their home.  SUSAN and DARYL can not bear to be
around here because they lost all the money they made during their career.
However, SUSAN and DARYL would like to testify against NASI and GILLIS.
SUSAN's cell phone number is (310)968-8971 and e-mail address is
secndchnc1@verizon.net.

# NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1762

## ATM EQUIPMENT PURCHASE AGREEMENT

10/2 , 20 13

This undersigned, as BUYER, hereby agrees to purchase from NATIONWIDE AUTOMATED SYSTEMS, INC., ("SELLER"), the automated teller machine(s) ("ATMs") listed and described on "Exhibit A" which will be forth coming within 45 days of this purchase.

The total purchase price to be paid by BUYER to SELLER for the ATMs shall be as follows:

| NUMBER OF ATMs | PRICE PER ATM |
|---|---|
| 1 0   DHH | 12,000   DMA |

TOTAL PURCHASE PRICE:          $ ~~60,000~~   120,000   DHH

LESS BUYERS DEPOSIT     DMM    $ ~~60,000~~   120,000

BALANCE DUE ON SIGNING:        $   0

SELLER shall deliver the ATM(s) to location written on Exhibit A and forwarded to the buyer within sixty (60) days of the date hereof. If SELLER fails to make delivery of the ATM(s) within said sixty (60) day period, BUYER shall be entitled to cancel this contract and to receive a refund of the monies previously paid to SELLER, without interest thereon or deduction therefrom. The refund of BUYER's payments to SELLER shall be BUYER's sole and exclusive remedy hereunder.

SELLER hereby warrants that the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.
A California Corporation

By: _Joel Miller_

Title: PRESIDENT

By: _____

Title: _____

BUYER:

By: X _____

Title: OWNER

_____
(Address)

Santa Monica, CA 90402

_____
(Telephone Number)
Social Security Number: _ _ _ _ _ _ _ _ _

-2-

Nationwide Automated Systems, Inc.

## ADDENDUM TO OWNER LEASE AGREEMENT

1) If at anytime the owner's ATM machine fails to make enough transactions
To pay the owner a monthly check equivalent to a twenty (20%) percent
Annual return on the owner's investment of $12,000. Nationwide Automated
Systems, Inc. guarantees to pay owner the difference between what the
Owner has received and $2,400. This is based on a rental fee of $.50
Per transaction. This is done on an annual basis calculating and commencing
with the first month of the lease as stated under paragraph 3 of the "ATM
Equipment Lease Agreement".

2) At anytime after the first two years of ownership, should the owner wish to
.... Sell his or her ATM's, N.A.S. guarantees it will purchase said ATM's from
Owner for the original sales price of $12,000.

Nationwide Automated Systems, Inc.

By _Joel Millis_____

_____Owner_____

# NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1762

### ATM EQUIPMENT LEASE AGREEMENT

This agreement ("Agreement") is made as of _____10/2_____, 20_13_ by and between NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") and

_____DARYL_____ ~~████████~~ _____ ("Lessor").

### RECITALS

A.    NASI is in the business of placing, operating and maintaining automated teller machines ("ATMs").

B.    Lessor is the owner of the ATM(s) listed and described on Schedule A which will be forwarded within 45 days.

C.    NASI desires to lease from Lessor the ATM(s) listed and described on Schedule A on the terms and conditions set forth herein.

D.    Lessor desires to lease such ATM(s) to NASI on such terms and conditions.

NOW, THEREFORE, with respect to the foregoing recitals and in consideration of the following, the parties hereto represent, acknowledge and agree as follows:

1.    **Lease of Equipment.** Lessor hereby leases to NASI, and NASI hereby leases from Lessor, the ATM(s) listed and described on Schedule A which will be forwarded to Lessor within forty five (45) days from the date of this Agreement.

2.    **Term.** The initial term of this Agreement shall be for a period of ten (10) years commencing on the date first written above. The Agreement shall be automatically renewed for additional three (3) year periods thereafter unless the lessor provides written notice at least sixty (60) days prior to the end of the initial term or any subsequent renewal term of its desire to terminate this Agreement.

3.    Rent.  NASI shall pay to Lessor as rent an amount equal to $0.50 for each "approved transaction" (as defined herein) produced by the ATMs for each calendar month during the term of this Agreement.   For purposes of this Agreement, an "approved transaction" is defined as a transaction produced by the ATMs for which the appropriate ATM system, (i.e. STAR, PLUS, CIRRUS, AMEX, VISA, PULSE, etc.), and federal, state and local laws permit a transaction fee to be charged to ATM users.

Commencing with the first month of this Agreement and continuing during its term, including any extensions thereof, NASI shall provide Lessor with an accounting of the number of approved transactions produced by the ATMs during the previous calendar month.   Concurrently therewith, NASI shall pay Lessor the required rent payments as provided for herein.  All such accounting and rent payments will be due no later than thirty (30) days after the end of each calendar month.

4.    Relocation of ATMs.   During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, may relocate with lessors permission, any or all of the ATMs to other location(s) in the United States of America at any time or times; provided, however, that prior to moving or relocating any ATM, NASI shall provide Lessor with a thirty (30) day written notice advising it of the new location(s) of the ATMs. Any ATM owned by Lessor that has been terminated by sale of the location or by destruction whereby the ATM becomes non operational, shall be replaced immediately by Nationwide with one or more of their ATMs which is producing a like amount of transactions.

5.    Operation/Maintenance of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall operate and maintain the ATMs and provide all services relating thereto.  Such services include, but are not limited to, processing and accounting for all ATM transactions, obtaining, the delivering and loading of cash for the ATMs, and repairing, maintaining and servicing the ATMs.

6.    Insurance of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall maintain insurance coverage on the ATMs in an amount not less than the full replacement value of the ATMs. All insurance proceeds on the ATMs shall be payable directly to Nationwide Upon the occurrence of any such insurable event, Nationwide shall immediately replace the ATM.

-2-

NASI shall also maintain liability insurance (both public liability and property damage) covering the operation of the ATMs. NASI shall inform Lessor in writing at least fifteen (l5) days in advance of any policy cancellation.

7.    **Indemnity.** NASI shall indemnify and hold Lessor harmless from and against any and all claims, actions, suits, proceedings, costs, expenses, damages, and liabilities, (including attorney's fees), arising out of, connected with, or resulting from the possession, use, operation, maintenance, or repair of the ATMs by NASI, to the fullest extent permitted by law.

8.    **Authority/Ownership of Lessor.** Lessor has the right, power, legal capacity and authority to enter into, and perform its obligations under this Agreement, without the approval or consent of any other persons. Lessor is the owner of the ATMs, free and clear of all liens, encumbrances, pledges, security interests, claims, charges, and restrictions of any kind. The ATMs is/are and shall at all times remain the sole and exclusive personal property of Lessor, and NASI shall have no right or interest therein except as expressly set forth in this Agreement.

9. **Taxes/License Fees.**    During the term of this Agreement, including any extensions thereof, Nationwide shall pay, prior to delinquency, all personal property taxes assessed against and levied upon the ATMs.

10.    **Condition of Equipment.** Lessor makes no representation as to the condition of the ATMs and NASI acknowledges and agrees that all of the ATMs listed on Schedule "A" is/are being leased in its/their "As-Is," "Where-Is" condition, without representations or warranties of any kind by Lessor.

11.    **Non-Interference.** During the term of this Agreement, including any extensions thereof, and provided that NASI is not in default under the terms hereof, Lessor agrees not to interfere with the operation of the ATMs by NASI in any manner including, but not limited to, contacting the locations where the ATMs is/are installed and/or any service providers under contract with NASI relating to the operation of such ATMs.

12.    **Return of ATMs to Lessor.** Upon termination of this Agreement, NASI

-3-

shall, at its sole cost and expense, deliver the ATMs to Lessor's designation or return the initial investment back to Lessor. This is the option of the Lessor.

13. Miscellaneous Provisions

A. This Agreement, including any exhibits and schedules, constitutes the entire Agreement between the parties pertaining to the subject matter contained in it and supersedes any and all prior agreements between them. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all of the parties.

B. All of the parties' rights and remedies hereunder shall be deemed to be cumulative and not exclusive. No waiver by either party to this Agreement of any of the provisions hereof shall be deemed, or shall constitute, a waiver of any other provision, covenant or condition of this Agreement, whether or not similar. No waiver shall be binding unless executed in writing by the party making the waiver.

C. This Agreement shall in all respects be interpreted, enforced and governed by and under the laws of the State of California.

D. If any dispute or claim arising out of or related to this Agreement, or the breach or enforcement thereof, results in a legal action or other proceeding, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

E. All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the second day after mailing if mailed, by first class mail, registered or certified, postage prepaid, and properly addressed as follows:

TO NASI:           Nationwide Automated Systems, Inc.
                   5000 No. Parkway Calabasas, Suite 303
                   Calabasas, CA. 91302

TO LESSOR:

F. This Agreement shall be binding on, and shall inure to, the benefit of the parties to it and their respective heirs, legal representatives,

-4-

successors, and assigns.

G.     The parties hereto each agree to execute, acknowledge and deliver any additional documents and instruments, and to take any other action consistent with the terms of this Agreement that may reasonably be requested by the other party to give effect to the provisions hereof.

H.     This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

I.     If any provision of this Agreement shall be held to be unlawful, void or unenforceable by any court of competent jurisdiction for any reason, such provision or provisions shall be deemed severable from and shall in no way affect the validity or enforceability of the remaining provisions of this Agreement.

J.     ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, OR THE BREACH THEREOF, SHALL BE SETTLED BY ARBITRATION, TO BE CONDUCTED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AT THE REQUEST OF EITHER PARTY, IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION, AND JUDGMENT UPON AN AWARD RENDERED BY THE ARBITRATOR(S) MAY BE RENDERED IN ANY COURT HAVING JURISDICTION THEREOF.

THE PARTIES SHALL HAVE THE RIGHT TO DISCOVERY IN AID OF THE ARBITRATION IN ACCORDANCE WITH CODE OF CIVIL PROCEDURE SECTION 1283.05; PROVIDED, HOWEVER, THAT THE ARBITRATOR'S PERMISSION SHALL NOT BE REQUIRED FOR SUCH DISCOVERY.

EACH OF THE PARTIES RESERVES THE RIGHT TO FILE A JUDICIAL ACTION TO ENABLE THE RECORDING OF A NOTICE OF PENDING ACTION, OR TO APPLY FOR ORDERS OF ATTACHMENT, RECEIVERSHIP, INJUNCTION, OR OTHER PROVISIONAL REMEDIES ON THE GROUNDS THAT THE ARBITRATION AWARD TO WHICH THE APPLICANT MAY BE ENTITLED MAY BE RENDERED INEFFECTUAL IN THE ABSENCE OF SUCH RELIEF.  ANY SUCH ACTION BY A PARTY HERETO SHALL NOT CONSTITUTE A WAIVER OF THE RIGHT TO ARBITRATION UNDER THIS PROVISION.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.

-5-

A California Corporation

By: _Joel Nelles_

Title: PRESIDENT

LESSOR:

By: X _____

Title: LESSOR

# NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1762

## ATM EQUIPMENT PURCHASE AGREEMENT

10/7 , 2013

This undersigned, as BUYER, hereby agrees to purchase from NATIONWIDE AUTOMATED SYSTEMS, INC., ("SELLER"), the automated teller machine(s) ("ATMs") listed and described on "Exhibit A" which will be forth coming within 45 days of this purchase.

The total purchase price to be paid by BUYER to SELLER for the ATMs shall be as follows:

| NUMBER OF ATMs | PRICE PER ATM |
|---|---|
| 29 | 12,000 |

TOTAL PURCHASE PRICE:     $348,000

LESS BUYERS DEPOSIT     $ 344,000

BALANCE DUE ON SIGNING:     $ 0

SELLER shall deliver the ATM(s) to location written on Exhibit A and forwarded to the buyer within sixty (60) days of the date hereof. If SELLER fails to make delivery of the ATM(s) within said sixty (60) day period, BUYER shall be entitled to cancel this contract and to receive a refund of the monies previously paid to SELLER, without interest thereon or deduction therefrom. The refund of BUYER's payments to SELLER shall be BUYER's sole and exclusive remedy hereunder.

SELLER hereby warrants that the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.
A California Corporation

By: _Joel Millis_____

Title: PRESIDENT


By:_____

Title:_____


BUYER:
By: X_____

Title: OWNER

448 Euclid St._____
(Address)
Santa Monica, CA 90402_____


_____
(Telephone Number)
Social Security Number: _ _ _ _ _ _ _ _ _

-2-

Nationwide Automated Systems, Inc.

## ADDENDUM TO OWNER LEASE AGREEMENT

1) If at anytime the owner's ATM machine fails to make enough transactions
   To pay the owner a monthly check equivalent to a twenty (20%) percent
   Annual return on the owner's investment of $12,000. Nationwide Automated
   Systems, Inc. guarantees to pay owner the difference between what the
   Owner has received and $2,400. This is based on a rental fee of $.50
   Per transaction. This is done on an annual basis calculating and commencing
   with the first month of the lease as stated under paragraph 3 of the "ATM
   Equipment Lease Agreement".

2) At anytime after the first two years of ownership, should the owner wish to
   .... Sell his or her ATM's, N.A.S.I guarantees it will purchase said ATM's from
   Owner for the original sales price of $12,000.

Nationwide Automated Systems, Inc.

By _Joel Willis_ _____

Owner

X _____

# NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1762

## ATM EQUIPMENT LEASE AGREEMENT

This agreement ("Agreement") is made as of __10/7_____, 20_13_ by and between NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") and

__Daryl~~██████~~_____("Lessor").

## RECITALS

A.     NASI is in the business of placing, operating and maintaining automated teller machines ("ATMs").

B.     Lessor is the owner of the ATM(s) listed and described on Schedule A which will be forwarded within 45 days.

C.     NASI desires to lease from Lessor the ATM(s) listed and described on Schedule A on the terms and conditions set forth herein.

D.     Lessor desires to lease such ATM(s) to NASI on such terms and conditions.

NOW, THEREFORE, with respect to the foregoing recitals and in consideration of the following, the parties hereto represent, acknowledge and agree as follows:

1.     **Lease of Equipment.** Lessor hereby leases to NASI, and NASI hereby leases from Lessor, the ATM(s) listed and described on Schedule A which will be forwarded to Lessor within forty five (45) days from the date of this Agreement.

2.  **Term.** The initial term of this Agreement shall be for a period of ten (10) years commencing on the date first written above. The Agreement shall be automatically renewed for additional three (3) year periods thereafter unless the lessor provides written notice at least sixty (60) days prior to the end of the initial term or any subsequent renewal term of its desire to terminate this Agreement.

3.    **Rent.** NASI shall pay to Lessor as rent an amount equal to $0.50 for each "approved transaction" (as defined herein) produced by the ATMs for each calendar month during the term of this Agreement.  For purposes of this Agreement, an "approved transaction" is defined as a transaction produced by the ATMs for which the appropriate ATM system, (i.e. STAR, PLUS, CIRRUS, AMEX, VISA, PULSE, etc.), and federal, state and local laws permit a transaction fee to be charged to ATM users.

Commencing with the first month of this Agreement and continuing during its term, including any extensions thereof, NASI shall provide Lessor with an accounting of the number of approved transactions produced by the ATMs during the previous calendar month.  Concurrently therewith, NASI shall pay Lessor the required rent payments as provided for herein. All such accounting and rent payments will be due no later than thirty (30) days after the end of each calendar month.

4.    **Relocation of ATMs.**  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, may relocate with lessors permission any or all of the ATMs to other location(s) in the United States of America at any time or times; provided, however, that prior to moving or relocating any ATM, NASI shall provide Lessor with a thirty (30) day written notice advising it of the new location(s) of the ATMs. Any ATM owned by Lessor that has been terminated by sale of the location or by destruction whereby the ATM becomes non operational, shall be replaced immediately by Nationwide with one or more of their ATMs which is producing a like amount of transactions.

5.    **Operation/Maintenance of ATMs.**  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall operate and maintain the ATMs and provide all services relating thereto.  Such services include, but are not limited to, processing and accounting for all ATM transactions, obtaining, the delivering and loading of cash for the ATMs, and repairing, maintaining and servicing the ATMs.

6.    **Insurance of ATMs.**  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall maintain insurance coverage on the ATMs in an amount not less than the full replacement value of the ATMs. All insurance proceeds on the ATMs shall be payable directly to Nationwide Upon the occurrence of any such insurable event, Nationwide shall immediately replace the ATM.

-2-

NASI shall also maintain liability insurance (both public liability and property damage) covering the operation of the ATMs. NASI shall inform Lessor in writing at least fifteen (l5) days in advance of any policy cancellation.

7. **Indemnity.** NASI shall indemnify and hold Lessor harmless from and against any and all claims, actions, suits, proceedings, costs, expenses, damages, and liabilities, (including attorney's fees), arising out of, connected with, or resulting from the possession, use, operation, maintenance, or repair of the ATMs by NASI, to the fullest extent permitted by law.

8. **Authority/Ownership of Lessor.** Lessor has the right, power, legal capacity and authority to enter into, and perform its obligations under this Agreement, without the approval or consent of any other persons. Lessor is the owner of the ATMs, free and clear of all liens, encumbrances, pledges, security interests, claims, charges, and restrictions of any kind. The ATMs is/are and shall at all times remain the sole and exclusive personal property of Lessor, and NASI shall have no right or interest therein except as expressly set forth in this Agreement.

9. **Taxes/License Fees.** During the term of this Agreement, including any extensions thereof, Nationwide shall pay, prior to delinquency, all personal property taxes assessed against and levied upon the ATMs.

10. **Condition of Equipment.** Lessor makes no representation as to the condition of the ATMs and NASI acknowledges and agrees that all of the ATMs listed on Schedule "A" is/are being leased in its/their "As-Is," "Where-Is" condition, without representations or warranties of any kind by Lessor.

11. **Non-Interference.** During the term of this Agreement, including any extensions thereof, and provided that NASI is not in default under the terms hereof, Lessor agrees not to interfere with the operation of the ATMs by NASI in any manner including, but not limited to, contacting the locations where the ATMs is/are installed and/or any service providers under contract with NASI relating to the operation of such ATMs.

12. **Return of ATMs to Lessor.** Upon termination of this Agreement, NASI

-3-

shall, at its sole cost and expense, deliver the ATMs to Lessor's designation or return the initial investment back to Lessor. This is the option of the Lessor.

13.    Miscellaneous Provisions

A.    This Agreement, including any exhibits and schedules, constitutes the entire Agreement between the parties pertaining to the subject matter contained in it and supersedes any and all prior agreements between them. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all of the parties.

B.    All of the parties' rights and remedies hereunder shall be deemed to be cumulative and not exclusive. No waiver by either party to this Agreement of any of the provisions hereof shall be deemed, or shall constitute, a waiver of any other provision, covenant or condition of this Agreement, whether or not similar. No waiver shall be binding unless executed in writing by the party making the waiver.

C.    This Agreement shall in all respects be interpreted, enforced and governed by and under the laws of the State of California.

D.    If any dispute or claim arising out of or related to this Agreement, or the breach or enforcement thereof, results in a legal action or other proceeding, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

E.    All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the second day after mailing if mailed, by first class mail, registered or certified, postage prepaid, and properly addressed as follows:

TO NASI:        Nationwide Automated Systems, Inc.
                5000 No. Parkway Calabasas, Suite 303
                Calabasas, CA. 91302

TO LESSOR:

F.    This Agreement shall be binding on, and shall inure to, the benefit of the parties to it and their respective heirs, legal representatives,

-4-

successors, and assigns.

G.     The parties hereto each agree to execute, acknowledge and deliver any additional documents and instruments, and to take any other action consistent with the terms of this Agreement that may reasonably be requested by the other party to give effect to the provisions hereof.

H.     This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

I.     If any provision of this Agreement shall be held to be unlawful, void or unenforceable by any court of competent jurisdiction for any reason, such provision or provisions shall be deemed severable from and shall in no way affect the validity or enforceability of the remaining provisions of this Agreement.

J.     ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, OR THE BREACH THEREOF, SHALL BE SETTLED BY ARBITRATION, TO BE CONDUCTED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AT THE REQUEST OF EITHER PARTY, IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION, AND JUDGMENT UPON AN AWARD RENDERED BY THE ARBITRATOR(S) MAY BE RENDERED IN ANY COURT HAVING JURISDICTION THEREOF.

THE PARTIES SHALL HAVE THE RIGHT TO DISCOVERY IN AID OF THE ARBITRATION IN ACCORDANCE WITH CODE OF CIVIL PROCEDURE SECTION 1283.05; PROVIDED, HOWEVER, THAT THE ARBITRATOR'S PERMISSION SHALL NOT BE REQUIRED FOR SUCH DISCOVERY.

EACH OF THE PARTIES RESERVES THE RIGHT TO FILE A JUDICIAL ACTION TO ENABLE THE RECORDING OF A NOTICE OF PENDING ACTION, OR TO APPLY FOR ORDERS OF ATTACHMENT, RECEIVERSHIP, INJUNCTION, OR OTHER PROVISIONAL REMEDIES ON THE GROUNDS THAT THE ARBITRATION AWARD TO WHICH THE APPLICANT MAY BE ENTITLED MAY BE RENDERED INEFFECTUAL IN THE ABSENCE OF SUCH RELIEF. ANY SUCH ACTION BY A PARTY HERETO SHALL NOT CONSTITUTE A WAIVER OF THE RIGHT TO ARBITRATION UNDER THIS PROVISION.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.

-5-

A California Corporation

By: _Joel Mills_
Title: PRESIDENT

LESSOR:
By: X
Title: LESSOR

-6-

⊕ Operations Image Browser (OIB) should be used for large volume photocopy requests

## View Check Copy

Print

| | |
|---|---|
| Check Number | 1403 |
| Date Posted | 11/01/2013 |
| Check Amount | $468,000.00 |

DARYL
SANTA MONICA, CA 90402-2128

**1403**
16-24/1220 5584
8990861927

10/24/13 Date

Pay to the Order of _NATIONWIDE AUTOMATED SYSTEMS_ $ 468,000 00

_Four hundred and sixty eight thousand + 00/100_ Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
California
wellsfargo.com

For _39 ATMS_

⑈122016066<
0248 81655 1181

PAY TO THE ORDER OF
CITY NATIONAL BANK
120016066
FOR DEPOSIT ONLY
NATIONWIDE AUTOMATED
SYSTEMS, INC.
022414410

# Check Images



REF#2247215023 CK# 143 2060.00

REF#8810520834 CK# 1403 468000.00

REF# 1405 8000.00

1406 300.00

REF# CK# 1407 1500.00

EOPCKTDHF1 015918 NNNNNNNNNN NNN NNN 005 007 114 180245 10737819.1.1



FEDERAL BUREAU OF INVESTIGATION

Date of entry   10/15/2014

        ADAM K███████ ("K██████"), date of birth ████████1973, residing a█████████
█████████████ Hidden Hills, California, cellular phone number
████████, e-mail address ████████████████ was interviewed at his
residence.  Also present during the interview was K██████'s attorney, JAY
BETTINGER ("BETTINGER"), office 1401 Dove Street, Suite 450, Newport Beach,
California, cellular phone number (213)300-0050, e-mail address
jay@bettingerlaw.com.  After being advised of the identity of the
interviewing Agents and the nature of the interview, K██████ provided the
following information:

        K██████ bought Lakers basketball tickets from ALBERT NASSI ("NASSI").
NASSI referred K██████ to his friend, MARK SOFFA ("SOFFA") about an
investment with NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI").  SOFFA owned
FUEL DOCTOR, which JOEL GILLIS ("GILLIS") and EDWARD WISHNER ("WISHNER")
are partners in.

        K██████ went to meet SOFFA in the summer of 2013 at his office in
Calabasas, California, that was down the street from NASI.  SOFFA told
K██████ that he and his family have $300,000 worth of ATMs from NASI, and
the ATMs have been generating at least a 20% return.  SOFFA told K██████
that NASI ATMs were scarce, but if K██████ were interested, he would
introduce him to GILLIS.  After the NASI trouble started, K██████ found out
from SOFFA that he personally did not own any ATMs, but it was his family
that owned NASI ATMs.

        K██████ met with GILLIS shortly after meeting with SOFFA.  K██████ went
to GILLIS' office in Calabasas.  GILLIS said the investment was an ATM
leaseback.  GILLIS said that K██████ would be buying an ATM, and he would
have the option to sell back the ATM to NASI to get the original capital
that was put in after 24 months.  GILLIS guaranteed a 20% return on the
ATMs.  K██████ stated that he later received interest checks that averaged
about 30%.  GILLIS explained that ATMs placed in hotels had higher

Investigation on   10/09/2014   at   Hidden Hills, California, United States (In Person)

File #  3 █████████████████                                    Date drafted  10/09/2014

by   WU EUGENE P., Amie C. Stemen

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

transaction fees.  If the fee was $3.50, the investor received 50 cents, the hotel received 50 cents, and NASI received the remainder.  The fee allocation did not change for ATMs in convenience stores even though transaction fees were lower than hotel ATMs.  GILLIS said the remainder of what NASI received from transaction fees went towards insurance, the ATM service-provider, money for filling the ATMs, and armored-car service. GILLIS did not discuss what his profits were.  GILLIS said that he had been around in the industry for 20 years.  GILLIS offered names of people to K██████ who would verify that they had been receiving timely payments from NASI.  GILLIS said WISHNER was his partner, who was also an accountant. K██████ wanted profitable locations for his ATMs, and asked GILLIS if he had any control of where it was placed.  GILLIS replied that K██████ had no control, but that the ATMs were guaranteed a 20% return and if the number of monthly transactions did not meet at least a 20% return, he would make up the difference.  GILLIS said they had a switch board that notified them when an ATM needed to be serviced or filled with money.  GILLIS gave a copy of a purchase contract to K██████ at the end of their meeting.  K██████ then emailed it to BETTINGER.

K██████ only saw GILLIS in the NASI office and thought it was odd for one person to run such a large business.  There was not even a secretary. K██████ thought that the NASI office was not impressive.  K██████ then started do his due diligence on NASI.  There were a few red flags: NASI had no audited financials, the contract was not sophisticated, NASI's website seemed very basic, and the only thing he found on Google was one post about NASI.

BETTINGER stated that he looked at the purchase contract and told K██████ it was a dangerous investment.  BETTINGER looked on the internet and saw there were ATM leaseback scams.  BETTINGER and K██████ made a telephone conference call to GILLIS, and BETTINGER asked to modify the purchase contract.  GILLIS said the contract could not be modified, "take it or leave it."  BETTINGER asked to talk NASI's bank, which was City National Bank.  BETTINGER called City National Bank, and City National Bank verified that NASI was their client, but it was not authorized to talk about NASI's accounts.  GILLIS said banks did not give loans to finance ATMs because banks could not use ATMs as collateral.  GILLIS said that maybe more ATMs would come up in the future if K██████ did not want to invest.  According to BETTINGER, GILLIS made the ATMs seem limited, and the time given to K██████ to purchase the ATMs was also limited.  GILLIS said it was near the end of the month, and K██████ had to decide soon.  GILLIS remarked that he did not need K██████'s money.  BETTINGER asked GILLIS why there was a non-interference clause in the contract, and GILLIS replied that it was too difficult to deal with people calling about the ATMs all the time.  GILLIS also said NASI was allowed to move the ATMs to different

50