locations. GILLIS said the investment was guaranteed personally by him anyway. GILLIS said that if K██████ did not like the investment, he would give K██████ back his money. BETTINGER ultimately thought it was not uncommon for K██████R to take risks in investments. BETTINGER also thought he and K██████R could operate their own ATMs.

K██████ has a personal wealth banker at Morgan Stanley. K██████'s income is two-thirds fixed, so he thought the NASI investment would generate good supplemental income. K██████ thought that he was not putting all his eggs in one basket. After consulting with BETTINGER and his banker, K██████ ultimately bought ATMs from NASI in batches.

K██████ made his initial investment with NASI in July 2013. K██████ returned the signed contract in person to GILLIS. K██████ wired $1,000,000 from his CITIBANK account to NASI's bank account at City National Bank. K██████ purchased 83 ATMs for $12,000 each. KASOWER received $4,000 back from NASI. After K██████ received from NASI a list of ATMs that he owned, he remarked that they were in places he would never visit. GILLIS said to K██████ at their meeting that people did not have easy access to banks in small towns and that people went to convenience store ATMs to take out money. GILLIS said people normally took out $20 every few days and they were charged a fee every time. These people were not intelligent enough to know they were charged every time. This made sense to K██████. K██████ went on Google and typed in the name of the store and its location of where his ATM was supposed to be to verify if the store was actually there.

K██████ then made a second investment with NASI and purchased 90 ATMs for $1,080,000. The second contract was dated October 8, 2013. The total amount was made over two payments; K██████ wired $600,000 from his CITIBANK account and $480,000 from his Morgan Stanley account to NASI.

SOFFA always complained that he never received anything from NASI to K██████'s friend, TERRY HELLER ("HELLER"). HELLER told K██████ to do something nice for SOFFA. K██████ decided to buy a Rolex watch for about $10,000 to $14,000 for SOFFA. K██████ simply did this as a nice gesture. K██████ has an e-mail from SOFFA written around September or October 2013, that said he was wearing the gift that K██████ gave him.

Prior to making a third investment with NASI, K██████ spoke with SOFFA and SOFFA said that he was helping GILLIS because NASI used a legacy system. SOFFA said NASI was signing up around 80 to 100 people a year, so K██████ thought NASI could not be a Ponzi scheme as there were not enough people to pay large investors like K██████. SOFFA said to K██████ that he saw contracts between NASI and Hilton Hotels, and other hotel chains. K██████ asked SOFFA for copies of the contracts with the hotels. SOFFA photocopied the contracts and brought them to K██████. K██████ showed the

51


documents to the Agents.  The letter was printed on Hilton letterhead and dated January 16, 2002.  After K▓▓▓▓ read in the document that Hilton Hotels did an extensive review of NASI's background, he believed in NASI.  The letter was signed by JAN HUMBLE, as the Director of Leasing.  K▓▓▓▓ looked on the internet today and saw that JAN HUMBLE was Hilton's current Director of Leasing, so he questioned whether or not the document was real as JAN HUMBLE would have been in the same position for the last 12 years.

K▓▓▓▓ made a third investment at the end of January 2014 with NASI and purchased 95 ATMs for $12,000 each.  K▓▓▓▓ wired $1,000,000 and then an additional $140,000 to NASI.

K▓▓▓▓ was shown copies of wires from his accounts to NASI.  K▓▓▓▓ verified that he made the payments to NASI.  The documents have been electronically attached to this report.

K▓▓▓▓'s friend, JEFF ▓▓▓▓ (▓▓▓▓▓, who also invested with NASI, went to Michigan and took a picture of the ATM he owned from NASI and sent it to K▓▓▓▓.

K▓▓▓▓ received monthly payments from NASI every month.  The interest check that arrived in August 2014 came late.  K▓▓▓▓ received a letter in the mail from NASI that told people not to call NASI about interest checks because it was having an administrative issue.  K▓▓▓▓ opined that the letter was aggressive.  K▓▓▓▓ finally received an interest check around August 10, 2014.  K▓▓▓▓ deposited the check without issue.  K▓▓▓▓'s mother-in-law, AILEEN ▓▓▓▓▓▓▓▓▓▓ ("AILEEN"), and her son, CHARLES ▓▓▓▓▓ ("CHARLES"), also invested $300,000 each with NASI.  AILEEN's check did not bounce, but CHARLES' check bounced.

Since the troubles with NASI have unraveled in the last six weeks, K▓▓▓▓ went to SOFFA to ask what was going on.  SOFFA told K▓▓▓▓ that he did not know anything.  K▓▓▓▓ asked if SOFFA got any referral fees.  SOFFA replied that he never received any of K▓▓▓▓R's investment.  SOFFA eventually said that he was paid as a consultant to NASI.  SOFFA then finally said he had an agreement with NASI to receive $200 per ATM per year, for five years.

By September 2014, K▓▓▓▓ did not get an interest check.  K▓▓▓▓ called and emailed GILLIS in September asking why he did not get a check.  GILLIS did not respond.  K▓▓▓▓ then received a letter from NASI about an SEC subpoena.  K▓▓▓▓ forwarded everything to BETTINGER.

K▓▓▓▓ knew that GILLIS and WISHNER went to Marmalade Café every morning and saw them there on occasion.  K▓▓▓▓ went to Marmalade Café and the NASI office to look for GILLIS, but the NASI office was closed and


people had not seen GILLIS at the café.

K▓▓▓▓, ▓▓▓▓, and ▓▓▓▓ decided to go to WISHNER's office in mid-September 2014. K▓▓▓▓ found WISHNER at his office in Woodland Hills, California. There were four Filipino females working in WISHNER's office. There were about six investors also in the office; one complained that they were going to lose their house. WISHNER said to everyone that there was no more money. Even though WISHNER said there was no more money, he wrote checks to the investors who complained. K▓▓▓▓ said it was like a scene out of a movie. K▓▓▓▓ did not ask for a check but asked WISHNER if there was no more money, how everyone would get paid. WISHNER said he would make restitution. K▓▓▓▓ asked WISHNER if he was taking new investors' money to pay old investors. WISHNER said yes. K▓▓▓▓ then asked if there were actually 25,000 NASI ATMs, and WISHNER said around that many existed. K▓▓▓▓ asked WISHNER if there was any chance that different investors owned the same ATM, and WISHNER said absolutely not. WISHNER said that GILLIS could confirm that as well. An investor who was present at WISHNER's office showed a statement with the same serial and location as another investor's ATM. WISHNER made it seem like it was GILLIS who was in charge, and that he would talk to GILLIS. WISHNER said he was going to meet with a criminal attorney the next day. WISHNER said he would send out a letter to everyone letting them know what was going to happen. K▓▓▓▓ thought that WISHNER was sincere in his answers.

WISHNER then reached into his desk drawer and pulled out his passport. WISHNER told everyone there that he was thinking of leaving the country but after having a sit-down with his family, he said that he was 75 years old and would rather see his family on weekends than not at all. HARRIS and HELLER were also present during all of this. When K▓▓▓▓ ▓▓▓▓, and ▓▓▓▓ walked out of WISHNER's office, they saw WISHNER's son who owned a pizzeria next door to WISHNER's office. They told the son that WISHNER was going to jail, but the son did not respond.

▓▓▓▓' phone number is (8▓▓▓▓▓▓3. H▓▓▓▓ and his father invested about $2,100,000 with NASI. ▓▓▓▓'s phone number is (9▓▓▓▓▓▓0. H▓▓▓▓ invested about $145,000.

K▓▓▓▓ would not have invested with NASI if he had known that his money was used to pay other investors their guaranteed interest, that NASI was not profitable, or that his money was not used to purchase his ATMs.

BETTINGER stated that R▓▓▓▓ K▓▓▓▓ contacted BETTINGER to get advice regarding his investment. In addition, BETTINGER noted that K▓▓▓▓ was telling other investors not to talk to the FBI for fear that the investors would lose their money.



Continuation of FD-302 of <u>Interview of ADAM KA██████</u> , On <u>10/09/2014</u> , Page <u>6 of 6</u>

    KA██████ and BETTINGER emailed documents related to KA██████'s investment with NASI to the Agents.  They have been electronically attached to this report.

# NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1762

## ATM EQUIPMENT PURCHASE AGREEMENT

_7-19_____, 20_13_

    This undersigned, as BUYER, hereby agrees to purchase from NATIONWIDE AUTOMATED SYSTEMS, INC., ("SELLER"), the automated teller machine(s) ("ATMs") listed and described on "Exhibit A" which will be forth coming within 45 days of this purchase.

    The total purchase price to be paid by BUYER to SELLER for the ATMs shall be as follows:

| NUMBER OF ATMs | PRICE PER ATM |
|---|---|
|  | $12,000 |

TOTAL PURCHASE PRICE:      $ $1,000,000

LESS BUYERS DEPOSIT      $_____

BALANCE DUE ON SIGNING:      $_____

    SELLER shall deliver the ATM(s) to location written on Exhibit A and forwarded to the buyer within sixty (60) days of the date hereof. If SELLER fails to make delivery of the ATM(s) within said sixty (60) day period, BUYER shall be entitled to cancel this contract and to receive a refund of the monies previously paid to SELLER, without interest thereon or deduction therefrom. The refund of BUYER's payments to SELLER shall be BUYER's sole and exclusive remedy hereunder.

    SELLER hereby warrants that the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.
A California Corporation

By: _Joel Gillis_____
Title: PRESIDENT


By:_____
Title:_____


BUYER:
By: X_____
Title: OWNER


_____
(Address)
_____

_____
(Telephone Number)
Social Security Number: ~~████████~~

-2-

# NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1762

## ATM EQUIPMENT LEASE AGREEMENT

This agreement ("Agreement") is made as of _7-19_____, 20_13_ by and between NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") and _____Adam K█████████_____ ("Lessor").

## RECITALS

A.    NASI is in the business of placing, operating and maintaining automated teller machines ("ATMs").

B.    Lessor is the owner of the ATM(s) listed and described on Schedule A which will be forwarded within 45 days.

C.    NASI desires to lease from Lessor the ATM(s) listed and described on Schedule A on the terms and conditions set forth herein.

D.    Lessor desires to lease such ATM(s) to NASI on such terms and conditions.

NOW, THEREFORE, with respect to the foregoing recitals and in consideration of the following, the parties hereto represent, acknowledge and agree as follows:

1.    Lease of Equipment.  Lessor hereby leases to NASI, and NASI hereby leases from Lessor, the ATM(s) listed and described on Schedule A which will be forwarded to Lessor within forty five (45) days from the date of this Agreement.

2. Term.  The initial term of this Agreement shall be for a period of ten (10) years commencing on the date first written above.  The Agreement shall be automatically renewed for additional three (3) year periods thereafter unless the lessor provides written notice at least sixty (60) days prior to the end of the initial term or any subsequent renewal term of its desire to terminate this Agreement.

3.     Rent.  NASI shall pay to Lessor as rent an amount equal to $0.50 for each "approved transaction" (as defined herein) produced by the ATMs for each calendar month during the term of this Agreement.  For purposes of this Agreement, an "approved transaction" is defined as a transaction produced by the ATMs for which the appropriate ATM system, (i.e. STAR, PLUS, CIRRUS, AMEX, VISA, PULSE, etc.), and federal, state and local laws permit a transaction fee to be charged to ATM users.

Commencing with the first month of this Agreement and continuing during its term, including any extensions thereof, NASI shall provide Lessor with an accounting of the number of approved transactions produced by the ATMs during the previous calendar month.  Concurrently therewith, NASI shall pay Lessor the required rent payments as provided for herein.  All such accounting and rent payments will be due no later than thirty (30) days after the end of each calendar month.

4.  Relocation of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, may relocate with lessors permission any or all of the ATMs to other location(s) in the United States of America at any time or times; provided, however, that prior to moving or relocating any ATM, NASI shall provide Lessor with a thirty (30) day written notice advising it of the new location(s) of the ATMs. Any ATM owned by Lessor that has been terminated by sale of the location or by destruction whereby the ATM becomes non operational, shall be replaced immediately by Nationwide with one or more of their ATMs which is producing a like amount of transactions.

5.     Operation/Maintenance of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall operate and maintain the ATMs and provide all services relating thereto.  Such services include, but are not limited to, processing and accounting for all ATM transactions, obtaining, the delivering and loading of cash for the ATMs, and repairing, maintaining and servicing the ATMs.

6.     Insurance of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall maintain insurance coverage on the ATMs in an amount not less than the full replacement value of the ATMs.  All insurance proceeds on the ATMs shall be payable directly to Nationwide Upon the occurrence of any such insurable event, Nationwide shall immediately replace the ATM.

-2-

NASI shall also maintain liability insurance (both public liability and property damage) covering the operation of the ATMs. NASI shall inform Lessor in writing at least fifteen (15) days in advance of any policy cancellation.

7.    **Indemnity.** NASI shall indemnify and hold Lessor harmless from and against any and all claims, actions, suits, proceedings, costs, expenses, damages, and liabilities, (including attorney's fees), arising out of, connected with, or resulting from the possession, use, operation, maintenance, or repair of the ATMs by NASI, to the fullest extent permitted by law.

8.    **Authority/Ownership of Lessor.** Lessor has the right, power, legal capacity and authority to enter into, and perform its obligations under this Agreement, without the approval or consent of any other persons. Lessor is the owner of the ATMs, free and clear of all liens, encumbrances, pledges, security interests, claims, charges, and restrictions of any kind. The ATMs is/are and shall at all times remain the sole and exclusive personal property of Lessor, and NASI shall have no right or interest therein except as expressly set forth in this Agreement.

9. **Taxes/License Fees.**    During the term of this Agreement, including any extensions thereof, Nationwide shall pay, prior to delinquency, all personal property taxes assessed against and levied upon the ATMs.

10.    **Condition of Equipment.** Lessor makes no representation as to the condition of the ATMs and NASI acknowledges and agrees that all of the ATMs listed on Schedule "A" is/are being leased in its/their "As-Is," "Where-Is" condition, without representations or warranties of any kind by Lessor.

11.    **Non-Interference.** During the term of this Agreement, including any extensions thereof, and provided that NASI is not in default under the terms hereof, Lessor agrees not to interfere with the operation of the ATMs by NASI in any manner including, but not limited to, contacting the locations where the ATMs is/are installed and/or any service providers under contract with NASI relating to the operation of such ATMs.

12.    **Return of ATMs to Lessor.** Upon termination of this Agreement, NASI

-3-

shall, at its sole cost and expense, deliver the ATMs to Lessor's designation or return the initial investment back to Lessor. This is the option of the Lessor.

13. Miscellaneous Provisions

A. This Agreement, including any exhibits and schedules, constitutes the entire Agreement between the parties pertaining to the subject matter contained in it and supersedes any and all prior agreements between them. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all of the parties.

B. All of the parties' rights and remedies hereunder shall be deemed to be cumulative and not exclusive. No waiver by either party to this Agreement of any of the provisions hereof shall be deemed, or shall constitute, a waiver of any other provision, covenant or condition of this Agreement, whether or not similar. No waiver shall be binding unless executed in writing by the party making the waiver.

C. This Agreement shall in all respects be interpreted, enforced and governed by and under the laws of the State of California.

D. If any dispute or claim arising out of or related to this Agreement, or the breach or enforcement thereof, results in a legal action or other proceeding, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

E. All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the second day after mailing if mailed, by first class mail, registered or certified, postage prepaid, and properly addressed as follows:

TO NASI:     Nationwide Automated Systems, Inc.
             5000 No. Parkway Calabasas, Suite 303
             Calabasas, CA. 91302

TO LESSOR:   Adam K███████ _____

             _____

F. This Agreement shall be binding on, and shall inure to, the benefit of the parties to it and their respective heirs, legal representatives,

-4-

successors, and assigns.

G. The parties hereto each agree to execute, acknowledge and deliver any additional documents and instruments, and to take any other action consistent with the terms of this Agreement that may reasonably be requested by the other party to give effect to the provisions hereof.

H. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

I. If any provision of this Agreement shall be held to be unlawful, void or unenforceable by any court of competent jurisdiction for any reason, such provision or provisions shall be deemed severable from and shall in no way affect the validity or enforceability of the remaining provisions of this Agreement.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.
A California Corporation

By: _Joel Kelly_

Title: PRESIDENT

LESSOR:

By:_X_ _Adm Km_

Title: LESSOR

-5-

Nationwide Automated Systems, Inc.

ADDENDUM TO OWNER LEASE AGREEMENT

This Addendum supersedes any and all paragraphs in the Owner Lease Agreement.

1) If at anytime the owner's ATM machine fails to make enough transactions
To pay the owner a monthly check equivalent to a twenty (20%) percent
Annual return on the owner's investment of $12,000. Nationwide Automated
Systems, Inc. guarantees to pay owner the difference between what the
Owner has received and $2,400. This is based on a rental fee of $.50
Per transaction. This is done on an annual basis calculating and commencing
with the first month of the lease as stated under paragraph 3 of the "ATM
Equipment Lease Agreement."

2) At anytime after the first two years of ownership, should the owner wish to
.... Sell his or her ATM's, N.A.S.I guarantees it will purchase said ATM's from
Owner for the original sales price of $12,000.

Nationwide Automated Systems, Inc.

By _Joel Tells_ 7-19-13

Owner
By X _A. Km_ 07/23/13

62

BNK: CNB      SND DATE: 130730              VAL: 130730            TRN: 130730-00002402
AMT: $1,000,000.00                         CUR: USD               FOR AMT: 1,000,000.00
SRC: FED      ADV: LTR      TYP: FTR        LOC:                  CHECK NUM:

| | |
|---|---|
| DBT: A/021000089 | CDT: D/022414410 |
| ACC: G/09811201000                    ON FILE: Y | ACC: D/022414410                      ON FILE: Y |
| DEPT: 098                             CTRY: | DEPT: 022                            CTRY: |
| CITIBANK, NEW YORK | NATIONWIDE AUTOMATED SYSTEMS, INC. |
| 111 WALL ST | (GENERAL ACCOUNT) |
| NEW YORK, NY | 5000 N PARKWAY CALABASAS SUITE 303 |
| | CALABASAS CA 91302 |
| SEND: | |
| SNDR REF NUM: LCT32110349000 | BNF:                                   BK: N |
| | |
| ORIG BNK: /40611172 | |
| MORGAN STANLEY | |
| REF NUM: | |
| | |
| ORIG: /2371326160 | |
| MR ADAM K███████████ | |
| EXPRESS CREDIT LINE ACCOUNT | |
| ██████████████ | |
| AGOURA HILLS C██████████8 | |
| REF NUM: | |

BNK: CNB       SND DATE: 131030                 VAL: 131030              TRN: 131030-00002854
AMT: $600,000.00                                CUR: USD                FOR AMT: 600,000.00
SRC: FED       ADV: LTR        TYP: FTR         LOC:                    CHECK NUM:

DBT: A/021000089                                        CDT: D/022414410
ACC: G/098102408287               ON FILE: Y            ACC: D/022414410                  ON FILE: Y
DEPT: 098                         CTRY:                 DEPT: 022                          CTRY:
CITIBANK, NEW YORK                                      NATIONWIDE AUTOMATED SYSTEMS, INC.
111 WALL ST                                             (GENERAL ACCOUNT)
NEW YORK, NY                                            5000 N PARKWAY CALABASAS SUITE 303
                                                        CALABASAS CA 91302
SEND:
SNDR REF NUM: LCT33030342600                            BNF:                               BK: N

ORIG BNK: /40611172
MORGAN STANLEY
REF NUM:

ORIG: /2371324040
MR ADAM ▓▓▓ K▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓ St.
AGOURA HILLS CA ▓▓▓▓▓▓▓▓▓
REF NUM:

BNK: CNB      SND DATE: 140203          VAL: 140203          TRN: 140203-00006842
AMT: $140,000.00                      CUR: USD            FOR AMT: 140,000.00
SRC: FED      ADV: LTR      TYP: FTR        LOC:                  CHECK NUM:

DBT: A/021000089                          CDT: D/022414410
ACC: G/098102408287          ON FILE: Y      ACC: D/022414410            ON FILE: Y
DEPT: 098                        CTRY:           DEPT: 022                        CTRY:
CITIBANK, NEW YORK                    NATIONWIDE AUTOMATED SYSTEMS, INC.
111 WALL ST                           (GENERAL ACCOUNT)
NEW YORK, NY                         5000 N PARKWAY CALABASAS SUITE 303
                                        CALABASAS CA 91302

SEND:
SNDR REF NUM: LCT40340778600              BNF:                            BK: N

ORIG BNK: /40611172
MORGAN STANLEY
REF NUM:

ORIG: /2371574190
ADAM ░░░ K░░░░░░ TTEE
░░░░░░░░░░░░░
AGOURA HILLS CA ░░░░░░
REF NUM:

1   GARY Y. LEUNG, *L.R. 83-2.4.1 leave to practice granted*
    Email: leungg@sec.gov
2   PETER F. DEL GRECO (Cal. Bar No. 164925)
    Email: delgrecop@sec.gov
3
    Attorneys for Plaintiff
4   Securities and Exchange Commission
    Michele Wein Layne, Regional Director
5   Lorraine Echavarria, Associate Regional Director
    John W. Berry, Regional Trial Counsel
6   5670 Wilshire Boulevard, 11th Floor
    Los Angeles, California 90036
7   Telephone: (323) 965-3998
    Facsimile: (323) 965-3908

8

9                    **UNITED STATES DISTRICT COURT**

10                  **CENTRAL DISTRICT OF CALIFORNIA**

11                        CV14   07249-SJO(FFMx)

12

13   SECURITIES AND EXCHANGE
     COMMISSION,
14
                    Plaintiff,                **DECLARATION OF SHELDON APPEL**
15
            vs.
16
     NATIONWIDE AUTOMATED
17   SYSTEMS, INC., JOEL GILLIS, and
     EDWARD WISHNER,
18
                    Defendants,
19
20                  and

21   OASIS STUDIO RENTALS, LLC,
     OASIS STUDIO RENTALS #2, LLC,
22   and OASIS STUDIO RENTALS #3,
     LLC,
23
24                  Relief Defendants.

25

26

27

28

DECLARATION OF SHELDON APPEL      1

## DECLARATION OF SHELDON APPEL

I, Sheldon Appel, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.     I have personal knowledge of the matters set forth herein and, if called as a witness, could and would competently testify hereto under oath.

2.     I live in Los Angeles County, California, and became an investor with Nationwide Automated Systems, Inc. ("NASI") in or around August 2013. Prior to my investment, my daughters were investors with NASI. They told me about the large guaranteed returns that NASI provided, and encouraged me to invest. I was initially skeptical of the investment, but based on my daughters' history with NASI, as well as positive things I had heard about the company from some of my friends, I decided to consider investing.

3.     During the summer of 2013, I met with Joel Gillis, whom I believe controlled NASI, at his office in Calabasas, California. Gillis explained that NASI could provide a 20% annual guaranteed rate of return. He told me that my funds would be used to purchase ATMs that I would own outright. I would then lease the machines back to NASI, which would manage the machines and pay me monthly returns of $.50 per transaction for every machine I owned. To the extent my ATMs did not generate enough revenues in transaction fees to provide me with a 20% annual return on my investment, NASI would make up the difference.

4.     I was suspicious of how NASI could guarantee a 20% rate of return, and asked Gillis how the company made up the difference to investors in the event their ATMs didn't service enough transactions to support a 20% rate of return. Gillis explained to me that all of the ATMs charged a transaction fee much larger than the $.50 being returned to investors. He said that most of the ATMs charged in the range of $2.50 to $3.00 per ATM transaction, and NASI received that entire amount less the $.50 it returned to investors. Therefore, in the event the $.50 return per transaction was not enough to provide a 20% annual rate of return, NASI

had plenty of additional funds in the form of the larger ATM fees they received, to make up the difference. Gillis also told me that if I was unhappy with my investment, I could get out at any time and have my funds returned.

5. Gillis was a smooth talker, and his explanation made sense to me at the time, so I decided to invest. In or around August 2013, I invested $99,000 to purchase five ATMs from NASI in the name of the Sheldon and Carol Appel Family Foundation, for which I act as Trustee. As part of my investment, Gillis provided me with a signed contract that listed several specific ATMs on an exhibit to the agreement. To the best of my knowledge, the document attached hereto as Exhibit A is a true and correct copy of my agreement with NASI. Based on the terms of the agreement, as well as the explanation Gillis provided me during our conversation in his office, I believed that our family foundation owned all of the ATMs listed in Exhibit A.

6. Shortly after investing, I became uncomfortable with my NASI investments. Something just didn't seem right to me, especially because I could never truly confirm that I owned the ATMs I had been promised. My daughter called some of the businesses at which my ATMs were supposedly located, and while they confirmed that ATMs existed in their stores, they could never provide any information that would confirm my ownership of the ATMs.

2

7.    I contacted Gillis and asked to get out of the investment, but despite
the fact that he initially told me I could get out at any time, he said the terms of the
contract precluded me from doing so for at least two years.  Because my daughters
had been investors for over two years, they sold some of their ATMs back to Gillis,
and used the money to buy the ATMs I had purchased.


I declare under penalty of perjury under the laws of the United States that
the foregoing is true and correct.  Executed on September 12, 2014.

SHELDON APPEL

3



## NATIONWIDE AUTOMATED SYSTEMS, INC.



6000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1782

<u>ATM EQUIPMENT LEASE AGREEMENT</u>

This agreement ("Agreement") is made as of _August 1st_ 20 13 by and between NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") and _Shalimer and Arfa Family Foundation_ ("Lessor").

<u>RECITALS</u>

A.    NASI is in the business of placing, operating and maintaining automated teller machines ("ATMs").

B.    Lessor is the owner of the ATM(s) listed and described on Schedule A which will be forwarded within 45 days.

C.    NASI desires to lease from Lessor the ATM(s) listed and described on Schedule A on the terms and conditions set forth herein.

D.    Lessor desires to lease such ATM(s) to NASI on such terms and conditions.

NOW, THEREFORE, with respect to the foregoing recitals and in consideration of the following, the parties hereto represent, acknowledge and agree as follows:

1.    Lease of Equipment. Lessor hereby leases to NASI, and NASI hereby leases from Lessor, the ATM(s) listed and described on Schedule A which will be forwarded to Lessor within forty five (45) days from the date of this Agreement.

2. Term. The initial term of this Agreement shall be for a period of ten (10) years commencing on the date first written above.  The Agreement shall be automatically renewed for additional three (3) year periods thereafter unless the lessor provides written notice at least sixty (60) days prior to the end of the initial term or any subsequent renewal term of its desire to terminate this Agreement.

3.     Rent.  NASI shall pay to Lessor as rent an amount equal to $0.50 for each "approved transaction" (as defined herein) produced by the ATMs for each calendar month during the term of this Agreement.   For purposes of this Agreement, an "approved transaction" is defined as a transaction produced by the ATMs for which the appropriate ATM system, (i.e STAR, PLUS, CIRRUS, AMEX, VISA, PULSE, etc.), and federal, state and local laws permit a transaction fee to be charged to ATM users.

Commencing with the first month of this Agreement and continuing during its term, including any extensions thereof, NASI shall provide Lessor with an accounting of the number of approved transactions produced by the ATMs during the previous calendar month.  Concurrently therewith, NASI shall pay Lessor the required rent payments as provided for herein.  All such accounting and rent payments will be due no later than thirty (30) days after the end of each calendar month.

4.     Relocation of ATMs.   During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, may relocate with lessors permission any or all of the ATMs to other location(s) in the United States of America at any time or times; provided, however, that prior to moving or relocating any ATM, NASI shall provide Lessor with a thirty (30) day written notice advising it of the new location(s) of the ATMs. Any ATM owned by Lessor that has been terminated by sale of the location or by destruction whereby the ATM becomes non operational, shall be replaced immediately by Nationwide with one or more of their ATMs which is producing a like amount of transactions.

5.     Operation/Maintenance of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall operate and maintain the ATMs and provide all services relating thereto.  Such services include, but are not limited to, processing and accounting for all ATM transactions, obtaining, the delivering and loading of cash for the ATMs, and repairing, maintaining and servicing the ATMs.

6.     Insurance of ATMs.  During the term of this Agreement, including any extensions thereof, NASI, at its sole cost and expense, shall maintain insurance coverage on the ATMs in an amount not less than the full replacement value of the ATMs. All insurance proceeds on the ATMs shall be payable directly to Nationwide Upon the occurrence of any such insurable event, Nationwide shall immediately replace the ATM.

-2-

NASI 0020654

Exhibit A Page 5

72

NASI shall also maintain liability insurance (both public liability and property damage) covering the operation of the ATMs. NASI shall inform Lessor in writing at least fifteen (15) days in advance of any policy cancellation.

7.   Indemnity.  NASI shall indemnify and hold Lessor harmless from and against any and all claims, actions, suits, proceedings, costs, expenses, damages, and liabilities, (including attorney's fees), arising out of, connected with, or resulting from the possession, use, operation, maintenance, or repair of the ATMs by NASI, to the fullest extent permitted by law.

8.   Authority/Ownership of Lessor.  Lessor has the right, power, legal capacity and authority to enter into, and perform its obligations under this Agreement, without the approval or consent of any other persons.  Lessor is the owner of the ATMs, free and clear of all liens, encumbrances, pledges, security interests, claims, charges, and restrictions of any kind.  The ATMs is/are and shall at all times remain the sole and exclusive personal property of Lessor, and NASI shall have no right or interest therein except as expressly set forth in this Agreement.

9.  Taxes/License Fees.   During the term of this Agreement, including any extensions thereof, Nationwide shall pay, prior to delinquency, all personal property taxes assessed against and levied upon the ATMs.

10.   Condition of Equipment.  Lessor makes no representation as to the condition of the ATMs and NASI acknowledges and agrees that all of the ATMs listed on Schedule "A" is/are being leased in its/their "As-Is," "Where-Is" condition, without representations or warranties of any kind by Lessor.

11.   Non-Interference.  During the term of this Agreement, including any extensions thereof, and provided that NASI is not in default under the terms hereof, Lessor agrees not to interfere with the operation of the ATMs by NASI in any manner including, but not limited to, contacting the locations where the ATMs is/are installed and/or any service providers under contract with NASI relating to the operation of such ATMs.

12.   Return of ATMs to Lessor.  Upon termination of this Agreement, NASI

-3-

NASI 0020655

Exhibit A Page 6

73

shall, at its sole cost and expense, deliver the ATMs to Lessor's designation or return the initial investment back to Lessor. This is the option of the Lessor.

13.   Miscellaneous Provisions

A.   This Agreement, including any exhibits and schedules, constitutes the entire Agreement between the parties pertaining to the subject matter contained in it and supersedes any and all prior agreements between them. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all of the parties.

B.   All of the parties' rights and remedies hereunder shall be deemed to be cumulative and not exclusive. No waiver by either party to this Agreement of any of the provisions hereof shall be deemed, or shall constitute, a waiver of any other provision, covenant or condition of this Agreement, whether or not similar. No waiver shall be binding unless executed in writing by the party making the waiver.

C.   This Agreement shall in all respects be interpreted, enforced and governed by and under the laws of the State of California.

D.   If any dispute or claim arising out of or related to this Agreement, or the breach or enforcement thereof, results in a legal action or other proceeding, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.

E.   All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the second day after mailing if mailed, by first class mail, registered or certified, postage prepaid, and properly addressed as follows:

TO NASI:        Nationwide Automated Systems, Inc.
                5000 No. Parkway Calabasas, Suite 303
                Calabasas, CA. 91302

TO LESSOR:      _____
                _____


F.   This Agreement shall be binding on, and shall inure to, the benefit of the parties to it and their respective heirs, legal representatives,

-4-

NASI 0020656
Exhibit A Page 7

74

successors, and assigns.

G.    The parties hereto each agree to execute, acknowledge and deliver any additional documents and instruments, and to take any other action consistent with the terms of this Agreement that may reasonably be requested by the other party to give effect to the provisions hereof.

H.    This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

I.    If any provision of this Agreement shall be held to be unlawful, void or unenforceable by any court of competent jurisdiction for any reason, such provision or provisions shall be deemed severable from and shall in no way affect the validity or enforceability of the remaining provisions of this Agreement.

J.    ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, OR THE BREACH THEREOF, SHALL BE SETTLED BY ARBITRATION, TO BE CONDUCTED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AT THE REQUEST OF EITHER PARTY, IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION, AND JUDGMENT UPON AN AWARD RENDERED BY THE ARBITRATOR(S) MAY BE RENDERED IN ANY COURT HAVING JURISDICTION THEREOF.

THE PARTIES SHALL HAVE THE RIGHT TO DISCOVERY IN AID OF THE ARBITRATION IN ACCORDANCE WITH CODE OF CIVIL PROCEDURE SECTION 1283.05; PROVIDED, HOWEVER, THAT THE ARBITRATOR'S PERMISSION SHALL NOT BE REQUIRED FOR SUCH DISCOVERY.

EACH OF THE PARTIES RESERVES THE RIGHT TO FILE A JUDICIAL ACTION TO ENABLE THE RECORDING OF A NOTICE OF PENDING ACTION, OR TO APPLY FOR ORDERS OF ATTACHMENT, RECEIVERSHIP, INJUNCTION, OR OTHER PROVISIONAL REMEDIES ON THE GROUNDS THAT THE ARBITRATION AWARD TO WHICH THE APPLICANT MAY BE ENTITLED MAY BE RENDERED INEFFECTUAL IN THE ABSENCE OF SUCH RELIEF. ANY SUCH ACTION BY A PARTY HERETO SHALL NOT CONSTITUTE A WAIVER OF THE RIGHT TO ARBITRATION UNDER THIS PROVISION.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.

-5-

NASI 0020657

A California Corporation

By: *[signature]*

Title: PRESIDENT

LESSOR:

By: X *[signature]* on behalf of The Sheldon and Same Arnell Family Foundation

Title: LESSOR

-6-

NASI 0020658

Exhibit A Page 9

76

# NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, CA 91302
818-223-0930
FAX: 818-591-1752

## ATM EQUIPMENT PURCHASE AGREEMENT

_August 1st_ 20 13

    This undersigned, as BUYER, hereby agrees to purchase from NATIONWIDE AUTOMATED SYSTEMS, INC., ("SELLER"), the automated teller machine(s) ("ATMs") listed and described on "Exhibit A" which will be forth coming within 45 days of this purchase.

    The total purchase price to be paid by BUYER to SELLER for the ATMs shall be as follows:

| NUMBER OF ATMs | PRICE PER ATM |
|---|---|
| 5 (FIVE) | 19,800 |

| | |
|---|---|
| TOTAL PURCHASE PRICE: | $ 99,000 |
| LESS BUYERS DEPOSIT | $ 99,000 |
| BALANCE DUE ON SIGNING | $ 0 |

    SELLER shall deliver the ATM(s) to location written on Exhibit A and forwarded to the buyer within sixty (60) days of the date hereof.  If SELLER fails to make delivery of the ATM(s) within said sixty (60) day period, BUYER shall be entitled to cancel this contract and to receive a refund of the monies previously paid to SELLER, without interest thereon or deduction therefrom.  The refund of BUYER's payments to SELLER shall be BUYER's sole and exclusive remedy hereunder.

    SELLER hereby warrants that the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges.

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.
A California Corporation

By: _Joel Tilles_

Title: PRESIDENT

By: _____

Title: _____

BUYER:

By: X _____ on behalf of the Sheldon & Carol Appel Family Foundation

Title: OWNER

█████████████████████

█████████████████

███████████

(Telephone Number)

Social Security Number: ████████████████

-2-

Nationwide Automated Systems, Inc.

ADDENDUM TO OWNER LEASE AGREEMENT

This Addendum supersedes any and all paragraphs in the Owner Lease Agreement.

1) If at anytime the owner's ATM machine fails to make enough transactions To pay the owner a monthly check equivalent to a twenty (20%) percent Annual return on the owner's investment of $19,800, Nationwide Automated Systems, Inc. guarantees to pay owner the difference between what the Owner has received and $4,000 annually. This is based on a rental fee of $.50. Per transaction.

2) At anytime after the first two years of ownership, should the owner wish to Sell his or her ATM's, N.A.S.I guarantees it will purchase said ATM's from Owner for the original sales price of $19,800.

Nationwide Automated Systems, Inc.

By _Joel Ellis_____

Owner

By _x Sheldon & Carol Krell Family Foundation_

NASI 0020661

Exhibit A Page 12

79

## EXHIBIT "A"

Sheldon & Carol Appel Family Foundation

| LOCATION NAME | Casey's Convenience Mart | | Sinclair Convenience Mart |
|---|---|---|---|
| ADDRESS | 105 1st Ave. SE | | 1009 W. Mission Ave. |
| CITY, STATE | Oelwein, IA. | | Bellevue, NE. |
| SERIAL NUMBER | EA-244610 | | EA-244675 |

| LOCATION NAME | Conoco Convenience Mart | | Kwik Shop Mini Mart |
|---|---|---|---|
| ADDRESS | 3186 Montana Hwy. 83 No. | | 3301 Holdrege St. |
| CITY, STATE | Seeley Lake, MT. | | Lincoln, NE. |
| SERIAL NUMBER | EA-244626 | | EA-244688 |

| LOCATION NAME | Conoco Convenience Mart | | |
|---|---|---|---|
| ADDRESS | 3912 US Hwy. 93 No. | | |
| CITY, STATE | Stevensville, MT. | | |
| SERIAL NUMBER | EA-244631 | | |

| LOCATION NAME | | | |
|---|---|---|---|
| ADDRESS | | | |
| CITY, STATE | | | |
| SERIAL NUMBER | | | |

| LOCATION NAME | | | |
|---|---|---|---|
| ADDRESS | | | |
| CITY, STATE | | | |

NASI 0020662

Exhibit A Page 13

ORIGINAL

1  GARY Y. LEUNG, *L.R. 83-2.4.1 leave to practice granted*
   Email: leungg@sec.gov
2  PETER F. DEL GRECO (Cal. Bar No. 164925)
   Email: delgrecop@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Lorraine Echavarria, Associate Regional Director
   John W. Berry, Regional Trial Counsel
6  5670 Wilshire Boulevard, 11th Floor
   Los Angeles, California 90036
7  Telephone: (323) 965-3998
   Facsimile: (323) 965-3908
8

FILED
CLERK, U.S. DISTRICT COURT

SEP 30 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

9              UNITED STATES DISTRICT COURT
10            CENTRAL DISTRICT OF CALIFORNIA
11
12      CV 14   07249- SJO (FFMx)
13  SECURITIES AND EXCHANGE
    COMMISSION,
14                                    DECLARATION OF TERI WILKS
             Plaintiff,
15
        vs.
16
17  NATIONWIDE AUTOMATED
    SYSTEMS, INC., JOEL GILLIS, and
18  EDWARD WISHNER,
19           Defendants,
20           and
21  OASIS STUDIO RENTALS, LLC,
22  OASIS STUDIO RENTALS #2, LLC,
    and OASIS STUDIO RENTALS #3,
23  LLC,
24           Relief Defendants.
25
26
27
28

DECLARATION OF TERI WILKS       1

## DECLARATION OF TERI WILKS

I, Teri Wilks, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I have personal knowledge of the matters set forth herein and, if called as a witness, could and would competently testify hereto under oath.

2.      I live in Los Angeles County, California, and became an investor with Nationwide Automated Systems, Inc. ("NASI") in or around February 2012. Prior to my investment, my sister was an investor with NASI. She told me there was a guaranteed 20% return and that it was a good investment, so I was interested in learning more about the investment opportunity.

3.      In early 2012, I spoke with Joel Gillis, who led me to believe that he controls NASI. Gillis explained that NASI could provide a 20% annual guaranteed rate of return. He told me that my funds would be used to purchase ATMs that I would own outright. I would then lease the machines back to NASI, which would manage the machines and pay me monthly returns of $.50 per transaction for every machine I owned. I was not told that my monthly returns would be paid from new cash raised by NASI from other investors. To the extent my ATMs did not generate enough revenues in transaction fees to provide me with a 20% annual return on my investment, NASI would make up the difference. Gillis told me that with the guaranteed 20% annual return, I would recoup the cost of my investment within five years.

4.      Based on Gillis' representations regarding the investment, I decided to purchase two ATMs at $19,800 each, for a total investment of $39,600. NASI sent me what appeared to be a form contract dated February 23, 2012, which I filled out, signed, and returned. The contract included an exhibit that listed two specific ATMs. My understanding based on the terms of the contract and the representations Gillis had made to me, was that I owned these two specific ATMs outright. A true and correct copy of my NASI contract is attached hereto as

Exhibit A. The contract attached as Exhibit A was the only NASI paperwork I signed to invest. No one at NASI ever asked me about my income, net worth, or investment experience.

5.    After investing with NASI, I received regular monthly checks along with an invoice showing the number of transactions that each of my ATMs had generated and my total return for the month. I thought the invoices seemed unprofessional because instead of clearly explaining where my returns were coming from, if the transaction fees from my ATMs didn't add up to $330 each – the amount necessary to provide my 20% annual return, the actual transaction fee amount was simply crossed out, with $330 handwritten instead. Later, the handwriting stopped, and a separate column entitled, "Adjusted Count" was added to the invoices. The "Adjusted Count" column often listed the number 660, which was exactly the number of transactions necessary to provide me with a 20% annual rate of return. I nonetheless believed the transaction figures in my monthly reports to be accurate. True and correct copies of my NASI invoices are attached hereto as Exhibit B.

6.    In addition, after I had invested, I went back and read the NASI contract more carefully and noticed that there was a provision that forbade me from calling the businesses at which my ATMs were located. I thought this was an odd provision given that I was supposed to own the ATMs, but I continued to receive my regular monthly checks from NASI until approximately August 2014.

7.    My August 2014 check from NASI bounced, and I called the company for the first time since my initial investment to find out what was going on. I spoke with someone named Chris, who told me to contact Analyn in NASI's accounting department. When I explained that my check had bounced, Chris told me that I shouldn't try cashing any additional checks at City National Bank, which is where my NASI checks had always come from before. On or about Friday,

2

September 12, 2014, I spoke with Analyn and told her I needed new July and August 2014 checks. She told me that NASI would issue me replacement checks, but I have not yet received them.

8.     I also recently received a letter from NASI regarding certain accounting problems that appeared to have been sent to all NASI clients. The letter indicated that NASI had experienced some processing problems that resulted in mailing delays. A true and correct copy of this letter is attached hereto as Exhibit C.

9.     I also reviewed a separate letter from NASI sometime within the last few months that explained that NASI would be upgrading investor ATMs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in Los Angeles, California on September 15, 2014.

_____
TERI WILKS

3

84



# NATIONWIDE AUTOMATED SYSTEMS, INC.

5000 No. Parkway Calabasas, Suite 303
Calabasas, Ca. 91302
818-223-0930
FAX: 818-591-1762

### ATM EQUIPMENT LEASE AGREEMENT

This agreement ("Agreement") is made as of _2 - 23_____, 20_12_ by and between NATIONWIDE AUTOMATED SYSTEMS, INC. ("NASI") and _TERRI WILKES, as her sole & separate property_____ ("Lessor").

### RECITALS

A.      NASI is in the business of placing, operating and maintaining automated teller machines ("ATMs").

B.      Lessor is the owner of the ATM(s) listed and described on Schedule A which will be forwarded within 45 days.

C.      NASI desires to lease from Lessor the ATM(s) listed and described on Schedule A on the terms and conditions set forth herein.

D.      Lessor desires to lease such ATM(s) to NASI on such terms and conditions.

NOW, THEREFORE, with respect to the foregoing recitals and in consideration of the following, the parties hereto represent, acknowledge and agree as follows:

1.      Lease of Equipment. Lessor hereby leases to NASI, and NASI hereby leases from Lessor, the ATM(s) listed and described on Schedule A which will be forwarded to Lessor within forty five (45) days from the date of this Agreement.

2.  Term. The initial term of this Agreement shall be for a period of ten (10) years commencing on the date first written above. The Agreement shall be automatically renewed for additional three (3) year periods thereafter unless the lessor provides written notice at least sixty (60) days prior to the end of the initial term or any subsequent renewal term of its desire to terminate this Agreement.

Exhibit A Page 4
NASI 0021249

86

A California Corporation

By: _Joel Wilks_

Title: _Pres_

LESSOR:

By:_ X _Teri Appel Wilks_

Title:___ _TERI APPEL WILKS_ as her sole + separate property

-6-

### *NATIONWIDE AUTOMATED SYSTEMS, INC.*

5000 No. Parkway Calabasas, Suite 303
Calabasas, Ca. 91302
818-223-0930
FAX: 818-591-1762

ATM EQUIPMENT PURCHASE AGREEMENT

_2 - 23_ , 20 _12_

    This undersigned, as BUYER, hereby agrees to purchase from NATIONWIDE AUTOMATED SYSTEMS, INC., ("SELLER"), the automated teller machine(s) ("ATMs") listed and described on "Exhibit A" which will be forth coming within 45 days of this purchase.
    The total purchase price to be paid by BUYER to SELLER for the ATMs shall be as follows:

| NUMBER OF ATMs | PRICE PER ATM |
|---|---|
| 2 | $17,800 |

TOTAL PURCHASE PRICE:      $ _39,600_

LESS BUYERS DEPOSIT      $ _39,600_

BALANCE DUE ON SIGNING:      $ _= 0 =_

    SELLER shall deliver the ATM(s) to location written on Exhibit A and forwarded to the buyer within sixty (60) days of the date hereof. If SELLER fails to make delivery of the ATM(s) within said sixty (60) day period, BUYER shall be entitled to cancel this contract and to receive a refund of the monies previously paid to SELLER, without interest thereon or deduction therefrom. The refund of BUYER's payments to SELLER shall be BUYER's sole and exclusive remedy hereunder.

    SELLER hereby warrants that the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges.

Exhibit A Page 6

NASI 0021251

88

IN WITNESS WHEREOF the parties have executed this Agreement on the date first set forth above.

NATIONWIDE AUTOMATED SYSTEMS, INC.
A California Corporation

By: _Joel Gillis_

Title: _Pres._

By:_____

Title:_____

BUYER:

By: X _Teri Appel Wilks_

Title: _TERI APPEL WILKS_  as her sole and separate property

██████████████
(Address)

██████████████████

██████████████
(Telephone Number)
Social Security Number: ████████████

-2-

Exhibit A Page 7

NASI 0021252



Nationwide Automated Systems, Inc.

### ADDENDUM TO OWNER LEASE AGREEMENT

This Addendum supersedes any and all paragraphs in the Owner Lease Agreement.

1) If at anytime the owner's ATM machine fails to make enough transactions
To pay the owner a monthly check equivalent to a twenty (20%) percent
Annual return on the owner's investment of $19,800, Nationwide Automated
Systems, Inc. guarantees to pay owner the difference between what the
Owner has received and $4,000 annually. This is based on a rental fee of
$.50
Per transaction.

2) At anytime after the first two years of ownership, should the owner wish to
.... Sell his or her ATM's, N.A.S.I guarantees it will purchase said ATM's from
Owner for the original sales price of $19,800.

Nationwide Automated Systems, Inc.

By _Joel Kelly 2-23-12_

Owner

By _X Heri Wilks_ as her sole + separate property.

NASI 0021253

Exhibit "A"

Teri Wilks

| LOCATION NAME | Airlines Super Express | | |
|---|---|---|---|
| ADDRESS | 10174 Airline Hwy. | | |
| CITY, STATE | Baton Rouge, La. | | |
| SERIAL NUMBER | EA-813142 | | |

| LOCATION NAME | Canaan Convenience Mart | | |
|---|---|---|---|
| ADDRESS | 247 Main St. | | |
| CITY, STATE | Canaan, Me. | | |
| SERIAL NUMBER | EA-813160 | | |

| LOCATION NAME | | | |
|---|---|---|---|
| ADDRESS | | | |
| CITY, STATE | | | |
| SERIAL NUMBER | | | |

| LOCATION NAME | | | |
|---|---|---|---|
| ADDRESS | | | |
| CITY, STATE | | | |
| SERIAL NUMBER | | | |

| LOCATION NAME | | | |
|---|---|---|---|
| ADDRESS | | | |
| CITY, STATE | | | |
| SERIAL NUMBER | | | |

Exhibit A Page 9

NASI 0021254

ELECTRONIC PROCESSING INC - XTRA CASH ATM
8787 COMPLEX DRIVE
SAN DIEGO, CA  92123

DISTRIBUTOR:  NATIONWIDE AUTOMATED SYSTEMS

Processing Period:  01-Jun 2014

Investor Summary for Teri Wilks

| Serial Nbr | Hotel Name | Location | Transaction Count | Adjusted Count |
|---|---|---|---|---|
| EA-813142 | Airlines Super Express | Baton Rouge, La. | 606 | 660 |
| EA-813160 | Canaan Conv. Mart | Canaan, Me. | 638 | 660 |
| | | Total | | 1,320 |
| | | | | $ .50 |

$660.00

Exhibit B·Page 10

93

ELECTRONIC PROCESSING INC - XTRA CASH ATM
8787 COMPLEX DRIVE
SAN DIEGO, CA  92123

DISTRIBUTOR:  NATIONWIDE AUTOMATED SYSTEMS

Processing Period:  01-May  2014

Investor Summary for Teri Wilks

| Serial Nbr | Hotel Name | Location | Transaction Count | Adjusted Count |
|---|---|---|---|---|
| EA-813142 | Airlines Super Express | Baton Rouge, La. | 615 | 660 |
| EA-813160 | Canaan Conv. Mart | Canaan, Me. | 650 | 660 |
| | | Total | | 1,320 |
| | | | | $ .50 |
| | | | | $660.00 |

Exhibit B Page 11

94

ELECTRONIC PROCESSING INC - XTRA CASH ATM
8787 COMPLEX DRIVE
SAN DIEGO, CA   92123

DISTRIBUTOR:  NATIONWIDE AUTOMATED SYSTEMS

Processing Period:  01-Apr  2014

Investor Summary for Teri Wilks

| Serial Nbr | Hotel Name | Location | Transaction | Adjusted |
|---|---|---|---|---|
| EA-813142 | Airlines Super Express | Baton Rouge, La | 621 | 660 |
| EA-813160 | Canaan Conv. Mart | Canaan, Me. | 664 | 664 |
|  |  | Total |  | 1,324 |
|  |  |  |  | $ .50 |

$662.00

Exhibit B Page 12

ELECTRONIC PROCESSING INC - XTRA CASH ATM
8787 COMPLEX DRIVE
SAN DIEGO, CA  92123

DISTRIBUTOR:  NATIONWIDE AUTOMATED SYSTEMS

Processing Period:  01-Mar  2014

Investor Summary for Teri Wilks

| Serial Nbr | Hotel Name | Location | Transaction Count | Adjusted Count |
|---|---|---|---|---|
| EA-813142 | Airlines Super Express | Baton Rouge, La. | 530 | 650 |
| EA-813160 | Canaan Conv. Mart | Canaan, Me. | 655 | 660 |
| | | Total | | 1,320 |
| | | | | $ .50 |

$660.00

Exhibit B Page 13

96

ELECTRONIC PROCESSING INC - XTRA CASH ATM
8787 COMPLEX DRIVE
SAN DIEGO, CA  92123

DISTRIBUTOR:  NATIONWIDE AUTOMATED SYSTEMS

Processing Period:  01-Feb  2014

Investor Summary for Teri Wilks

| Serial Nbr | Hotel Name | Location | Transaction Count | Adjusted Count |
|---|---|---|---|---|
| EA-813142 | Airlines Super Express | Baton Rouge, La. | 619 | 660 |
| EA-813160 | Canaan Conv. Mart | Canaan, Me. | 646 | 660 |

Total | 1,320

$ .50

$660.00

Exhibit B Page 14

97

ELECTRONIC PROCESSING INC - XTRA CASH ATM
8787 COMPLEX DRIVE
SAN DIEGO, CA 92123

DISTRIBUTOR:  NATIONWIDE AUTOMATED SYSTEMS

Processing Period:  01-Jan 2014

Investor Summary for Teri Wilks

| Serial Nbr | Hotel Name | Location | Transaction Count | Adjusted Count |
|---|---|---|---|---|
| EA-813142 | Airlines Super Express | Baton Rouge, La. | 628 | 660 |
| EA-813160 | Canaan Conv. Mart | Canaan, Me. | 653 | 660 |

Total                    1,320

$ .50

$660.00

Exhibit B Page 15

ELECTRONIC PROCESSING INC - XTRA CASH ATM
8787 COMPLEX DRIVE
SAN DIEGO, CA  92123

DISTRIBUTOR:  NATIONWIDE AUTOMATED SYSTEMS

Processing Period:  01-Dec  2013

Investor Summary for Teri Wilks

| Serial Nbr | Hotel Name | Location | Transaction Count | Adjusted Count |
|---|---|---|---|---|
| EA-813142 | Airlines Super Express | Baton Rouge, La. | 637 | 660 |
| EA-813160 | Canaan Conv. Mart | Canaan, Me. | 662 | 662 |
| | | Total | | 1,322 |
| | | | | $ .50 |
| | | | | $661.00 |

Exhibit B Page 16

ELECTRONIC PROCESSING INC - XTRA CASH ATM
8787 COMPLEX DRIVE
SAN DIEGO, CA   92123

DISTRIBUTOR:   NATIONWIDE AUTOMATED SYSTEMS

Processing Period:   01-Nov   2013

Investor Summary for Teri Wilks

| Serial Nbr | Hotel Name | Location | Transaction |
|---|---|---|---|
| EA-813142 | Airlines Super Express | Baton Rouge, La. | 627 |
| EA-813160 | Canaan Conv. Mart | Canaan, Me. | 655 |
|  |  | Total | 1,282 |
|  |  |  | $ .50 |

$641.00

CK 38127
12/31/13
($ 660)

Exhibit B Page 17