Reuven L. Cohen  (Bar No. 231915)
Email: rcohen@dordiwilliamscohen.com
Marc S. Williams (Bar No. 198913)
Email: mwilliams@dordiwilliamscohen.com
Charles J. Snyder (Bar No. 287246)
Email: csnyder@dordiwilliamscohen.com
**DORDI WILLIAMS COHEN, LLP**
724 South Spring Street, Suite 903
Los Angeles, CA 90014
Telephone:  (213) 232-5163
Facsimile:   (213) 232-5167

Attorneys for Defendant,
EDWARD WISHNER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>                    v.<br><br>EDWARD WISHNER,<br><br>                          Defendant. | Case No. CR-14-712-SJO<br><br>**DEFENDANT EDWARD WISHNER'S SENTENCING POSITION; EXHIBITS**<br><br>Sentencing Date:  November 16, 2015<br>Sentencing Time: 9:00 a.m. |

        Defendant Edward Wishner, by and through his attorneys of record, Reuven L. Cohen and Marc S. Williams, hereby submits his Sentencing Position.


Dated:  November 2, 2015          **DORDI WILLIAMS COHEN, LLP**

                                  By: /S/ Reuven L. Cohen
                                      Reuven L. Cohen, Esq.
                                      Marc S. Williams, Esq.
                                      Charles J. Snyder, Esq.
                                      Attorneys for Defendant,
                                      EDWARD WISHNER

# **TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................... 1

II. PROCEDURAL POSTURE AND MR. WISHNER'S COOPERATION .... 2

    A.  Acceptance of Responsibility ...................................................2

    B.  Cooperation.............................................................................4

        1.  The SEC Subpoena.........................................................4

        2.  Mr. Wishner's Important Early Cooperation
            with the Receiver regarding NASI .................................4

        3.  The Oasis Entities..........................................................5

        4.  Assistance with Clawback Proceedings ........................6

        5.  The Lisa Freede Settlement ..........................................6

        6.  Studios Maui..................................................................7

        7.  Other Cooperation .........................................................7

III. THE § 3553(A) FACTORS MERIT A SIGNIFICANT
    DOWNWARD VARIANCE ..................................................................... 8

    A.  The Court Should Vary Down Given
        Mr. Wishner's Lack of Malicious Intent................................8

    B.  The Court Should Vary Down Because
        NASI Was a Significant but Entirely Aberrant
        Deviation from Mr. Wishner's Otherwise Law-Abiding Life ............11

    C.  The Court Should Vary Down Based on
        Mr. Wishner's Extraordinary Acceptance of
        Responsibility and Extensive Cooperation with Authorities. .............14

    D.  The Court Should Vary Down Because
        Mr. Wishner Poses No Threat of Recidivism
        or Danger to Society. ..........................................................15

E.   The Court Should Vary Down Based on Mr. Wishner's

History and Characteristics..................................................16

   1.   The Court Should Vary Down Because

Mr. Wishner Is 77 Years Old and Faces

a Host of Health Concerns ........................................17

   2.   The Court Should Vary Down Based on

Mr. Wishner's Family and Community Support ......................19

F.   The Court Should Vary Down to Avoid Unwarranted

Sentencing Disparities and Similarities...............................................26

IV.   THE ADVISORY GUIDELINES RANGE ...................................... 31

A.   Because the Government Cannot Prove Actual

Loss with Clear, Convincing, and Reliable Evidence,

the Guidelines Recommend a Sentence of 78-97 Months ..................31

B.   While Normally a Necessary "Starting Point,"

the High-Loss Fraud Guidelines Are Not Helpful

Here in Ascertaining a Minimally-Sufficient

Sentence Because They Ignore Empirical Evidence,

National Experience, and the Purposes of Sentencing .........................32

   1.   Flawed from the Start, the Fraud Guidelines

Evolved as a One-Way Ratchet..................................................33

   2.   The Fraud Guidelines Lack Empirical,

Experiential, or Doctrinal Support ............................................36

V.   OBJECTIONS TO THE PSR ........................................................ 42

VI.   CONCLUSION.......................................................................... 44

**EDWARD WISHNER'S SENTENCING POSITION**

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Dorsey v. United States*,
    132 S.Ct. 2321 (2012)............................................................................8

*Gall v. United States*,
    552 U.S. 38 (2007)............................................................................passim

*Kimbrough v. United States*,
    552 U.S. 85 (2007)............................................................8, 33, 38, 39

*Pepper v. United States*,
    562 U.S. 476 (2011)............................................................16, 26, 33

*Peugh v. United States*,
    133 S.Ct. 2072 (2013)............................................................8, 16, 17

*Rita v. United States*,
    551 U.S. 338 (2007)............................................................8, 32, 34

*United States v. Adelson*,
    441 F.Supp.2d 506 (S.D.N.Y. 2006) ............................29, 33, 41, 42

*United States v. Ameline*,
    400 F.3d 646 (9th Cir. 2005) ........................................................8

*United States v. Apodaca*,
    641 F.3d 1077 (9th Cir. 2011) ....................................................26

*United States v. Arnaout*,
    431 F.3d 994 (7th Cir. 2005) ......................................................12

*United States v. Ayers*,
    759 F.Supp.2d 945 (N.D. Ohio 2010)........................................17

*United States v. Balboa*,
    No. 12-CR-196 (S.D.N.Y) ........................................................30

**EDWARD WISHNER'S SENTENCING POSITION**

*United States v. Barsumyan*,
   517 F.3d 1154 (9th Cir. 2008) ............................................... 33

*United States v. Booker*,
   543 U.S. 220 (2005) .............................................. 8, 12, 14, 41

*United States v. Brown*,
   985 F.2d 478 (9th Cir. 1993) ................................................ 14

*United States v. Carper*,
   659 F.3d 923 (9th Cir. 2011) ................................................ 26

*United States v. Carty*,
   520 F.3d 987 (9th Cir. 2008) .................................................. 8

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) ................................................... 9

*United States v. Corsey*,
   723 F.3d 366 (2d Cir. 2013) ............................... 28, 29, 39, 42

*United States v. Dallman*,
   533 F.3d 755 (9th Cir. 2008) ................................................ 12

*United States v. Davis*,
   No. 09-CR-335 (S.D. Tex.) .................................................... 30

*United States v. Edwards*,
   595 F.3d 1004 (9th Cir. 2010) .............................................. 17

*United States v. Emmenegger*,
   329 F.Supp.2d 416 (S.D.N.Y. 2004) ................................... 29

*United States v. Gaind*,
   829 F.Supp. 669 (S.D.N.Y. 1993) ....................................... 26

*United States v. Garcia*,
   182 F.3d 1165 (10th Cir. 1999) ........................................... 12

*United States v. Garcia-Sanchez*,
   189 F.3d 1143 (9th Cir. 1999) .............................................. 31

**EDWARD WISHNER'S SENTENCING POSITION**

*United States v. Grandmaison*,
   77 F.3d 555 (1st Cir. 1996) ............................................................. 12

*United States v. Hack*,
   443 F.Appx. 304 (9th Cir. July 18, 2011) ........................................ 8

*United States v. Heldeman*,
   402 F.3d 220 (1st Cir. 2005) ........................................................... 17

*United States v. Hernandez*,
   302 F.Appx. 699 (9th Cir. Dec. 3, 2008) ........................................ 12

*United States v. Howe*,
   543 F.3d 128 (3d Cir. 2008) ............................................................ 12

*United States v. Landron-Class*,
   696 F.3d 62 (1st Cir. 2012) ............................................................. 14

*United States v. Lauersen*,
   362 F.3d 160 (2d Cir. 2004) ............................................................ 41

*United States v. Lee*,
   725 F.3d 1159 (9th Cir. 2013) ............................................. 2, 14, 17

*United States v. Lenagh*,
   2009 WL 296999 (D. Neb. Feb. 6, 2009) ................................ 9, 33, 42

*United States v. Lojek*,
   755 F.Supp.2d 849 (N.D. Ohio 2010) ............................................ 17

*United States v. Marsh*,
   820 F.Supp.2d 320 (S.D.N.Y. 2011) .............................................. 17

*United States v. Mohamed*,
   459 F.3d 979 (9th Cir. 2006) ........................................................... 12

*United States v. Patrick*,
   707 F.3d 815, 820 (7th Cir. 2013) ................................................... 14

*United States v. Parris*,
   573 F.Supp.2d 744 (E.D.N.Y. 2008) ...................................... passim

**EDWARD WISHNER'S SENTENCING POSITION**

*United States v. Prosperi*,

   686 F.3d 32 (1st Cir. 2012) ............................................................... 9

*United States v. Rangel*,

   No. 10-CR-1061-SJO ...................................................................... 27

*United States v. Ranum*,

   353 F.Supp.2d 984 (E.D. Wis. 2005) ............................................... 9

*United States v. Restrepo*,

   946 F.2d 654 (9th Cir. 1991) ......................................................... 31

*United States v. Ruiz*,

   2006 WL 1311982 (S.D.N.Y. May 10, 2006) ............................... 15

*United States v. Severino*,

   454 F.3d 206 (3d Cir. 2006) ........................................................... 14

*United States v. Snow*,

   No. 11-CR-42 (S.D. Ind.) ............................................................... 30

*United States v. Takai*,

   941 F.2d 738 (9th Cir. 1991) ......................................................... 12

*United States v. Valencia*,

   No. 10-CR-1267-SJO ...................................................................... 27

*United States v. Van Alstyne*,

   584 F.3d 803 (9th Cir. 2009) ......................................................... 32

*United States v. Vigil*,

   476 F.Supp.2d 1231 (D.N.M. 2007) ............................................. 26

*United States v. Ward*,

   814 F.Supp. 23 (E.D. Va. 1993) .................................................... 13

*United States v. Watt*,

   707 F.Supp.2d 149 (D. Mass. 2010) ............................... 29, 33, 42

*United States v. White*,

   506 F.3d 635 (8th Cir. 2007) ......................................................... 17

**EDWARD WISHNER'S SENTENCING POSITION**

*United States v. Wurzinger*,

    467 F.3d 649 (7th Cir. 2006) ........................................................... 28

*United States v. Zolp*,

    479 F.3d 715 (9th Cir. 2007) ........................................................... 14

*Wisconsin v. Mitchell*,

    508 U.S. 476 (1993) ......................................................................... 9

**Statutes and Guidelines**

18 U.S.C. § 1343 ................................................................................... 2

18 U.S.C. § 1349 ................................................................................... 2

18 U.S.C. § 3551 ................................................................................. 15

18 U.S.C. § 3553(a) ...................................................................... passim

18 U.S.C. § 3742 ................................................................................. 14

18 U.S.C. § 1341 ................................................................................... 2

28 U.S.C. § 991 ................................................................................... 34

U.S.S.G. § 2B1.1 ............................................................................. 9, 39

U.S.S.G. § 2D1.1 ............................................................................... 38

U.S.S.G. § 2F1.1 ...................................................................... 34, 38, 39

U.S.S.G. § 3E1.1 ............................................................................... 14

U.S.S.G. § 4A1.2 ............................................................................... 13

U.S.S.G. § 5H1.1 ............................................................................... 17

U.S.S.G. § 51.11 ................................................................................ 26

U.S.S.G. § 5K2.20 ............................................................................. 12

U.S.S.G. § 5K1.1 ............................................................................... 14

Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) ...................... 15

**Other**

Alan Ellis, John Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for*

    *Economic Offenses*, 25 Crim. Just. 34 (2011) ................................ 40

David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) ................................................................. 15

Frank Bowman, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167 (2008) .......................................................................... 29, 39, 42

Human Rights Watch, *Old Behind Bars: The Aging Prison Population in the United States* (2012) ....................................................................................................... 18

Jeffery S. Parker & Michael K. Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset?*, 27 Am. Crim. L. Rev. 289 (1989) ............................... 36

Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1 (1988) ....................................... 34

Justice Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sent. Rep. 180 (1999)……………………………………………………………………………40

Paula Yost, *Sentencing Panel Member Resigns over Research*, Wash. Post., Aug. 23, 1989 ............................................................................................................... 36

U.S. Sent'g Comm'n, *2000 Sourcebook of Federal Sentencing Statistics* (2000) ............... 38

U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (2004) ...................................................................................... 34, 38, 40

U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004) ........................................................... 15

U.S. Sent'g Comm'n, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* (1987) ................................................................................ 34

U.S. Sent'g Comm'n, *The Nature and Severity of Punishment for Economic Crimes; Determinants of Offense Seriousness and Culpability* (2000)........................... 37

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421 (2007) ...................... 15

**EDWARD WISHNER'S SENTENCING POSITION**

# I.  <u>INTRODUCTION</u>

The Court faces a daunting task.  A paradoxical septuagenarian comes now before this Court and seeks a sentence that does not ensure his death in a federal prison.  That 77-year-old man, Edward Wishner, is, by all accounts, a loving father and husband who for decades has served his beautiful family and segments of his community honorably.  That same man, however, has hurt – in some cases profoundly – other loving and beautiful families, some of whom also hail from Mr. Wishner's community.

When this Court sentences Mr. Wishner on November 16, 2015, the Court will hear only from the broken-hearted.  The hearts of each and every member of Mr. Wishner's family – a collection of incredibly charitable, gentle, and intelligent people – are broken.  The hearts of many of the victims of the fraudulent scheme in this case – by all accounts, a diverse collection of innocent, shaken souls – are broken.  On November 16, 2015, there will not be a single winner in the courtroom, regardless of the outcome.

As set forth below, the intellectually and normatively honest resolution of this case cannot – and should not – be determined by a mechanical application of the United States Sentencing Guidelines.  Nor can it be determined by a typical purposes-of-punishment analysis.  Indeed, this sentencing proceeding is not about incapacitation or deterrence.  As an increasingly-infirm 77-year-old man who has led an otherwise decent and law-abiding life, Mr. Wishner poses no ongoing threat to society.  This sentencing proceeding also is not about rehabilitation or contrition.  Mr. Wishner admitted his wrongdoing well before prosecutors charged him with a crime; has provided significant and ongoing assistance to the government and the Court-appointed Receiver in the related SEC case ("Receiver"); and is unquestionably and demonstrably remorseful for his conduct.

At its core, this sentencing proceeding is about retribution – retribution for the very real harm that Joel Gillis and Mr. Wishner inflicted on investors in their Ponzi scheme.  The question for this Court is whether retribution demands a sentence that condemns Mr. Wishner to die in jail, or whether consideration of all the § 3553(a) factors calls for something less.  Given the "worthy tradition that death in prison is not to be ordered

lightly," *United States v. Lee*, 725 F.3d 1159, 1169 (9th Cir. 2013), Mr. Wishner's exceptional cooperation, and the host of mitigating factors at play – most notably, Mr. Wishner's age, poor health, and limited life expectancy – Mr. Wishner humbly seeks a sentence that will allow him to rejoin his family during his lifetime. The defense respectfully submits that such a sentence consists of a two-year custodial term, followed by three years of supervised release, and 1,000 hours of community service to be served during the period of supervised release.

## II. PROCEDURAL POSTURE AND MR. WISHNER'S COOPERATION

Mr. Wishner adopts the concise and accurate summary of events at NASI from Mr. Gillis's sentencing brief and picks up where that summary ends – with the SEC action and NASI's demise. *See* Joel Barry Gillis's Sentencing Brief ("Gillis Sent'g Br."), Docket No. 78, at 1:12-2:16. On September 30, 2014, this Court issued a "Temporary Restraining Order and Orders (1) Freezing Assets; (2) Prohibiting the Destruction of Documents; (3) Granting Expedited Discovery; (4) Requiring Accountings; and (5) Appointing a Temporary Receiver, and Order to Show Cause re Preliminary Injunction and Appointment of a Permanent Receiver" (the "TRO"). *SEC v. Nationwide Automated Systems, Inc., et al.*, Case 2:14-CV-7249-SJO-FFM (the "SEC Case"), Docket. No. 17. Since the Court entered the TRO – and beforehand – Mr. Wishner has been singularly focused on two things: (a) accepting responsibility for his wrongdoing, and (b) assisting the Receiver in preserving and protecting the assets of Nationwide Automated Systems, Inc. ("NASI"), recovering additional assets, and maximizing recovery for victims.

### A. Acceptance of Responsibility

On January 13, 2015, Mr. Wishner pleaded guilty without a plea agreement to a four-count information sounding in: (1) conspiracy, in violation of 18 U.S.C. §§ 1349, 1341, and 1343 (Count 1); (2) mail fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1341 and 2 (Counts 2 and 3); (3) wire fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1343 and 2 (Count 4). *See* Docket. Nos. 1, 44. That same month, Mr. Wishner proffered

with the government pursuant to a proffer agreement.[1]  Never – not once – at any juncture did Mr. Wishner consider putting the government to its burden of proving his guilt.  Rather, Mr. Wishner began cooperating with the Department of Justice well before his guilty plea – and well before he had *any* legal protections vis-à-vis the United States Attorney's Office.

Indeed, as accurately noted by the Receiver at the inception of the SEC Case, Mr. Gillis and Mr. Wishner "met with him and his counsel and provided important information at a time when [they faced] serious criminal liability and ha[d] no protection for their statements.  Although a lot more information is still needed, their cooperation in this regard has been helpful, particularly due to the very primitive system of spreadsheets and lists Gillis used to track investors and their transfers to and from NASI."  First Report and Recommendation, SEC Case, Docket. No. 44, at 10:18-23.

In the SEC Case, Mr. Wishner's counsel promptly agreed to accept service of the Summons, Complaint, and TRO.  And less than a month after the TRO was entered, Mr. Wishner stipulated to a preliminary injunction by signing a "Consent of Defendant Edward Wishner and Stipulation to Entry of Preliminary Injunction and Orders:  (1) Freezing Assets; (2) Prohibiting the Destruction of Documents; (3) Requiring Accountings; and (4) Appointing Receiver" (the "Consent to Preliminary Injunction").  *See* SEC Case, Docket No. 36.  In his Answer to the SEC's Complaint, Mr. Wishner admitted all of the allegations material to his liability, *see* SEC Case, Docket No. 50, and, thereafter, stipulated to partial summary judgment as to liability on all causes of action against him, leaving only the amount of restitution to be determined, *see* SEC Case, Docket No 86.

Mr. Wishner also did not object to the Receiver's request that the Court include Relief Defendants Oasis Studio Rentals, LLC, Oasis Studio Rentals #2, LLC and Oasis Studio Rentals #3, LLC (collectively "Oasis") within the scope of the receivership estate as affiliates of NASI.  *See, e.g.,* SEC Case, Docket No. 44 at 14:4-6.  Nor did he object when

---

[1] Mr. Wishner, through counsel, met with prosecutors assigned to this case several months earlier.

the Receiver requested that Studios Maui Production LLC ("Studios Maui") be added to the receivership. Simply stated, it is beyond cavil that Mr. Wishner has taken every action with the goal of trying to begin to right his wrongs and to assist in the victims' recovery.

**B. Cooperation**

Mr. Wishner's cooperation has at all times been provided without any protection for his statements and without any promises of leniency from the government. Mr. Wishner has remained on bond (without incident), which has enabled him to continue to cooperate fully with law enforcement and the Receiver. The extent of his cooperation is set forth as follows.

### 1. The SEC Subpoena

Mr. Wishner's cooperation started with his forthcoming response to the subpoena he received from the SEC. Mr. Wishner and Mr. Gillis turned over to the SEC all of their key files relating to NASI.

### 2. Mr. Wishner's Important Early Cooperation with the Receiver Regarding NASI

Mr. Wisher's cooperation continued after the SEC Case was filed. On October 1, 2014, the day after the Court issued the TRO, Mr. Wishner, members of his staff, and Mr. Wishner's counsel met with the Receiver's staff at Mr. Wishner's office and assisted them in gathering documents, copying files from computers, taking computers to be imaged offsite, and locating other materials the Receiver needed to take control of NASI and the Relief Defendants. *See, e.g.,* SEC Case, Docket No. 44, at 5:19-24. Mr. Wishner was present to answer questions and generally assist in the gathering of the materials.

After October 1, 2014, Mr. Wishner stood ready, willing, and able to meet with the Receiver, as needed, to provide assistance. The Receiver needed help immediately because NASI did not maintain a recognizable accounting system or investor database, which the Receiver needed to carry out his investigation and notify investors. *See, e.g.,* SEC Case, Docket No. 44, at 8:5-13, 8:23-26. Mr. Wishner agreed to meet the Receiver in the NASI offices on October 8, 2014, but the Receiver postponed the meeting to October 21, 2014.

On that date, Mr. Wishner and Mr. Gillis, along with their counsel, met with the Receiver, his staff, and the Receiver's counsel at the NASI offices. *Id.* at 8:27-28. At the meeting, Mr. Wishner and Mr. Gillis made further documents and materials available to the Receiver, answered questions, and explained NASI's operations in detail. During the meeting, the Receiver and his staff worked with Mr. Gillis to locate files on both his computer and one of the NASI employee's computers, including a list of investors that included ATM Locations and ATM serial numbers associated with each investor, a list of investors with addresses, templates used when forwarding monthly payments to ATM locations, and monthly investor payments. *Id.* at 8:27 - 9:5. Mr. Wishner and Mr. Gillis also provided the names of NASI's employees. *Id.* at 9:16. And Mr. Wishner provided the Receiver with the documents NASI produced to the SEC prior to commencement of the SEC Case, which Mr. Wisher's prior counsel, Sheldon Jaffe, had in his possession. *Id.* at 10:7-10.

On October 29 and 31, 2014, the Receiver's office sent Mr. Wishner's counsel a list of additional documents and information the Received needed, including a list of NASI vendors, vendor invoices from August and September 2014, proofs of purchase for ATMs, payroll information for NASI employees, tax returns for Oasis, transfers to Oasis, and monthly and annual financial statements for NASI. *Id.* at 10:13-15. From November 6 through 26, 2014, Mr. Wishner and his counsel produced responsive documents on a rolling basis to the Receiver, with explanations of the documents produced and why others could not be produced.

### 3. *The Oasis Entities*

On November 25, 2015, after the Court added the Oasis entities to the receivership estate, the Receiver's office sent Mr. Wishner a letter requesting 21 additional categories of documents. Mr. Wishner complied with that request to the best of his ability, providing documents and information through his counsel by email. Mr. Wishner's counsel also offered to have the Receiver or his staff meet with Mr. Wishner and his staff at Mr.

Wishner's office to gather the balance of the requested Oasis materials, just as the Receiver had done with respect to NASI. The Receiver did not respond to Mr. Wishner's offer.

In early February 2015, the Receiver's counsel sent two more requests for documents and information about Oasis. Each time, Mr. Wishner and his counsel promptly supplied the requested materials to the extent they could be located.

On March 10, 2015, the Receiver's counsel informed Mr. Wishner's counsel that a recent deposition raised concerns about a "lack of documents" produced by Mr. Wishner relating to Oasis. Mr. Wishner's counsel immediately contacted the Receiver's counsel and scheduled a call for the next day, at which time Mr. Wishner's counsel explained that Mr. Wishner had suffered a stroke in mid-February 2015 and reminded the Receiver's counsel that the Receiver had not responded to Mr. Wishner's earlier suggestion that the Oasis documents and information be gathered by the Receiver onsite at Mr. Wishner's office. On March 12, 2015, Mr. Wishner's counsel again offered a meeting at Mr. Wishner's office to make sure the Receiver would be able to obtain all needed documents, computers, and information relating to Oasis. A meeting was subsequently scheduled and held on April 3, 2015. In the interim, Mr. Wishner and his staff produced three additional boxes of Oasis materials to the Receiver.

### 4. Assistance with Clawback Proceedings

On January 23, 2015, the Receiver's counsel requested a meeting with Mr. Gillis and Mr. Wishner in San Diego to discuss potential clawback claims against investors who received substantial profits. Mr. Wishner immediately indicated his availability and desire to participate in such a meeting and stood ready, willing, and able to participate. The Receiver later decided that a meeting was not necessary and requested that Mr. Gillis and Mr. Wishner create a list (based on their recollections) of the 25 investors with the largest net gains together with information they may have about their assets and the collectability of prospective judgments against them. The list was provided.

### 5. The Lisa Freede Settlement

On March 25, 2015, the Receiver's counsel contacted Mr. Wishner's counsel and

inquired whether Mr. Wishner had been receiving $1,500 per month in settlement payments from Ms. Lisa Freede. The Receiver's counsel explained that the settlement amounts were owed to Oasis and Mr. Wishner should not be receiving them. Mr. Wishner's counsel wrote back immediately, confirming Mr. Wishner had been receiving the settlement payments and explaining that Mr. Wishner had not recalled any connection between the settlement with Ms. Freede (over a separate jewelry business) and NASI or Oasis. After further investigation, Mr. Wishner returned the funds to the Receiver and wrote to Ms. Freede instructing her to make all future payments to the Receiver.

### 6. *Studios Maui*

On March 25, 2015, at the Receiver's request, Mr. Wishner's counsel accepted service of a subpoena on Studios Maui (which later became part of the receivership estate). Mr. Wishner does not have day-to-day involvement with Studios Maui. Nevertheless, when the Receiver was having trouble obtaining information from Branscombe Richmond, the manager of Studios Maui, Mr. Wishner contacted Mr. Richmond on several occasions and instructed him to call the Receiver and produce the records demanded in the subpoena. Mr. Wishner also provided all of the documents in his possession relating to Studios Maui.

### 7. *Other Cooperation*

On February 23, 2015, the Receiver's counsel requested certain tax returns, working papers, and financial statements for NASI. Mr. Wishner's counsel responded with the available documents and information on February 25, 2015. On April 15, 2015, at the Receiver's counsel request, Mr. Wishner confirmed that he had no objection to $160,000 being returned to the receivership estate. These funds were to repay a loan made by NASI and Oasis to a third party. Finally, on June 5, 2015, the Receiver's counsel requested that Mr. Wishner accept service of a subpoena issued to The Devonshire Group and that Mr. Wishner produce all documents in his possession relating to transfers/investments from NASI or any of the Oasis entities to The Devonshire Group. Mr. Wishner agreed to accept such service and promptly responded to the request for documents and information.

**EDWARD WISHNER'S SENTENCING POSITION**

### III.   THE § 3553(A) FACTORS MERIT A SIGNIFICANT DOWNWARD VARIANCE.

Although sentencing starts by calculating the Guidelines, *Gall v. United States*, 552 U.S. 38, 49 (2007), courts "must then consider the arguments of the parties and the [other] factors set forth in § 3553(a)," *Peugh v. United States*, ___U.S.___, 133 S.Ct. 2072, 2080 (2013) (quotations omitted), with the ultimate aim of achieving a sentence "sufficient but not greater than necessary" to satisfy the stated goals of sentencing, *see Kimbrough v. United States*, 552 U.S. 85, 111 (2007).  *See also United States v. Booker*, 543 U.S. 220, 259-60 (2005); *United States v. Ameline*, 400 F.3d 646, 655-56 (9th Cir.) *vacated without disagreement on reh'g en banc*, 409 F.3d 1073 (9th Cir. 2005) ("[T]he advisory guideline range is only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence").  In so doing, a court should not give the Guidelines more weight or consideration than any other factor in the sentencing analysis, *United States v. Carty*, 520 F.3d 987, 991 (9th Cir. 2008) (en banc), and "may not presume that the guideline range is reasonable," *Peugh*, 133 S.Ct. at 2080 (quotations omitted); *see also Rita v. United States*, 551 U.S. 338, 351-52 (2007).  Perhaps more significantly, a sentencing court's goal *should not be to impose a reasonable sentence*; instead, the court should strive to impose the particularized sentence minimally sufficient to accomplish the statutory purposes of sentencing.  *Carty*, 520 F.3d at 995 (citing *Gall*, 552 U.S. at 50); *Kimbrough*, 552 U.S. at 111; *Rita*, 551 U.S. at 351.  Here, the Court can achieve that objective – and thereby comport with § 3553(a)'s parsimony principle – by imposing a two-year custodial sentence, followed by a term of supervised release and community service.

### A. The Court Should Vary Down Given Mr. Wishner's Lack of Malicious Intent.

§ 3553(a)(1) directs sentencing courts to consider the "nature and circumstances" of the offense, and particularly "the culpability of the offender," *Dorsey v. United States*, ___ U.S.___, 132 S. Ct. 2321, 2343 (2012), in fashioning an appropriate sentence, *see United States v. Hack*, 443 F.Appx. 304, 305 (9th Cir. July 18, 2011) (indicating that "nature and circumstances" analysis includes intent).  Although a defendant's motive is highly relevant

in this analysis, *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) (citations omitted), a rigid focus on loss (as the Guidelines suggest, *see* U.S.S.G. § 2B1.1 cmt., backg'd), is an overly-blunt tool for the job, *see, e.g., United States v. Prosperi*, 686 F.3d 32, 41 (1st Cir. 2012) (affirming downward variance to probation from Guideline range of 87-108 months for high-loss fraud where "advisory guideline range, while accurately calculated, [was] not a fair representation of the defendant's culpability" absent any "evidence that the defendant intended to enrich himself personally or intended to harm the . . . public").[2]

In this case, while losses may be significant, Mr. Wishner never set out with malicious intent. As thoroughly explained in Mr. Gillis's sentencing papers, Mr. Gillis and Mr. Wishner started NASI as a legitimate business and operated it in that manner for a number of years. It was not until the Starwood contract fell through (and the men faced the seemingly-shameful prospect of disappointing their investors) that they made the far-more-awful choice to paper over that failure with an interim solution. *See* PSR ¶ 39 ("Wishner noted that when NASI began to solicit investors, they never intended to run a Ponzi scheme"; but when Starwood failed, "and while attempting to secure another deal, they used new . . . money to pay old investors"); Ltr. of Beverly Wishner, Ex. 2-1 at 2 ("Your Honor, I can say without any doubt that I know Eddie better than any other human being on earth . . . . I believe to the bottom of my heart that Eddie did not start NASI with the intent of defrauding or hurting anyone"). In time, that interim solution snowballed and became the business. But fraud was never the goal; the goal was to do right by NASI investors.

---

[2] *See also United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008) ("[A] district court may find that even after giving weight to the large . . . financial impact, there is a wide variety of culpability amongst defendants"); *United States v. Ranum*, 353 F.Supp.2d 984, 990 (E.D. Wis. 2005) (varying downward and noting that one "of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level," which wrongly "treat[s] a person who steals $100,000 to finance a lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child"); *United States v. Lenagh*, No. 07-CR-346-JFB, 2009 WL 296999, at *6 (D. Neb. Feb. 6, 2009) (stating that, while "the amount of loss" "is one measure of . . . seriousness," it is "not always a reliable proxy" for "culpability of [a specific] defendant").

Pursuing that goal was consistent with Mr. Wishner's self-vision and longstanding reputation among friends and business associates as a "how-can-I-help kind of guy." *See* Ltr. of Daniel Durschlag, D.D.S., Ex. 2-9. Indeed, both before and after he became involved with NASI, Mr. Wishner ran a successful accounting business with hundreds of clients. *See* PSR ¶ 76. Several of those clients submitted sentencing letters. In the aggregate, these people describe a man fiercely committed to his clients, recounting several occasions where Mr. Wishner went above and beyond – often without pay, but always within the confines of the law – to save the day, or at least maintain an exacting standard of professionalism. *E.g.,* Ltrs. of Dominico Caputo, Ex. 2-45, Eric Mahler, Ex. 2-13, Dimitri Flessas, Ex. 2-11, Mark Glyptis, Ex. 2-35, Jerry Jacobson, Ex. 2-20, George Kaczender, Ex. 2-17, Terri MacInnis, Ex. 2-16, Mindy Nadell, Ex. 2-18, Tomasso Barletta, Ex. 2-27; *see also* Ltr. of Beverly Wishner ("Eddie has given his heart and soul to serving his clients"). Failing to meet that standard and disappointing NASI's investors was simply unacceptable for Mr. Wishner. While horribly misguided, it was this result that Mr. Wishner sought to avoid in the post-Starwood years.

As Mr. Gillis notes, it is significant to assessing his and Mr. Wishner's underlying motivation that more than 90% of NASI funds went to investors – or to investments that they hoped would generate returns for investors (like Fuel Doctor and Oasis, *see* PSR ¶ 32) – while Messrs. Gillis and Wishner paid themselves non-lavish salaries and Mr. Wishner maintained a six-day-a-week schedule as an accountant. *See* Ltr. of Beverly Wishner at 2 ("Even now, [facing] his own financial ruin and incarceration, Eddie is still working six days a week, making sure his clients' needs are being met and trying to keep his long-time employees . . . employed"). It is also significant that Mr. Wishner immediately accepted responsibility and started helping the receiver locate funds upon recognizing NASI's inevitable failure. *See* PSR ¶¶ 37-38. Were the goal simply to fleece investors and live excessively, NASI would not have survived for 18 years.

**B. The Court Should Vary Down Because NASI Was a Significant but Entirely Aberrant Deviation from Mr. Wishner's Otherwise Law-Abiding Life.**

Along with praise for Mr. Wishner's integrity and professionalism, a related theme running through his sentencing letters is utter shock at his involvement in criminal conduct. A letter from Herbert Tamres, former Deputy Chief of the Criminal Division in the United States Attorney's Office for the Eastern District of New York, exemplifies this sentiment:

> I learned with astonishment, several months ago, that my dear friend, Ed Wishner, had been charged with several financial transgressions. I use the word 'astonished,' because Ed has been my oldest friend and confidante for over 50 years and never once left me with the feeling that he was anything but an upstanding, sincere, unpretentious individual.

Ltr. of Herbert Tamres, Ex. 2-8 at 1. Letters from Dimitri Flessas, Harvey Bibicoff, Charles Lowlicht, Merhnaz Sepehripour, Mindy Nadell, and J. Richard Leyner, all of whom have known Mr. Wishner for at least three decades, express similar disbelief, as do letters from Mr. Wishner's family and others.[3]

---

[3] *See* Ltrs. of Dimitri Flessas ("In addition to being my friend . . . Ed has been doing my taxes [for] probably . . . 30 year[s] . . . [and] . . . I have referred many friends and family members to Ed . . . . We have always been very happy with his professionalism, service and . . . advise [*sic*]. I am SHOCKED at the allegations against Ed, this is completely out of character."); Harvey Bibicoff, Ex. 2-15 ("While I know that his actions hurt quite a lot of people.....some of whom were hurt very badly, I really don't understand how this ever happened. It just doesn't fit. As I said, I have known Eddie since 1953. I've seen how he deals with clients, friends and even strangers and I must say that his actions in this situation are totally out of character."); Charles Lowlicht, Ex. 2-10 ("I have known Ed Wishner for over 60 years . . . . When I heard of Ed's troubles, my first thought was if I was given 1000 guesses who it might be among my associations, Ed's name would never have come to mind. I am not privy to all the circumstances behind this aberration in his character but I am convinced it is a one time situation and will never be repeated."); Mehrnaz Sepehripour, Ex. 2-32 ("I have known Edward Wishner ('Ed') for over the past 30 years. My first reaction of learning about Ed's legal trouble was shock and disbelief. I seriously [thought] that there must be [a] mistake and I questioned if he was framed and/or got involved with the wrong people. I will never believe Ed would be capable of any wrongdoing of any kind."); Mindy Nadell ("I have referred [Mr. Wishner] to many people including my family and have never heard anything negative about him. He always did a good job and in a professional manner. I would absolutely be at a total loss in not having him do my taxes every year as it never worried me about being audited as Mr. Wishner was really honest. I feel his conviction is really out of Character and was totally shocked when I read the news about his case. I, and all the people I have referred to him were also shocked."); J. Richard

A court can vary downward where a defendant's criminal conduct represents an anomalous deviation from an otherwise law-abiding life. *United States v. Hernandez*, 302 F.Appx. 699, 700 (9th Cir. Dec. 3, 2008) ("We may consider the allegedly aberrant nature of [a defendant's] conduct when determining the ... reasonableness of his sentence") (citing *United States v. Dallman*, 533 F.3d 755, 761 (9th Cir. 2008)). Even before *Booker*, courts blessed this deviation for first-time offenders in cases where the aberrant conduct involved a series of related acts, rather than simply a rash decision. *See United States v. Takai*, 941 F.2d 738, 743 (9th Cir. 1991) ("it is fair to read 'single act' to refer to the particular action that is criminal"); *United States v. Garcia*, 182 F.3d 1165, 1176 (10th Cir. 1999) (although the defendant's crime was "carefully planned," affirming aberrant-behavior finding because correct focus is not on number of discrete acts defendant undertakes, but rather aberrational character of the conduct); *United States v. Grandmaison*, 77 F.3d 555, 563 (1st Cir. 1996) ("That aberrant behavior departures are available to [first-time] offenders whose course of criminal conduct involves more than one criminal act is implicit in our holding").[4] Now free to exercise world-wise judgment and common sense in a post-*Booker* environment, courts can vary (or depart) for aberrational conduct based on a non-technical assessment of a defendant's history and characteristics. *See Dallman*, 533 F.3d at 761 ("[Whether] offense conduct [is] aberrant . . . may be encompassed within the district court's assessment of 'history and characteristics'" under "3553(a)(1)"); *United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) ("Howe might be less blameworthy had he withdrawn from the fraud at an earlier point during the two-year period. But where there is no dispute that Howe 'led an

---

Leyner, Ex. 2-23 ("I have never been involved in any transaction with [Mr. Wishner] where he did not act with the utmost integrity . . . . When this case was brought to my attention I was stunned . . . . My reaction is, 'Not Ed, he has always been an upstanding, forthright, citizen.' Never have I know of any occasion where he had deviated from the law.").

[4] To be clear, Mr. Wishner is not requesting a departure under U.S.S.G. § 5K2.20; he is asking for a variance under § 3553(a). In any event, as the Ninth Circuit has recognized, departures have little meaning after *Booker* because a court can reject a defined departure while still granting a substantively-identical variance. *United States v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006); *see also United States v. Arnaout*, 431 F.3d 994, 1003 (7th Cir. 2005) ("[T]he concept of 'departures' has been rendered obsolete in the post-*Booker* world") (citations omitted).

**EDWARD WISHNER'S SENTENCING POSITION**

honorable and lawful life until this point,' the District Court did not commit clear error in characterizing what he did as an isolated mistake [and varying downward on that basis]").

It is beyond understatement to call Mr. Wishner's conduct at NASI aberrant. In his 60 years before 2001, Mr. Wishner led an exemplary life, characterized by service to his country (*see* PSR ¶ 90), family, clients, and fellow man. He had no troubles with the law. *See id.* ¶¶ 62-65. He did not bounce from one shady venture to the next, as this Court no doubt sees in many fraud prosecutions. Indeed, several of Mr. Wishner's sentencing letters express shock precisely because he conducted himself with such consistent integrity in all areas of his life – and particularly business.[5] While NASI hurt many people, it stands as the single, spectacular aberration in Mr. Wishner's otherwise honorable existence. Viewed in the context of his fathering, husbanding, and cooperation to try to right his wrongs, that otherwise-consistent virtuousness should count for something.[6] As Mr. Tamres suggests, the Court should vary downward so that Mr. Wishner's sentence reflects the entirety of "his life and his credits," not just his single significant failure.

---

[5] *See, e.g.,* Ltrs. of Mindy Nadell ("I . . . never worried . . . about being audited as Mr. Wishner was really honest . . . I feel his conviction is really out of Character"); Tommaso Barletta ("Sometime ago I was in a financial predicament and a friend had suggested me to take some action I was not confortable [*sic*] with. I asked Mr. Wishner about that and he explained in a clear way the risk I was going to take in breaking the law and offered me a legal alternative that saved me and my company. That is the true Ed Wishner, a good man to me."); Loredana Nesci, Ex. ("I was astonished when I learned from Ed's own mouth what had happened because Ed has always made sure that I paid what was due to the State and Federal Governments every year"); J. Richard Leyner ("I have never been involved in any transaction with [Mr. Wishner] where he did not act with the utmost integrity . . . . When this case was brought to my attention I was stunned.").

[6] It is sometimes argued that Criminal History categorization accounts for aberrant conduct; but, as the Court knows, that is not quite right since there are many reasons why people with different "true" criminal histories might end up in the same category. *See, e.g.,* U.S.S.G. § 4A1.2(c)-(j). Also, criminal history does not to account for age of first offense. *See United States v. Ward*, 814 F.Supp. 23, 24 (E.D. Va. 1993) ("While awarding defendants . . . some credit for leading relatively crime-free lives, the Criminal History Category of the Sentencing Guidelines does not account for the length of time a particular defendant refrains from criminal conduct. Thus, for example, the guidelines do not distinguish between a nineteen-year-old and a sixty-year-old, both of whom have led crime-free lives and consequently are assigned the same low Criminal History Category . . . because the longevity of the sixty-year-old's criminal history is not taken into account[.]").

**C. <u>The Court Should Vary Down Based on Mr. Wishner's Extraordinary
Acceptance of Responsibility and Extensive Cooperation with Authorities.</u>**

In addition to departing three levels under U.S.S.G. § 3E1.1, the Court should vary
or depart further based on Mr. Wishner's previously-described early, complete, and
unprotected acceptance of responsibility. *See United States v. Brown*, 985 F.2d 478, 482
(9th Cir. 1993) ("The mere existence of [§ 3E1.1] does not preclude the sentencing court
from making an additional departure . . . [if] the defendant manifests an extraordinary
acceptance of responsibility"); *United States v. Severino*, 454 F.3d 206, 211 (3d Cir. 2006)
("We agree with the guidance of other courts that after *Booker*, a guidelines departure
prohibition does not preclude the district court from considering that factor when the issue
is a variance," so "if [a court] held that it could not consider extraordinary acceptance of
responsibility under the sentencing factors of § 3553(a), such error could render [a]
sentence unlawful under 18 U.S.C. § 3742(a)(1) and require reversal") (citations omitted).

In addition, whether or not the government moves for a § 5K1.1 departure, this Court
should vary downward based on Mr. Wishner's extensive and ongoing cooperation and
assistance with the government and Receiver. *See United States v. Zolp*, 479 F.3d 715, 721
(9th Cir. 2007) ("[T]he district court did not err by considering [the defendant's]
cooperation as part of its analysis under . . . § 3553(a) rather than as part of its advisory
guidelines calculation"); *United States v. Landron-Class*, 696 F.3d 62, 77 (1st Cir. 2012)
("[A] sentencing court has discretion to consider the defendant's cooperation with the
government as a § 3553(a) factor, even if the government has not made a USSG § 5K1.1
motion for a downward departure") (collecting cases).

A downward variance for acceptance of responsibility and cooperation is particularly
important where, as here, the government is requesting an effective life sentence. *Lee*, 725
F.3d at 1169 (remanding for court to "give more serious consideration to whether to impose
a sentence that effectively condemns a 72-year-old woman who provided extensive
assistance to the government to death in prison"); *United States v. Patrick*, 707 F.3d 815,

820 (7th Cir. 2013) (remanding for court to reconsider the "severity of [a] de facto life sentence" in light of the defendant's cooperation).

### D. **The Court Should Vary Down Because Mr. Wishner Poses No Threat of Recidivism or Danger to Society.**

§ 3553(a)(2) requires courts to consider the need for a sentence to prevent a defendant from engaging in future criminal conduct or endangering society. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). In this vein, Congress has advised that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society[.]" *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (note to 18 U.S.C. § 3551).

The empirical facts show that Mr. Wishner poses virtually no threat of recidivism or danger to society. As a married 77-year-old employed college graduate with no criminal history points or history of drug use, Mr. Wishner is among the offenders least likely to recidivate in the entire criminal justice system. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 7, 12-13 & Exs. 2, 9-11 (2004); *see also United States v. Ruiz*, No. 04-CR-1146-03-RWS, 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) (collecting cases "declin[ing] to impose Guidelines sentences on defendants . . . over the age of forty at the time of sentencing on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants"). This is even truer given the nature of his conviction. *Measuring Recidivism*, *supra*, at Ex. 11 (first-time fraud offenders least likely to recidivate); David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in the deterrent effect of prison and probation for white-collar offenders); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) (finding "no decisive evidence" supporting "conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders").

But the Court does not need empirical data to discern that, while he made a major error and harmed many people, Mr. Wishner poses no continuing threat to society. Mr. Wishner is an elderly, increasingly-infirm man with strong family support and an ongoing vocation. He has led an otherwise honorable life and is deeply remorseful for the pain he has caused NASI investors. *E.g.,* Ltrs. of Beverly Wishner at 3 ("He understands the magnitude of his failure and the people he has hurt. I think that pains him even more than the consequences this has had for his family."); Harvey Bibicoff ("I have spoken to and met with Eddie since this situation became public and I know how sorry he is for his participation."). In his remaining few years, Mr. Wishner would like to try to redeem himself for the shameful mistakes he made at NASI and spend as much time as possible with his family. He has every incentive to scrupulously obey the law – as he did for his entire life before the NASI debacle – which is at least one reason why several former prosecutors and law-enforcement officers wrote in support of leniency. *E.g.,* Ltrs. of David Wright, Ex. 2-5 (son-in-law and former criminal AUSA, C.D. Cal); Herbert Tamres (former criminal AUSA, E.D.N.Y.); Hamid Naraghi, Ex. 2-29 (former CHP Officer); Lorendana Nesci, Ex. 2-30 (former LAPD Officer). A lengthy prison term is not necessary to protect society or to prevent Mr. Wishner from re-offending.

E. **The Court Should Vary Down Based on Mr. Wishner's History and Characteristics.**

That § 3553(a)(1) requires courts to consider the "history and circumstances" of each defendant reflects the "uniform and constant . . . federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Peugh*, 133 S.Ct. at 1239-40 (citations and quotations omitted). In particular, the Supreme Court has emphasized that possessing "the fullest information possible concerning the defendant's life and characteristics" is "[h]ighly relevant – if not essential – to [the] selection of an appropriate sentence." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citations and quotations omitted). Underlying this notion "is the principle

that the punishment should fit the offender and not merely the crime." *Peugh*, 133 S.Ct. at 1240 (citations and quotations omitted).

> **1. The Court Should Vary Down Because Mr. Wishner Is 77 Years Old and Faces a Host of Health Concerns.**

As Mr. Gillis notes in his sentencing brief, age and poor health are recognized and encouraged grounds for adjustment under § 3553(a)(1) and the Guidelines. *See Lee*, 725 F.3d at 1169 (finding district court did not give sufficient weight to fact "that for a 72-year old woman, a 96-month sentence is likely to be the equivalent of a life sentence," and remanding for the court to "give more serious consideration to whether to impose a sentence that effectively condemns a 72-year-old woman who provided extensive assistance to the government to death in prison"); U.S.S.G. § 5H1.1 ("Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration"); *id.* § 5H1.4. In addition, courts have an obligation to consider whether the sentence imposed provides the defendant with "medical care . . . in the *most effective manner*." 18 U.S.C. § 3553(a)(2)(D) (emphasis added); *see also United States v. Edwards*, 595 F.3d 1004, 1011 (9th Cir. 2010) (affirming probationary sentence for repeat-offending 63 year-old defendant despite 27-33 month Guideline range because, while "Bureau of Prisons was capable of providing for [his]" diabetes-related medical care, a "sentence of probation would satisfy the requirement of providing needed care in the most effective manner").[7]

---

[7] *See also, e.g., United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007) (rejecting government argument in child-pornography case that sentencing court wrongly varied downward based on the defendant's age, 51, and medical condition); *United States v. Heldeman*, 402 F.3d 220, 224 (1st Cir. 2005) (remanding for resentencing where trial court failed to account for defendant's age, 72, and "unstable" medical condition); *United States v. Marsh*, 820 F.Supp.2d 320, 387-88 (S.D.N.Y. 2011) (exercising discretion under § 3553 in fraud case and imposing 12 month sentence on 52-year-old defendant with heart disease and related conditions notwithstanding 108-135 month Guideline range because, among other things, the "defendant's many health problems . . . make it harder for him to serve a prison term"); *United States v. Lojek*, 755 F.Supp.2d 849 (N.D. Ohio 2010) (varying down from Guidelines range by nearly 2/3 in bribery case after balancing

**EDWARD WISHNER'S SENTENCING POSITION**

This is a case where age and poor health merit a downward variance. Mr. Wishner is 77 years old. He had a stroke earlier this year and suffers from atrial fibrillation, loss of balance, and weakness in his extremities. *See* PSR ¶¶ 81, 83. He also has osteoarthritis of the spine, a chronic condition affecting his bones, ligaments, and discs, for which his doctors have advised him not to lift or stand for longer than 30 minutes, and generally to minimize physical exertion. *See* Ltr. of Tirsch & Lownberg Chiropractic, Ex. 3. He sees several specialists for his conditions, including a cardiologist, neurologist, and physical therapist, along with his general practitioner. Earlier this year, one of Mr. Wishner's physicians succinctly summarized the state of his health and need for care: "I have explained to [Mr. Wishner] that he is a fairly sick guy and we certainly would not want him to be incarcerated." *See* 2/23/15 Contemporaneous Note of Dr. Lawrence May, Ex. 4.[8]

As Mr. Gillis noted, a shorter period of incarceration is sufficient but not greater than necessary to achieve the statutory goals of punishment. Mr. Wishner is highly unlikely to re-offend, *see* Section III.D., *supra*, and will suffer outsized physical and dignitary punishment from even a brief time in jail, *see* Section III.F., *infra*; *see also* Human Rights Watch, *Old Behind Bars: The Aging Prison Population in the United States* 43-88 (2012) (describing disproportionate physical and dignitary burdens imposed on older vs. younger

aggravating and mitigating factors, including fact that defendant's health "is what one would expect for an 83-year-old"); *United States v. Ayers*, 759 F.Supp.2d 945, 957 (N.D. Ohio 2010) (discussing sentences of co-defendants and "high-profile defendants sentenced in white collar fraud matters in recent years" and finding that loss overstatement and 74-year-old defendant's age and health supported variance from life to 15 years for organizing $2.3 billion fraud ring)

[8] *See also, e.g.,* Ltrs of Russell Wishner, Ex. 2-2 at 2 ("The result of my dad's poor-decision making and the harm he has caused the victims, as well as his own family, has taken a tremendous effect on him emotionally and physically. He has been hospitalized two times in the last year, he has collapsed multiple times in his own home, and he now suffers from labored breathing, all the result of much stress and anxiety"); Darren Wishner, Ex. 2-4 at 1 ("It saddens me to see that my Dad has made some poor decisions that were definitely out of character for him, and he has opened up to me how awful he feels about what has happened because of those choices. I hate seeing what this situation has done to his health. It is hard for me to watch his health decline rapidly and he can't even walk some days. He doesn't seem like the same man who could keep up with us in sports just a few years ago."); Beverly Wishner at 2-3 ("I have watched him age decades in the span of just a few months. He has recently suffered a stroke, developed labored breathing, and has collapsed from lack of strength and coordination in his legs.").

18

prisoners), *available at* http://bit.do/Old-Behind-Bars. Being unable to see his family, receive normal stimulation, and obtain regular specialized medical care will almost certainly deteriorate the quality and quantity of his remaining life. Given all of the § 3553(a) considerations, a brief period of incarceration is sufficient but not greater than necessary to punish an elderly man in the winter of his existence.

### 2. The Court Should Vary Down Based on Mr. Wishner's Family and Community Support.

#### (a) Devotion to family and friends.

A few consistent themes emerge when reading Mr. Wishner's sentencing letters, but one that jumps immediately to the fore is his total devotion to family and friends. As his son-in-law wrote:

> The . . . phrase "devoted family man" is one . . . used with such frequency and lack of discernment that it has lost its meaning -- as if the mere act of having a family is all that is necessary to qualify someone as devoted. But for Edward, his devotion to his family is absolute and infused in every fiber of his being.

*See* Ltr. of David Wright at 1-2. No one could say it better.

Mr. Wishner and his "beloved"[9] wife Beverly started out as 13-year-old sweethearts in Brooklyn, "[s]itting on the stoop of [her] parents' apartment" and "solving all the world's problems." *See* Ltr. of Beverly Wishner at 1. They have been "best friend[s]" ever since, and have now been married for over 50 years. *Id.*

Mrs. Wishner's poignant letter describes the person she knows "better than any other human being on earth" as "intensely loyal, dependable, supportive, and caring," recounting how, when his mother died, Mr. Wishner dropped everything to comfort his father and move him to California to be with family; how he got his wife involved in charity work; and how Mr. Wishner has "given his heart and soul" to serving his accounting clients and

---

[9] *See* Ltr. of Jill Wishner, Ex. 2-6 at 1 ("All these years, he visits his boys daily at their restaurant where we often are, and we spend many of Darren's nights or day off with he and his wife, his 'beloved', as he always calls her").

**EDWARD WISHNER'S SENTENCING POSITION**

staff. *Id.* at 2. Ultimately, Mrs. Wishner explains her ongoing devotion to her husband in terms not rooted in ignorance, but rather in understanding that while he has caused harm, Mr. Wishner is a fundamentally-decent man and an excellent husband and father:

> For over 50 years, Eddie has been completely faithful to me and to his family. How many men can say the same? To me, that shows the man that Eddie truly is. That is why I stand by him. That is why I know that, though Eddie did wrong, he is not a bad person, husband, or father. Selfless is the perfect word to describe him. He has a genuine passion to help and serve others and puts everyone else's needs and struggles before his own.

*Id.* at 2.

After more than 50 years, Mrs. Wishner is terrified that she will never again see her best friend outside of prison. And her children are equally concerned about the impact it will have on their mother. *E.g.*, Ltrs. of Russell Wishner at 3 ("My dad has been my mom's best friend, loving partner, and supportive husband. For over 50 years, they have done everything together. She is totally and completely dependent on him in every aspect of her life."); Stacy Wishner, Ex. 2-3 at 2 ("It seems inevitable that my mom will soon be left without her . . . best friend and husband for over half a century, which has already taken a toll on her . . . . The happiest person I knew now suffers from anxiety and depression . . . . To say that she is terribly frightened about her future is an understatement."). Mrs. Wishner writes that she and the family "will be lost without Eddie by [their] side":

> What can I say to you, Your Honor, other than that I love this man more than I have ever loved another human being. Our children and our grandchildren love him and need him in their lives. I just want to be with him, together with our family. That is all I have ever wanted. Everyone makes mistakes in life. Please don't make him pay for his mistake with his life. I beg you to give Eddie a sentence that will allow us to be together with him once again.

*Id.* at 3.

Mr. Wishner shares equally strong bonds with his children and grandchildren.  Mr. Wishner's sons describe him as a "best friend" and a "go-to guy for every major decision."  *See* Ltrs. of Russell Wishner at 2-3 ("My dad was not, and still is, not just a dad.  He is my best friend and my confidant.  He is my go-to guy for every major decision I have made in my life."); Darren Wishner at 2 ("I love my Dad so much and he is one of my best friends.").[10]  While he is no longer able to mix it up with his sons and "their friends" on the basketball court,[11] Mr. Wishner still visits his sons daily at the pizza restaurant – Fratelli's – that he helped them found more than 20 years ago:

> [We] have a bond so strong that my brother and I actually opened up our
> restaurant within walking distance of my dad's tax preparation office, where
> he has worked for over 30 years.  Not a single day goes by without a drop-in
> by my dad to check up on our well-being, help out with customers, and/or help
> supervise our staff . . . to make sure our day goes smoothly and successfully.

Ltr. of Russell Wishner at 1.  Mr. Wishner's sons are devastated that those visits will likely end for a while, but "beg" the Court that it not be forever:

> I plead with you to give my father a sentence that will be just but also merciful
> so that my mother and father can end their lives on this earth together,
> surrounded by the family that they have made and nurtured for half a century.

*Id.* at 3.

Mr. Wishner's youngest daughter describes her dad as "the most compassionate, moral, hard-working, caring, and loving man in my life," and writes that he "has instilled in

---

[10] *See also* Ltrs. of Jill Wishner at 2 ("I had never seen my husband cry before he found out he may not have his Dad in his daily life because of the ATM business. Darren has such a special relationship with his Dad"); Jonathan Kates, Ex. 2-40 ("I was always a little envious of the relationship he has with Russell because he [is] not only a father but he is also a best friend[.]").

[11] *See* Ltr. of Russell Wishner at 2 ("My dad is truly loved by so many that I can honestly say most of my buddies have actually become his close friends over the years, where he was regularly called for pick-up basketball and flag football games.  Unfortunately, the regretful offense he has committed has taken an obvious toll on his emotional and physical well-being to the point where he is no longer physically able to engage in those activities, but 'our' friends still come around often to engage my dad socially and to offer support.").

each of his four children the value of hard work, strong family relationships, and benevolence." *See* Ltr. of Stacy Wishner at 1. Just as with his sons, Mr. Wishner showed his proclivity for hard-work and benevolence when Stacy found herself at a crossroads after college. Wanting his kids to be self-sufficient, he moved her back into the family home for five years, helping her transition to an independent career. *Id.* at 1. As Stacy writes, Mr. Wishner has also showed his passion for family in other ways, including small but telling gestures like "never miss[ing] a single hospital birth of his five grandchildren." Stacy "owe[s] [her dad] everything" and trusts "him with [her] life." *Id.* at 2-3.

The letters from Mr. Wishner's other family members are compelling and specific, describing a man who would drop everything to be by a sick daughter-in-law's side, *see* Ltrs. of Jill Wishner and Kathi Copans, Ex. 2-19, show exceptional compassion to a son-in-law in trying times, *see* Ltr. of David Wright at 2-3, and generally open his heart and strive to do right by those in his life. Mr. Wishner respectfully asks the Court to consider these letters as it attempts to fashion a sentence fitting not just the offense, but also a complex offender.

Mr. Wishner also requests that the Court consider the letters submitted by his friends, many of whom have known Mr. Wishner for over 50 years. Those letters describe him as "wonderful, caring, moral," "dependable," "loyal," "full of love," filled with a "goodness + friendliness . . . that no one can deny," "reliable, sincere, genuine, and, and, and." *See* Ltrs. of Herbert Tamres at 2 (50+ years), Steve Doherty (36 years), Richard Anaya (30 years), Chris Flessas and Margaret McWilliams (35 years), John Baressi (36 years), Voula Flessas (36 years); *see also* Ltrs. of Dimitri Flessas (36 years), Harvey Bibicoff (62 years), Martin Michaels (50 years), Charles Lowlicht (60 years), Eric Mahler (20+ years), Bruce Miltenberg (50+ years), J. Richard Leyner (36 years), Vassiliki Flessas (36 years). Mr. Wishner's ability to maintain these close, decades-long friendships says something in itself.

But the letters say much more. Mr. Wishner's oldest friends describe a positive and loyal man always ready to help. For example, Harvey Bibicoff, who went to high school with Mr. Wishner, writes: "His actions over the years, at least the ones that I have had the

22

[chance] to see or be involved with have always been 'good guy' actions. He was always ready to help if he could." Herbert Tamres, a friend for over 50 years, writes that he "love[s] Ed as a brother and Beverly as a sister," and describes Mr. Wishner as "a wonderful, caring, moral and ethical family man[.]" Steve Doherty, a friend and business associate for over 35 years, writes: "Ed is a very dependable person. Anytime I would need anything, money or guidance, Ed was always there to help – without him I would not exist." *See* Ex. 2-28. Richard Anaya, a friend for over 30 years, describes Mr. Wishner as an ideal basketball teammate: "He always made me feel like a necessary part of the team, even when I might have felt otherwise. He is that kind of person: supportive, enthusiastic, loyal, and many other admirable traits." *See* Ex. 2-22. Chris Flessas, a friend for 35 years, describes Mr. Wishner as "a man of character and full of love," and states that he and his wife "trust Ed with [their] lives." *See* Ex. 2-26. A friend for over 50 years, Bruce Miltenberg writes that Mr. Wishner is "good man [who] deserves the recognition for all the good he has participated in through a life of generosity." *See* Ex. 2-12.

In addition to his contemporaries, Mr. Wishner has also formed strong bonds as a friend and mentor to younger adults. For example, Dimitri Flessas was 10 years old when he first met Mr. Wishner. He recalls that "Ed was always laughing, joking, and giving all the neighborhood kids and his kids nicknames which we still call each other 36 years later." As Mr. Flessas got older, his relationship with Mr. Wishner became a true friendship: "up until a few years ago . . . Ed would pick [him] up to go and play basketball at the [rec center]." "Although not a relative," Mr. Flessas writes, "my life experiences with Ed would put Ed in a category of how an uncle should be." Mr. Flessas's sister goes even further, writing: "Ed has been like a 2nd father to me." *See* Ltr. of Voula Flessas, Ex. 2-21.

Eric Mahler was in his "early 20s and newly married" when he met Mr. Wishner over 20 years ago. Since then, Mr. Wishner "truly mentored [him] in [fiscal] responsibility and [provided] guidance which shaped [him] to a man of integrity and honor." According to Mr. Mahler:

**EDWARD WISHNER'S SENTENCING POSITION**

Anybody that knows Ed would agree that he truly cares about his friends. He
listens with intent and offers heart felt advice when asked. I have spent hours
in his office spilling my heart out about personal issues and life's challenges
on his business time. I can't recall [once] he didn't give me the time I needed.

*See* Ltr. of Eric Mahler.

Mr. Wishner's friends uniformly assert that Mr. Wishner's conduct at NASI is out of character; they ask the Court to consider his entire life history and positive attributes when imposing a sentence.

### (b)  Good works, industriousness, and a passion for people.

Along with devotion to family and friends, another theme running throughout Mr. Wishner's sentencing letters is a true passion for people and history of silent good works. *See* Ltrs. of Beverly Wishner at 2 ("Eddie does not call attention to himself and he never talks about his generosity to others, not even to me. I have to find out about it from others relating it to me."); Ltr. of David Wright at 3 ("Edward is one of the hardest working people I have ever known. But he does so silently. He does not ask for praise or thanks or even gratitude."). For example, Dr. Daniel Durschlag, an accounting client, recalls:

One of the instances of his generosity and decency that I particularly
remember concerns one of the Mexican assistants working in my office, facing
serious problems with her tax return filings. They had been done so
improperly that she was concerned about potential deportation action. As a
favor, I asked Ed to step in and help her, which he did without question. Not
only was he able to straighten out her tax filings, he refused to take any money
for all of his hard work and time spent. This is vintage Ed Wishner.

Other clients, friends, and family members repeat similar stories in their letters:

- Steven Sepassi: "I have always thought of Ed as a helpful and kind person.
  Several incidents stand out for me[.] One was the passing of his long time
  secretary[.] When she passed . . . she had nobody in her life. Ed was the only

person that took care of her affairs after her passing, and kept her ashes in his office as a memory of her time with him."  Ltr. of Steven Stepassi, Ex. 2-14.

- Bruce Miltenberg: "Fortune and luck sometimes overshadowed business.  Ed was always available to guide, advise and help clients, staff and friends.  When my first child was born in 1965, Ed helped and guided me financially and emotionally through a difficult time in my life.  In fact, he lent me money to pay for the cost of bringing my Son into this world."

- Terry MacInnis: "I have often watched Ed take an interest in the wellbeing of his clients.  In fact, when he learned that my assistant, for whom he also prepared tax returns, was having a difficult time financially, he prepared her returns at no cost to her for the next several years."

- Jerry Jacobsen: "As our relationship progressed to friendship, I was . . . involved and witnessed Ed help a number of business owners that fell delinquent with the IRS or State of CA to climb out of their desperate situations which would have crumbled not only their businesses but also their lives, while donating his time and expertise in helping them to finally get their businesses and lives on the right track."

- Darren Wishner: "After hearing about a family in need of a residence after losing their home from the mortgage meltdown, my father is the one who suggested and encouraged me to pack up and move out of my townhouse that I own and move back into his house in order to give that family a home before they would be forced to live on the streets due to their then-ruined, bad-credit rating."

- George Kaczender: During our working relationship," which began in the 1980s, "we were often unable to pay for his professional fees for months.  He never asked us for the money or suspended his service for us."

- Tommaso Barletta: "I have opened my financial inexperience to this man and I received honesty, friendship and invaluable help from someone that enjoyed life and friends so much. Never took advantage of that. Your Honor I hope you . . . consider the way Mr. Wishner took care of me and many of the staff by not charging for his

time and offering to help anyone here without asking nothing back but a simple hug and a thank you."

### (c) Military service and loss of community standing.

While not exhaustive, a few other factors are important to obtaining the "fullest information possible concerning [Mr. Wishner's] life and characteristics." *Pepper*, 562 U.S. at 488. Military service is another reflection of Mr. Wishner's good works and devotion to others, *see* PSR ¶ 90; the Court should consider that service when imposing his sentence, *see, e.g.,* U.S.S.G. § 5H1.11; *United States v. Carper*, 659 F.3d 923, 924 (9th Cir. 2011) (affirming below-Guideline sentence where district court varied downward based on defendant's military service and unlikelihood of recidivism). The Court should also consider the collateral punishment that Mr. Wishner has suffered in the form of humiliation and lost standing in the community – after a lifetime of building his reputation. *See* Ltr. of Beverly Wishner ("What is worse for Eddie, however, is that he has lost credibility in the public eye . . . . He understands the magnitude of his failure and the people he has hurt. I think that pains him even more than the consequences this has had for his family."); *United States v. Gaind*, 829 F.Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Vigil*, 476 F.Supp.2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation and widespread media coverage).

Of course, it's impossible to capture the richness and complexity of a person's life in a 44-page legal document. But these factors, as well as several others above, demonstrate Mr. Wishner's humanity and fundamentally good nature, filling in a picture now defined in many ways by his single, significant human failing.

### F. __The Court Should Vary Down to Avoid Unwarranted Sentencing Disparities and Similarities.__

§ 3553(a)(6) requires courts to consider the need to avoid unwarranted disparities among similarly-situated defendants, *see* 18 U.S.C. § 3553(a)(6), as well as the need to

avoid unwarranted similarities among dissimilarly-situated defendants, *see Gall*, 552 U.S. at 55; *United States v. Apodaca*, 641 F.3d 1077, 1087 (9th Cir. 2011).

As Mr. Gillis noted, this Court has imposed significant sentences in at least two prior high-loss, high-victim-count Ponzi cases: *United States v. Rangel*, No. 10-CR-1061-SJO and *United States v. Valencia*, No. 10-CR-1267-SJO. Those cases differ from this case in at least four ways: motive, age and health, recidivism risk, and loss amounts.

Mr. Gillis's brief dealt with the first distinction and Mr. Wishner adopts his analysis. *See* Gillis Sent'g Br. at 18:15-20. Unlike *Rangel* and *Valencia*, this is not a case where Mr. Gillis and Mr. Wisher intentionally preyed on vulnerable victims and spent all of NASI's money funding their own lavish lifestyles. The nature and circumstances of the offenses, and particularly the defendants' relative motives and culpability, distinguish this case.[12]

Also distinguishing are the defendants' relative ages and medical conditions. Mr. Rangel was 47 years old when the Court sentenced him to 22 years in prison, and the Court did not mention any medical infirmities during his sentencing hearing. Even if he served the entire term, Mr. Rangel would be seven years younger upon release than Mr. Wishner is today. Ms. Valencia was also 47 when the Court sentenced her to prison and, like Mr. Rangel, the Court did not mention medical ailments during her sentencing hearing. If Ms. Valencia served the entire nine-year term imposed, she would still be younger upon release than Mr. Wishner was when he started with NASI. By contrast, and as discussed above, Mr. Wishner is 77 years old at the time of sentencing and suffers from several ailments.

---

[12] *See* PSR ¶¶ 29-31; *cf.* Case. No. 10-CR-1061-SJO, Docket No. 74, Sent'g Tr. at 24:16-29:6, 32:14-18, 33:22-34:1, 40:24-25, 98:3-11 (explaining that Mr. Rangel drained all money from scheme and may have stashed money and assets in Mexico, leaving "particularly vulnerable" investors with nothing and, in many cases, causing them to lose their homes, while he himself "had a [$]2.5 or $2.2 million home," "drove a Lamborghini," and expressed "callousness" at the "harm and trauma that has befallen the community"); Case No. 10-CR-1267-SJO, Docket No. 56, Sent'g Tr. at 12:21-24, 18:1-5 (explaining that "Ms. Valencia used a substantial portion of the victim investor money for her personal benefit including purchase of her personal residence, purchase of cars for herself, her friends, [and] family members," while other money went into fake "properties" that were actually vehicles for transferring money to associates).

**EDWARD WISHNER'S SENTENCING POSITION**

In mathematical terms of disparity, Ms. Valencia's nine-year sentence represents just 22.7% of her baseline life expectancy, but over 100% of Mr. Wishner's; Mr. Rangel's 22-year sentence represents 60% of his baseline life expectancy, but 265.1% of Mr. Wishner's. *See* U.S. Soc. Sec. Admin., *Calculators: Life Expectancy*, *available at* http://bit.do/Life-Expectancy-Calculator (identifying average life expectancy for 65-year-old). In real-life terms, a custodial sentence of any duration will drastically shorten Mr. Wishner's life as a senior-citizen inmate[13]; and a sentence approaching Mr. Rangel's or Ms. Valencia's would almost certainly ensure that, unlike those defendants, Mr. Wishner will die in jail. In addition to motive, offender characteristics – especially age and health – distinguish this case. *See United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006) ("Death is . . . a uniquely traumatic experience, and prison . . . deprives defendants of the ability to be with their families or to otherwise control the circumstances of death. A sentence that forces this experience on a prisoner is quantitatively more severe than a sentence that does not consume the entirety of a defendant's life, inflicting greater punishment[.]").

The risk of recidivism also distinguishes the cases. For all of the reasons discussed above, Mr. Wishner poses no meaningful risk of recidivism. Conversely, this Court found Mr. Rangel such an ongoing "economic risk to the community" that it recommended his deportation upon release. Case. No. 10-CR-1061-SJO, Docket No. 74, Sent'g Tr. at 95:2-5. For Ms. Valencia, the Court found the misconduct sophisticated and especially pernicious because she preyed on longtime friends and struggling family members; combined with her relatively young age upon release, those factors make her a far greater recidivism threat than Mr. Wishner. *See* Case. No. 10-CR-1267-SJO, Docket No. 56, Sent'g Tr. at 72:11-23.

Of course, the government's loss estimate in this case is greater than the estimates in either *Rangel* or *Valencia*. But focusing on loss when imposing a high-loss fraud sentence

---

[13] *See, e.g.,* U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates* 10 (2004), *available at* http://nicic.gov/library/018735 (reviewing studies showing that jail time causes "accelerated signs of aging and deteriorated health," to the point where inmates over 55 are medically on par with non-inmates 11.5 years their senior).

**EDWARD WISHNER'S SENTENCING POSITION**

leads to a web of unwarranted similarities and disparities. *See, e.g., United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring) ("Until this Court weighs in on the merits of the loss guideline, sentences in high-loss cases will remain wildly divergent as some district judges apply the loss guideline unquestioningly while others essentially ignore it. The widespread perception that the loss guideline is broken leaves district judges without meaningful guidance in high-loss cases[.]").

Indeed, as Mr. Gillis noted, courts around the country have criticized the high-loss Guidelines and their misleading "fetish with abstract arithmetic" as "patently absurd on their face," *United States v. Adelson*, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F.Appx. 93 (2d Cir. 2008),[14] "a black stain on common sense," *United States v. Parris*, 573 F.Supp.2d 744, 754 (E.D.N.Y. 2008), and, ultimately, "of no help" to the task of ascertaining a minimally-sufficient sentence, *United States v. Watt*, 707 F.Supp.2d 149, 151 (D. Mass. 2010), among other pejoratives.[15]

For this reason, judges have consistently deviated down in high-loss fraud cases after concluding that the Guidelines led them *away* from the principal goals of sentencing, rather than towards them. *See* Frank Bowman, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169 (2008) ("The sentences nominally prescribed by

---

[14] *Adelson*, 441 F.Supp.2d at 515 (also stating that the "absurd" sentencing ranges for high-loss frauds "expose[] . . . the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense").

[15] *See also, e.g., Corsey*, 723 F.3d at 377 (Underhill, J., concurring) (describing the high-loss fraud Guideline as "fundamentally flawed" and the sentences it produces as "shockingly high"); *United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004) (describing the amount of loss as "kind of an accident" and a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); U.S. Sent'g Comm'n, *Plenary Discussion: "Views From Stakeholders Regarding the Fraud Guideline," U.S. Sent'g Comm'n Symposium on Economic Crime* (Sept. 18, 2013) (Judge Charles Breyer: "[O]ne thing seems to be apparent, which is that with respect to 2B1.1, the fraud guideline, we see over time now an increasing distance between guideline sentence[s] and variances or non-guideline sentences. And we see that growing . . . . [T]o the extent the disparity's becoming greater and greater, maybe it's telling us something about the guidelines themselves."; Judge Loretta Preska: describing various non-guidelines sentences and characterizing the 2B1.1 guidelines, at least in some cases, as "[s]imply absurd"), *available at* http://bit.do/Fraud-Guideline-Commentary.

**EDWARD WISHNER'S SENTENCING POSITION**

the Guidelines for high-loss corporate fraud cases have become so draconian that judges are unwilling to impose them even in the biggest and most publicly notorious cases"). As Mr. Gillis rightly noted, for example, courts imposed below-Guideline sentences in 55% of all fraud cases in 2014. *See* Gillis Sent'g Br. at 19:20-20:4.

The below-Guideline numbers are even more acute for high-loss frauds. The Commission last collected high-loss sentencing data in advance of its 2013 Symposium on Economic Crime. That data shows that, in 2012, courts sentenced 42 people for $50m frauds, two for $100m frauds, three for $200m frauds, and nine for $400m+ frauds. Of those offenders, over 80% received below-guidelines sentences, often without government assistance. *See* U.S. Sent'g Comm'n, *Sentencing and Guideline Application Information for § 2B1.1 Offenders*, Figs. 7-8, *available at* http://bit.do/USSC-Nationwide-Trends. And despite literally off-the-chart ranges for many of these offenders, the average sentence was 102 months.

Indeed, courts have imposed significantly reduced sentences in less compelling cases with far larger loss amounts:

- *United States v. Balboa*, No. 12-CR-196 (S.D.N.Y) (varying downward from guidelines offense level of 49 (life) ($390m loss, 97 victims, obstruction, leader, overseas, securities laws) to 48 months, citing defendant's characteristics as good father/husband, his family's dependency, his resulting inability to participate in the financial industry, and the circumstances listed on p. 20 of his sentencing paper);

- *United States v. Davis*, No. 09-CR-335 (S.D. Tex.) (despite Guidelines calculation of 46 and stat max of 360 months, sentencing Allen Stanford's deputy, who made nearly $13m over 21 years in $7b Ponzi-scheme, to 60 months, citing early acceptance of responsibility and cooperation in convicting other defendants, explaining the fraud, and identifying foreign and overseas assets);

- *United States v. Snow*, No. 11-CR-42 (S.D. Ind.) (in Ponzi scheme causing >$200m loss to >5,000 victims, varying downward from Guideline sentence of life and stat max of 85 years to 120 months because defendant played a less central role, did not

directly lie to others, was a good family man, and, at the time of the fraud, needed to remain employed because his wife had breast cancer).

*See also* Gillis Sent'g Br. at 20:7-21:10; *Parris*, 573 F.Supp.2d at 753. A downward variance is appropriate to avoid unwarranted similarities and disparities.

## IV. THE ADVISORY GUIDELINES RANGE

**A. Because the Government Cannot Prove Actual Loss with Clear, Convincing, and Reliable Evidence, the Guidelines Recommend a Sentence of 78-97 Months.**

Part II of Mr. Gillis's brief discusses the advisory guidelines range, the government's burden of establishing loss by "clear and convincing" evidence, the appropriate measure of loss in this case, and the impropriety of applying a sophisticated-means enhancement. *See* Gillis Sent'g Br. at 3:20-11:25. Mr. Wishner concurs with that discussion, as well as Mr. Gillis's corrected guidelines calculation. Rather than belaboring the Court with repetition, Mr. Wishner writes briefly to supplement one of Mr. Gillis's existing arguments.

As Mr. Gillis rightly noted, the government must prove loss by clear and convincing evidence, *United States v. Restrepo*, 946 F.2d 654, 659-60 (9th Cir. 1991) (en banc), and must do so with materials possessing "sufficient indicia of reliability to support" the "probable accuracy" of the facts they purport to establish, *United States v. Garcia-Sanchez*, 189 F.3d 1143, 1148 (9th Cir. 1999). The government has indicated that it considers pre-2009 investors "net winners" given NASI's 20% annual returns. *See* Declaration of Ranee Katzenstein ¶ 7.b., Docket No. 75-1 ("[B]ecause NASI paid 20% annual interest to its investors . . . any investor who invested before July 2009 (i.e., five years before NASI's collapse) would have been a net winner"). But the government's loss analysis, upon which the PSR appears to be based, begins in September 2007, not July 2009. *See* Gillis Sent'g Br., Ex. 41.[16] Including untold numbers of government-described "net winners" in its loss

---

[16] Further, the receiver's recently-produced "net winners" list includes names that the government's loss analysis deems net losers. *Compare, e.g.,* Exhibit 41 to Gillis Sent' Br. at 8 at # 25 (G.E. & W.E.), 30 at # 2 (M.S.) *with* Ex. 1 at 1 at #5 (G.E. and W.E.), 3 # at 35 (M.S.).

estimate is yet another reason why the government cannot meet its burden of proving actual loss with clear, convincing, and reliable evidence. *See United States v. Van Alstyne*, 584 F.3d 803, 818 (9th Cir. 2009) (explaining that "payments to losing investors up to the amount of their investment do not count as losses" under the Guidelines). As Mr. Gillis explained, intended loss, measured by Mr. Wishner's and Mr. Gillis's personal gain, is the best measure of loss in this case. *See* Gillis Sent'g Br. at 9:23-10:6.

Thus, prior to departures and variances, the total offense level should be 28, and the advisory Guidelines range should be 78-97 months:

| Base offense level | 7 |
|---|---|
| Loss adjustment | 18 |
| Over 250 victims | 6 |
| Acceptance of responsibility | (3) |
| Total offense level | 28 |
| Criminal history category | I |
| Guidelines range | 78-97 months |

**B. While Normally a Necessary "Starting Point," the High-Loss Fraud Guidelines Are Not Helpful Here in Ascertaining a Minimally-Sufficient Sentence Because They Ignore Empirical Evidence, National Experience, and the Purposes of Sentencing.**

As is often stated, the Guidelines mark the starting point of sentencing, *Gall*, 552 U.S. at 49; and 18 U.S.C. § 3553(a)(4) requires courts to consider the Guidelines range as one factor in its sentencing analysis. In *Rita*, the Supreme Court identified two reasons why courts might "fair[ly] . . . assume" that the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." 551 U.S. at 349-50. First, the original Commission generally used an "empirical approach," which included "an . . . examination of 10,000 presentence reports setting forth what judges had done in the past." *Id.* at 349. Second, following this initial analysis, the Commission's ongoing charge

requires it to review and revise the Guidelines based on judicial feedback (via sentencing decisions), and consultation with frontline actors and experts. *Id.* at 348-50. When acting in this "institutional role," the Commission ostensibly has a capacity that courts lack: "to base its determinations on empirical data and national experience, guided by a professional staff with [relevant] expertise." *Kimbrough*, 552 U.S. at 109 (citations omitted).

In practice, however, the Sentencing Commission deviated from this approach when developing certain Guidelines, and, in the process, undermined the justification for viewing those Guidelines as reliable § 3553(a) baselines. *See Pepper*, 562 U.S. at 501; *Gall*, 552 U.S. at 46 & n.2 (recognizing that "not all of the Guidelines are tied to . . . empirical evidence"). Where this has occurred – as with the crack and high-loss fraud Guidelines – sentencing courts have rightly avoided reliance on Guidelines that do little, if anything, to advance the goal of arriving at a minimally-sufficient sentence. *See Kimbrough*, 552 U.S. at 109-111 (finding that district court properly rejected Guideline where Commission promulgated recommendation based on non-expert, political reasons, rather than national experience or empirical evidence); *United States v. Barsumyan*, 517 F.3d 1154, 1158-59 (9th Cir. 2008) (explaining that the Supreme Court has "blessed . . . policy-based deviation[s] from the Sentencing Guidelines" where the "operation of a particular guideline" "inappropriately distort[s] the final . . . calculation" in a given case); *Adelson*, 441 F.Supp.2d at 515; *Parris*, 573 F.Supp.2d at 754; *Watt*, 707 F.Supp.2d at 151; *Lenagh*, 2009 WL 296999, at *3, 6 ("In formulating this sentence, the court has considered the sentencing range established by the Guidelines, but, because the fraud offense Guidelines were [not] promulgated . . . by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines."). A brief review demonstrates how this came to pass.

### 1. Flawed from the Start, the Fraud Guidelines Evolved as a One-Way Ratchet.

According to the PSR, Mr. Wishner's guideline range is 235-293 months. Before the Guidelines, however, courts sentenced just 82% of similarly-situated offenders to jail, with

the average sentence being just 18-24 months.  *See* U.S. Sent'g Comm'n, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* 33 (1987), *available at* http://bit.do/1987-Supp-Rprt; U.S. Sent'g Comm'n, *1987 Guidelines Manual* 5.2 (1987), *available at* http://bit.do/1987-Manual.  The other 18% of defendants were not sentenced to prison at all.  *Supplementary Report*, *supra*, at 33.[17]

Nonetheless, when the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" for white collar offenses.  *See* Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 17 (1988).[18]  The Commission required some form of confinement for all but the least serious cases, and adopted a fraud guideline requiring no less than 0-6 months, and no more than 30-37 months, for defendants in Criminal History Category I.  *See* U.S.S.G. § 2F1.1 (1987).  In so doing, the Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." U.S.S.G., ch. 1, intro., pt. 4(d) (1987); *see also* U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 56 (2004) (explaining that the Commission sought to ensure that white-collar offenders faced a "short but definite period of confinement"), *available at* http://bit.do/15-Yr-USSG-Study.

---

[17] Although he pleaded guilty without trial, Mr. Wishner uses as his basis for comparison first-time offenders convicted at trial of sophisticated fraud involving the highest loss amounts recorded.

[18] When enacting the Sentencing Reform Act of 1984, Congress told the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing as set forth in section 3553(a)," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-Guidelines period as a "starting point," *id.* § 994(m).  Notwithstanding § 991(b)(1)(A), the original Commission abandoned its effort to design guidelines based on the purposes of sentencing since it could not agree on which purposes should predominate, *Rita*, 551 U.S. at 349, and, notwithstanding § 994(m), deviated from past practice as a "starting point" for fraud offenses after concluding that "courts sentence to probation an inappropriately high percentage of offenders guilty of certain economic crimes . . . that in the Commission's view are 'serious.'"  U.S.S.G., ch. 1, intro., pt. 4(d) (1987).

**EDWARD WISHNER'S SENTENCING POSITION**

The Commission, however, quickly abandoned its original goal of ensuring "short but definite" sentences. Beginning just two years after the Guidelines went into effect, prison sentences for fraud offenders steadily began to increase. Taking the PSR figures at face value, the effect of those increases in this case was to add seven levels for loss in 1989, to add eight more levels for loss in 2001, to increase the base offense level by one in 2003, and to add six levels for the number of victims in 2001 and 2003. As a result, relying on PSR's loss and victim-count figures, Mr. Wishner's advisory Guidelines range is roughly *10 times* greater than the recommended range under the original 1987 Guidelines:

| 1987 Sentence Based on Figures in PSR | |
|---|---|
| Base offense level (§ 2F1.1) | 6 |
| Loss adjustment | 11 |
| Over 1 victim | 2 |
| Acceptance of responsibility | (2) |
| Total offense level | 17 |
| Criminal history category | I |
| Guidelines range | 24-30 months |

| 2014-15 Sentence Based on Figures in PSR | |
|---|---|
| Base offense level (§ 2B1.1) | 7 |
| Loss adjustment | 26 |
| Sophisticated means adjustment | 2 |
| Over 250 victims | 6 |
| Acceptance of responsibility | (3) |
| Total offense level | 38 |
| Criminal history category | I |
| Guidelines range | 235-93 months |

**EDWARD WISHNER'S SENTENCING POSITION**

## 2. The Fraud Guidelines Lack Empirical, Experiential, or Doctrinal Support.

### (a) The Commission increased the loss guideline based on unsupported "signals" and to achieve parity with unsupported drug guidelines.

In arriving at this dramatic increase in punishment, the Commission deviated from its characteristic "institutional role." Starting in 1989, for example, two years after the guidelines went into effect, the Commission added seven levels for a losses over $80 million. *See* U.S.S.G., Appx. C, Amend. 154 (Nov. 1, 1989). The stated reason for the amendment was to "increase the offense levels for offenses with larger losses to provide additional deterrence and better reflect the seriousness of the conduct." *Id*.

But that reason was soon refuted. According to former Commissioner Michael K. Block (who had just resigned[19]) and former Deputy Chief Counsel Jeffrey S. Parker, the Justice Department's *ex-officio* member had persuaded four of six Commissioners "that recent congressional enactments had given oblique 'signals' to the Commission to increase fraud penalties," although the statutes "said no such thing." Jeffery S. Parker & Michael K. Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset?*, 27 Am. Crim. L. Rev. 289, 319 (1989). The Commission responded by "gratuitously" increasing penalties in high-loss fraud cases for reasons that were "overtly political and inexpert," and abandoned its statutory mandates by failing to rely on its own data, measure the efficiency or effectiveness of Guideline sentences, or provide a prison-impact analysis. *Id*. at 318-20.

In 2001, the Commission added another eight levels for loss amounts over $100 million as part of its Economic Crimes Package. *See* U.S.S.G, Appx. C, Amend 617 (Nov. 1, 2001). The Commission's official explanation for the amendment was that it responded to "comments received from the [1] Department of Justice, the [2] Criminal Law Committee of the Judicial Conference, and others, that [the fraud Guidelines] under-punish

---

[19] Paula Yost, *Sentencing Panel Member Resigns over Research*, Wash. Post, Aug. 23, 1989, at A25 (reporting that Commissioner Block resigned on August 22, 1989 "over what he said is a lack of commitment by commissioners to base decisions on research and scientific data when amending sentencing guidelines").

individuals involved in moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines." *Id.* While the Commission did not identify the "other guidelines" to which it referred, it is clear from the proceedings upon which the amendment was based that it referred to the drug Guidelines.

At the Commission's Economic Crimes Symposium in 2000, at which the issues and questions underlying the Economic Crimes Package were discussed, a formal question was posed and provided in writing: "[I]f there is a current problem with the guidelines that is in need of repair, is it that fraud and theft are punished too leniently or that drug crimes are punished too harshly?" U.S. Sent'g Comm'n, *The Nature and Severity of Punishment for Economic Crimes; Determinants of Offense Seriousness and Culpability* 54 (2000), *available at* http://bit.do/USSC-2000-Economic-Crimes. On behalf of (1) the Department of Justice, and in response to the moderator's question asking whether economic crimes should be "punished in the same way that we punish drug offenders," *id.* at 55, Assistant Attorney General James K. Robinson stated that "sentences for economic crimes should not be set, in our view, to match sentences for drug crimes," *id.* at 59, but should be set "in terms of the need to fulfill the purposes of sentencing," *id.* at 58. Judge J. Phil Gilbert, speaking on behalf of (2) the Criminal Law Committee of the Judicial Conference, stated that drug crimes and fraud offenses cannot be compared because they are "apples and oranges." *Id.* at 56. Mark Cohen, Professor of Economics at Vanderbilt University, stated that "drug offenses are broke so they need to be fixed," but that there was no "evidence that fraud is broke," and summarized research presented at the symposium demonstrating that increasing sentences for fraud would not serve the purpose of deterrence. *Id.* at 65-66, 69.

Nonetheless, as revealed by the question posed by the Commission and its reference to "penalty levels for offenses of similar seriousness sentenced under other guidelines," the Commission ratcheted up the fraud Guidelines based on the Guidelines for drug offenses.

This alone demonstrates that the increase was unsound, as the drug Guidelines themselves were not based on empirical data or national experience. *See Gall*, 552 U.S. at 46 & n.2; *Kimbrough*, 552 U.S. at 96. Instead, they were designed to be "proportional" to

37

statutory mandatory minimums, *see* U.S.S.G. § 2D1.1 comment. (backg'd) (1987), lack any empirical basis, and dramatically increased sentences for drug offenses "far above what had been typical in past practice, and in many cases above the level required by the literal terms of the mandatory minimum statutes." *Fifteen Years of Guidelines Sentencing*, *supra*, at 49. Moreover, and contrary to the Commission's vague assertion, the comments the Commission actually received did not indicate that the Commission should increase fraud penalties to approach or match drug penalties. So the Commission's explanations for the two amendments – which added 15 levels in this case – are deficient and inaccurate.

Indeed, in both 1989 and 2001, the Commission amended the Guidelines not in the exercise of its institutional role as an independent expert body, but rather based on unsupported "signals." The Commission ignored the overwhelming empirical research, discussed at length above and at the Economic Crimes Symposium, demonstrating that increases in sentence severity, as opposed to certainty, have no deterrent value.

It also ignored the actual feedback from the district courts. Though the Guidelines explicitly allowed for upward departures when the amount of loss does not "fully capture the harmfulness and seriousness of the conduct," *see* U.S.S.G. § 2F1.1 comment (n.11) (2000), sentencing courts granted upward departures in only 1.2% of cases sentenced under § 2F1.1 in the year 2000, while they granted downward departures in 11.2% of cases and another 19% saw substantial-assistance departures. *See* U.S. Sent'g Comm'n, *2000 Sourcebook of Federal Sentencing Statistics*, tbl. 28 (2000), *available at* http://bit.do/2000-USSG-Sourcebook; *see also The Nature and Severity of Punishment for Economic Crimes*, *supra*, at 63 (remarks of co-chair of Practitioner's Advisory Group citing similar data for 1999, and pointing out that, in fraud prosecutions, judges sentenced at the at the bottom of the range in most cases). This feedback from judges, the institutional actor best suited to make sentencing assessments, likewise did not support an increase to the loss table.

In short, the fraud-loss Guideline's development has many parallels with the quantity table in crack cases, which the Supreme Court addressed in *Kimbrough*. Just as with the crack-quantity table, the fraud-loss table does "not exemplify the Commission's exercise of

its characteristic institutional role." *Kimbrough*, 552 U.S. at 109. Rather, in "formulating Guidelines ranges for [fraud] offenses" "the Commission looked to [oblique, unsupported signals], and did not take account of 'empirical data and national experience.'" *Id.* As a result, the justification for "fairly assuming" that the fraud Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives" falls away. *Corsey*, 723 F.3d at 379 (Underhill, J., concurring) ("The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides.")

### (b) "Factor creep" further enhances punishment based on factors closely correlated with loss.

In addition to "gratuitously" increasing loss, the Commission also ratcheted-up fraud sentences by recognizing myriad new specific-offense characteristics for which loss used to serve as a rough proxy. The first fraud Guideline had two specific-offense characteristics in addition to loss, one with four subparts applicable in the alternative and one that required a floor of 12 levels. *See* U.S.S.G. § 2F1.1 (1987). Today, § 2B1.1 includes 19 cumulative specific-offense characteristics, many with multiple alternatives. *See* U.S.S.G. § 2B1.1 (2015). Further, while the initial Guidelines imposed one two-level enhancement if there was "more than minimal planning" and "more than one victim," the operative Guidelines impose an additional eight levels for "sophisticated means" and "250 or more victims."

Used to enhance Mr. Wishner's Guideline range, these eight levels – resulting in an additional 138-172 months – come from ostensibly non-loss offense characteristics. But, in reality, these factors are closely correlated with loss. *See Sentencing High-Loss Corporate Insider Frauds*, *supra*, at 170. "In effect," then "what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus." *Id.* As a result:

> [M]any factors for which loss was already a proxy not only have been given
> independent weight but also impose disproportionate increases in prison time

because they add offense levels on top of those already imposed for loss itself and do so at the top of the sentencing table where sentencing ranges are wide . . . . Any case involving a corporate officer and a multimillion-dollar fraud will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing – conducting a big fraud in a corporate setting."

*Id.* at 170. *See also* Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud*, 28 Cardozo L. Rev. 1611, 1648-49 (2007) (factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation"); Alan Ellis, John Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011) ("[T]he loss table often overstates the actual harm suffered by the victim," and "[m]ultiple, overlapping enhancements also have the effect of 'double counting' in some cases," while "the guidelines fail to take into account important mitigating offense and offender characteristics.").

The Commission has recognized this problem of "factor creep," in which, as "more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." *Fifteen Years of Guidelines Sentencing*, *supra*, at 37. In 1999, Justice Breyer warned that "[t]here is little, if anything, to be gained in terms of punishment's classical objectives by trying to use highly detailed offense characteristics to distinguish finely among similar offenders. And there is much to be lost, both in terms of Guideline workability and even in terms of fairness (recall the Guidelines' logarithmic numerical scales) . . . . The precision is false." *See, e.g.,* Justice Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sent'g Rep. 180 (1999).

But rather than correcting the recognized danger of overlapping enhancements, the Commission has aggravated it – particularly with the fraud Guidelines. Recognizing the Commission's inability to self-correct, many courts have departed or varied to avoid the

"absurd" "piling on of points" that results when they apply the Guidelines' ever-increasing, closely-correlated enhancements. *See, e.g., United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of *Booker*) (upholding departure to mitigate effect of "substantially overlapping enhancements" at the high end of the fraud sentencing table); *Parris*, 573 F.Supp.2d at 745 (characterizing § 2B1.1 Guidelines as "patently absurd" due, in part, to "piling on of points") (citing *Adelson*, 441 F.Supp.2d at 510 (stating that fraud Guidelines have "so run amok that they are patently absurd," and describing enhancement for "250 victims or more," along with others, as "represent[ing], . . . the kind of 'piling-on' of points for which the guidelines have frequently been criticized")).

### (c) The Guidelines produce harsher penalties for fraud than serious violent crime.

In deviating away from the fraud Guidelines, courts have no doubt recognized the questionable results produced by Guidelines that recommend equal or greater punishment for a "sophisticated" defendant responsible for a $125 million fraud loss, like Mr. Wishner, than for a defendant who:

- commits second-degree murder (§ 2A1.2, 235-93 months);
- conspires to solicit murder for hire (§ 2A1.5, 210-62 months);
- pirates an aircraft (§ 2A5.1, 235-93 months);
- kidnaps someone, uses a weapon, and causes the victim sustained permanent life-threatening bodily injury (§ 2A4.1, 235-93 months);
- robs a bank of $100 million, discharges a firearm, and causes bodily injury (§ 2B3.1, 188-235);
- assaults with intent to commit first-degree murder (§ 2A2.1, 135-68 months);
- recklessly kills someone (§ 2A1.4, 27-33 months);
- etc.

\\\
\\\
\\\

**EDWARD WISHNER'S SENTENCING POSITION**

### (d) Courts nationwide have criticized and disregarded the fraud Guidelines.

For this reason, and as discussed above, several courts around the country have effectively disregarded high-loss fraud Guidelines that many consider broken. *See* Section III.F (collecting data), *supra*; *Corsey*, 723 F.3d at 378 (Underhill, J.) ("The widespread perception [is] that the loss guideline is broken"); *Adelson*, 441 F.Supp.2d at 515 (describing high-loss Guidelines as "patently absurd on their face"); *Parris*, 573 F.Supp.2d at 754 (describing high-loss Guidelines as a "black stain on common sense"); *Watt*, 707 F.Supp.2d at 151 (characterizing high-loss Guidelines as "of no help" in determining the minimally-sufficient sentence); *Lenagh*, 2009 WL 296999, at *6 (affording high-loss Guidelines minimal weight given lack of empirical basis); *Sentencing High-Loss Corporate Insider Frauds*, *supra*, at 169 ("The sentences nominally prescribed by the Guidelines for high-loss corporate fraud cases have become so draconian that judges are [often] unwilling to impose them"). In so doing, courts have recognized that Guideline tools for high-loss frauds no longer serve their intended purpose. As a result, courts have rightfully used the other § 3553(a) tools in high-loss cases to realize their objective: imposing the minimally-sufficient punishment to achieve the statutory goals of sentencing. *See* 18 U.S.C. § 3553(a).

Here, the minimally-sufficient punishment is a sentence that acknowledges the wrongdoing without ending a human life in prison.

## V. OBJECTIONS TO THE PSR

Though largely covered elsewhere in Mr. Wishner's briefing, for the sake of completeness, Mr. Wishner formally objects to the PSR as follows:

### Offense Conduct

- ***Paragraph 8***: Paragraph 8 mistakenly references an Indictment, whereas Mr. Wishner waived Indictment and pleaded guilty to an Information.

- ***Paragraph 12***: Mr. Wishner objects to the omission from the PSR's Offense Conduct section, and specifically from Paragraph 9, the fact that NASI operated as a legitimate business for its first five years. While Paragraph 39 alludes to this fact, it

should be included in the Offense Conduct section as it is relevant to the commencement of the instant offense.

- **Paragraph 28**: Mr. Wishner objects to the loss figure of $125,063,604.62. As discussed in Section IV.A., *supra*, the government has not carried its burden of proving loss by clear, convincing, and reliable evidence.

- **Paragraph 32**: Mr. Wishner objects to Paragraph 32 and its allegation that investor funds were used to "fund" Mr. Wishner's other investments and business ventures, rather than their actual use: generating returns for NASI investors.

## Offense Level Computation

- **Paragraphs 45 and 46**: Mr. Wishner objects to the loss calculation in Paragraphs 45 and 46 for the reasons discussed in Section IV, *supra*.

- **Paragraph 47**: Mr. Wishner objects to the number of victims stated in Paragraph 47 because the government has not carried its burden of proving which investors were net losers by clear, convincing, and reliable evidence.

- **Paragraphs 50-52**: Mr. Wishner objects to Paragraphs 50-52 and the conclusion that the sophisticated-means enhancement applies in this case for the reasons stated in Section IV, *supra*, and in Mr. Gillis's objections. *See* Defendant Joel Gillis's Objections to the PSR, Docket No. 77 at 4:15-5:13.

## Physical Condition

- **Paragraphs 80-81:** Mr. Wishner objects to the implication that he is "primarily healthy" for the reasons stated in Section III.E.1., *supra*.

## Financial Condition: Ability to Pay

- **Paragraph 106:** Mr. Wishner objects to the PSR's finding that he has the ability to make a payment within 90 days of sentencing of at least $725,000. Mr. Wishner's assets have all been frozen by the Securities and Exchange Commission.

## Factors that May Warrant a Departure or Variance

- **Paragraphs 116-18:** Mr. Wishner objects to the PSR's failure to identify any factors that would warrant a departure from the applicable Guideline range, as well

as its failure to identify additional reasons for variance, for the reasons discussed in Section III, *supra*.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, Mr. Wishner respectfully requests a sentence of two years in custody to be followed by three years of supervised release and 1,000 hours of community service to be served during the period of supervised release.

Dated: November 2, 2015                **DORDI WILLIAMS COHEN, LLP**

By: <u>/S/ Reuven L. Cohen</u>
      Reuven L. Cohen, Esq.
      Marc S. Williams, Esq.
      Charles J. Snyder, Esq.
      Attorneys for Defendant,
      EDWARD WISHNER