EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
RANEE A. KATZENSTEIN (Cal. Bar No. 187111)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
PAUL G. STERN (Cal. Bar No.162734)
Assistant United States Attorney
Senior Litigation Counsel, Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2432/0715
     Facsimile: (213) 894-6269
     E-mail:   ranee.katzenstein@usdoj.gov
               Paul.stern@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>JOEL BARRY GILLIS and EDWARD WISHNER,<br><br>      Defendants. | No. CR 14-712-SJO<br><br>GOVERNMENT'S COMBINED (1) PARTIAL CONCURRENCE IN THE PRESENTENCE REPORTS AND (2) POSITIONS RE SENTENCING OF DEFENDANTS JOEL BARRY GILLIS AND EDWARD WISHNER<br><br>[DECLARATION OF TONYA PINKERTON AND EXHIBITS A-C THERETO FILED SEPARATELY UNDER SEAL CONCURRENTLY HEREWITH]<br><br>[DECLARATIONS OF RANEE A. KATZENSTIN; JANICE CHIQUET; AND TED FATES; AND EXHIBITS D-N THERETO FILED SEPARATELY CONCURRENTLY HEREWITH]<br><br>[LETTERS AND IMPACT STATEMENTS FROM VICTIMS FILED SEPARATELY UNDER SEAL CONCURRENTLY HEREWITH]<br><br>Hearing Date: November 16, 2015<br>Hearing Time: 9:00 a.m.<br>Location:    Courtroom of the<br>                Hon. S. James Otero |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Ranee A. Katzenstein and Paul G. Stern, hereby files its Combined (1) Partial Concurrences In The Presentence Reports And (2) Positions Re Sentencing Of Defendants JOEL BARRY GILLIS and EDWARD WISHNER ("Sentencing Position").

The government's Sentencing Position is based upon the attached memorandum of points and authorities; the declaration of Tonya Pinkerton and exhibits A-C thereto, which is being filed separately under seal concurrently herewith; the declarations of Ranee A. Katzenstein, Janice Chiquet, and Ted Fates and exhibits D-N thereto, which are being filed separately concurrently herewith; the files and records in this case; and such further evidence and argument as the Court may permit.

Dated: November 2, 2015

Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


/s/ *Ranee A. Katzenstein/Paul G. Stern*
RANEE A. KATZENSTEIN
PAUL G. STERN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                PAGE

TABLE OF AUTHORITIES.............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES.............................1

I.     INTRODUCTION.............................................1

II.    THE OFFENSE CONDUCT.....................................3

       A.     Overview.........................................3

       B.     The Fraudulent Scheme............................4

       C.     Collapse of the Scheme...........................6

       D.     GILLIS' and WISHNER's Profits from the Fraudulent
              Scheme...........................................7

III.   GOVERNMENT'S PARTIAL CONCURRENCE IN THE PSRs AND RESPONSE
       TO DEFENDANT GILLIS' OBJECTIONS..........................9

IV.    GOVERNMENT'S SENTENCING RECOMMENDATION..................13

       A.     Advisory Sentencing Guidelines..................13

              1.     The Base Offense Level is 7..............13

              2.     A 24-level Enhancement Applies Because The Loss
                     From the Offense Was In Excess of $65 Million.......13

                     a.     The Government Has Established Investor
                            Losses of Approximately $134.9 Million........13

                     b.     The government need only prove loss by a
                            preponderance of the evidence based on the
                            extent of the conspiracy.....................16

                     c.     The Government Has Provided a Reasonable
                            Estimate of the Amount of Loss and the
                            Number of Victims Warranting a 24-Level
                            Enhancement Under The Guidelines..............19

                     d.     GILLIS's two objections to the government's
                            loss calculation are without merit............20

              3.     A 6-level Enhancement Applies Because the Offense
                     Resulted in Substantial Financial Hardship to At
                     Least 25 Victims...................................24

              4.     A 2-level Enhancement Applies Because The Offense
                     Involved Sophisticated Means.......................30

i

DESCRIPTION                                                                 PAGE

         5.   Advisory Guidelines Calculation.....................33

   B.   Analysis of the § 3553(a) Factors.......................33

         1.   The Factors to be Considered.......................33

         2.   DEFENDANT GILLIS:  Analysis of the § 3553A
             factors.........................................34

             a.   Nature and Circumstances of the Offense.......34

             b.   History and Characteristics of the defendant...35

             c.   Goals of Sentencing...........................36

             d.   The government recommends a 204 month
                 sentence for defendant GILLIS.................37

         3.   DEFENDANT WISHNER: Analysis of the § 3553A
             factors.........................................38

             a.   Nature and Circumstances of the Offense.......38

             b.   History and Characteristics of Defendant......38

             c.   Goals of Sentencing...........................38

             d.   The government recommends a 204 month
                 sentence for defendant WISHNER.................39

V.   RESTITUTION..................................................40

VI.  DEFENDANTS SHOULD BE REMANDED INTO CUSTODY....................40

VII. CONCLUSION..................................................41

# TABLE OF AUTHORITIES

DESCRIPTION                                                      PAGE

**FEDERAL CASES**

United States v. Augare,
    800 F.3d 1173 (9th Cir. 2015)................................32

United States v. Barnes,
    125 F.3d 1287 (9th Cir. 1997)................................16

United States v. Berger,
    587 F.3d 1038 (9th Cir. 2009)....................17, 18, 19

United States v. Densmore,
    210 Fed. Appx. 965 (11th Cir. 2006)..........................26

United States v. Ellisor,
    522 F.3d 1255 (11th Cir. 2008)...............................26

United States v. Finck,
    407 F.3d 908 (8th Cir. 2005).................................32

United States v. Garro,
    517 F.3d 1163 (9th Cir. 2008)................................32

United States v. Harris,
    718 F.3d 698 (7th Cir. 2013)..............................26, 27

United States v. Harrison-Philpot,
    978 F.2d 1520 (9th Cir. 1992)................................18

United States v. Horob,
    735 F.3d 866 (9th Cir. 2013).................................32

United States v. Jennings,
    711 F.3d 1144 (9th Cir. 2013)................................32

United States v. Riley,
    335 F.3d 919 (9th Cir. 2003).................................18

United States v. Tanke,
    743 F.3d 1296 (9th Cir. 2014)................................32

United States v. Treadwell,
    593 F.3d 990 (9th Cir. 2010)..............................17, 18

**STATUTES**

18 U.S.C. § 1341...........................................2, 13

18 U.S.C. § 1343...........................................2, 13

iii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

**STATUTES**

18 U.S.C. § 1349...............................................................2, 13

18 U.S.C. § 3143(a)............................................................... 41

18 U.S.C. § 3553(a)..................................................13, 34, 37, 39

18 U.S.C. § 3664(d)(5)............................................................ 40

**UNITED STATES SENTENCING GUIDELINES:**

U.S.S.G § 2B1.1(a)(1).........................................................13,33

U.S.S.G § 2B1.1(b)(1)(M) **.................................................**passim

U.S.S.G § 2B1.1(b)(2) .........................................................passim

U.S.S.G § 2B1.1(b)(10)(c) .....................................................30, 33

U.S.S.G § 2B1.1, comment. (n.3(E)(i)) .........................................14, 20

U.S.S.G § 2B1.1, comment. (n.3(A)) ............................................... 23

U.S.S.G § 2B1.1, comment. (n.4(F)) ............................................... 25

U.S.S.G § 2B1.1, comment. (n.9(B)) ............................................... 30

U.S.S.G § 3E1.1(a),(b) ........................................................... 33

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.   INTRODUCTION

For more than a decade, defendants JOEL BARRY GILLIS ("GILLIS") and EDWARD WISHNER ("WISHNER") (together, "defendants") offered a sale/leaseback investment in ATM machines that didn't exist.  The Ponzi scheme GILLIS and WISHNER ran was one of the largest ever seen in this district and caused devastating financial harm to myriad investors.  When their scheme collapsed in 2014, nearly 1300 victim-investors lost in aggregate over $134 million.[1]

GILLIS and WISHNER induced their victims to invest large amounts of money in their fraudulent ATM-sale/leaseback program by deliberately lying to the investors about what they were investing in and how their money was actually going to be used.  GILLIS and WISHNER falsely told the investors that their company, Nationwide Automated Systems, Inc. ("NASI"), would sell them ATM machines, specifically identified by location and serial number, and then lease the ATMs back from the investors to generate income sufficient to pay the investors a substantial annual rate of return.  NASI would manage the ATM machines and send the victims the fee-income purportedly generated by the machines, which GILLIS and WISHNER guaranteed would amount to a 20% annual rate of return.

GILLIS and WISHNER sent the victim-investors monthly account statements that detailed the fictitious fee income in order to lull the victims, and conceal the fact that NASI was nothing more than a Ponzi scheme and the ATM machines that the investors were purchasing

---

[1] The government's loss estimate, discussed in detail below, is based on the financial analysis prepared by FBI Forensic Accountant Tonya Pinkerton ("FA Pinkerton") and summarized in Exhibit A attached to her declaration.

and leasing back to NASI did not exist.  GILLIS and WISHNER aggressively marketed their fictitious ATM program and profited handsomely from the scheme by using victims' money to pay themselves substantial "salaries" and benefits.  GILLIS admits that he and WISHNER took at least $7.8 million and – as explained below – the actual amount was likely much greater than what he has admitted to.

When GILLIS and WISHNER's Ponzi scheme collapsed, the victim-investors suffered irreparable financial harm, leaving them struggling to make ends meet, facing retirement bereft of assets, and unable to pay for necessary health care or provide for family members' medical expenses, education, and other needs.  These victims included individuals from whom GILLIS and WISHNER had solicited "investments" even after the Securities & Exchange Commission ("SEC") had served NASI with a subpoena signaling NASI's imminent shut-down.  More than 100 victims have sent letters to the Court describing the ruinous impact of the financial losses that GILLIS and WISHNER's conduct has caused.

GILLIS and WISHNER each pled guilty to a four-count information charging them with conspiracy, wire fraud and mail fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349.  The Probation Officer has determined that GILLIS and WISHNER's advisory sentencing guidelines range is 235 to 293 months. (GILLIS Presentence Investigation Report ("G-PSR") ¶ 109; WISHNER Presentence Investigation Report ("W-PSR") ¶ 100), or 188-235 under the sentencing guidelines now in effect (following amendments effective November 1, 2015, discussed below).

There can be no doubt that a lengthy term of incarceration is called for here.  Given the scope of the harm defendants caused, GILLIS's request in his Sentencing Position ("Gillis Sent'g Pos.") for

a sentence of only 24 months reflects a woeful misapprehension of the gravity of his wrongdoing and cannot be taken seriously.[2] Not only is GILLIS's request based on an erroneous interpretation of the facts, it completely ignores the havoc wreaked in the victims' lives by defendants' criminal conduct, and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford general deterrence. For these reasons, and the reasons set out more fully below, the government recommends that GILLIS and WISHNER each be sentenced to 204 months in custody, the middle of the applicable sentencing guidelines range, assuming a total offense level of 36 and Criminal History Category I.

## II.  THE OFFENSE CONDUCT

### A.  Overview

GILLIS and WISHNER each admitted under oath that, beginning as early as 2001, they ran their company, NASI, as a large-scale Ponzi scheme. (See Statement of Facts in Support of Guilty Pleas, CR 46 (Exh. D).)[3] The defendants offered a fictitious investment, namely a sale/leaseback investment in automated teller machines (ATMs) that, in fact, did not exist. The monthly payments that the investors received

---

[2] Defendant WISHNER has not yet filed his sentencing position. The government seeks leave to file a supplemental sentencing position regarding WISHNER in order to respond to any arguments that WISHNER presents that are not addressed in the instant sentencing position.

[3] "CR" refers to the Clerk's Record of Proceedings and is followed by the applicable docket number. "Exh." refers to the exhibits attached to the declarations filed concurrently with, and in support of, this Sentencing Position. Exhibits A-C are attached to the declaration of FA Pinkerton ("Pinkerton Dec."); Exhibits D-F are attached to the declaration of Ranee A. Katzenstein ("Katzenstein Dec."); and Exhibits G-N are attached to the declaration of Janice Chiquet ("Chiquet Dec."). The statement of facts in Exh. D was also read at the hearing on WISHNER's change of plea and WISHNER admitted under oath that all of the facts were true. (Katzenstein Dec. ¶ 2.)

as "fee income" from the ATMs were actually funded with other investors' money.  (Exh. D ¶ 3(f).)

**B.    The Fraudulent Scheme**

More specifically, at its inception, NASI owned and operated for its own benefit a small number of ATMS that were located in hotels, convenience stores and similar venues.  (PSR ¶ 9.)[4]  These machines were serviced by Cardtronics, NationalLink and ASAI, from which NASI received a small amount of net fee revenue each month.

By at least 2001, NASI was offering to sell ATMs to investors, who would then lease the ATMs they purchased back to NASI.  NASI would operate the machines on behalf of the investors and forward fee revenue (net of expenses) purportedly generated by the ATMs to the investors.  The controlling documents for these sale/leaseback transactions were:

(1) an ATM Equipment Purchase Agreement;

(2) an ATM Equipment Lease Agreement; and

(3) an Addendum to Owner Lease Agreement

(PSR ¶ 13; Exh. D ¶ 3(a)-(d); Exh. E at 16-24, 29-46, 55-62, 71-80, 86-91, 147-163.)

The documents establishing the sale/leaseback investments contained numerous false statements and representations, which were also made orally to the investors.  Among other false representations, GILLIS and WISHNER guaranteed NASI's payment of a monthly check to victim-investors equal to at least a 20% annual rate of return on the victim-investors' initial investment.  This 20% annual rate of return

---

[4] "PSR" refers to G-PSR and W-PSR and is followed by the relevant paragraph number, which is the same in both PSRs because they both include the same description of the Offense Conduct (¶¶ 8-32) and the Offense Level Computation (¶¶ 40-60).

was guaranteed even if the number of transactions produced by the victim-investor's ATM was insufficient to provide, at the $.50 per transaction rate, a 20% annual rate of return. (PSR ¶¶ 14-17, 19; Exh. D ¶ 3(d),(f); Exh. E, _passim_.)[5]

Although NASI did send monthly checks to victim-investors, these payments were not funded by revenue from the victim-investors' ATM machines (which did not, in fact, exist). To the contrary, the payments were funded with monies sent to NASI by other investors.[6] (PSR ¶¶ 19-20.) This fact – _i.e._, that NASI was a Ponzi scheme – is established beyond any doubt by the financial analysis of NASI's bank accounts and is not disputed by defendants.[7] (Exh. D ¶ 3(f); Gillis Sent'g Pos. at 1.)

GILLIS and WISHNER maintained the fiction that the victim-investors' money was safely invested as promised (_i.e._, for the purchase of ATMs) and was generating returns as promised by sending

---

[5] Victims also describe these false statements, representations, and promises in the letters they have submitted to the Court. These letters are being filed under seal concurrently herewith.

[6] GILLIS's contention that he all he wanted to do "was to make other people money, and for many years he did just that" (Gillis Sent'g Pos. at 2) is patently false. GILLIS is a con man who stole over a $100 million from nearly 1300 victims. GILLIS didn't make any money for the victims. All he did was sell non-existent ATMs and charge for his non-existent services purportedly managing the phantom ATMs. GILLIS did not earn the "interest" money he sent to the victims. He merely shifted some victims' money to other victims for the purpose of prolonging his scheme and disguising its fraudulent nature.

[7] The government's Summary of Source and Use of Funds by NASI in the period September 2007 through October 2014 (Exh. C) shows that NASI received approximately $355 million from investors during this time period (94% of all funds received), of which approximately $335 million was used to fund Ponzi payments and some "buy backs" – _i.e._, repayments of the "price" paid by an investor to "purchase" one of the non-existent ATMs -- sent to investors (approximately 88% of all of NASI's disbursements during this time period). In short, NASI was a Ponzi scheme through and through.

the victim-investors monthly account statements. These statements falsely and fraudulently reported that the source of the payments to the victim-investors was the performance of their ATM machines, and hid from the victim-investors that the money they were receiving was actually funded with other victims' money. (PSR ¶¶ 18, 22; Exh. D ¶ 3(f), (j); Exh. E at 93-115, 165, 167-171.)

In order to prevent their vicims from discovering that NASI was nothing more than a Ponzi scheme, GILLIS and WISHNER included a "non-interference" provision in the lease agreements that each victim-investor signed. (PSR ¶ 26.) This provision required each victim-investor to agree "not to interfere" with NASI's purported operation of the ATMs (which didn't exist) in any manner, including, but not limited to, not contacting the locations where the ATMs were purportedly placed and installed and not contacting any service providers purportedly under contract with NASI to assist in the operation of such ATMs. (Exh. E at 21, 34, 59.)

### C. Collapse of the Scheme

In March 2014, the SEC received a tip from a whistleblower law firm based on information from Sam Ditzion, "CEO and Founder of Tremont Capital Group in Boston, a leading provider of consulting and litigation support to the ATM industry." The SEC followed up on the tip and served a subpoena for documents on NASI in June 2014. (Exh. F.)

Knowing that their fraud was about to be exposed and the Ponzi scheme about to collapse, GILLIS and WISHNER nonetheless raised an additional $15,039,100 from victim-investors who they thereby also knew would certainly lose all of this money. (Pinkerton Dec. ¶ 8.) NASI ceased operations shortly thereafter when, on September 30, 2014,

1  this Court granted the SEC's application for a TRO and the appointment
2  of a receiver in <u>SEC v. NASI, Inc., et al.</u>, CV 14-7249-SJO.  When the
3  scheme collapsed, nearly 1300 victims had actual losses of over $134
4  million.  (<u>See</u> section IV.A.2, below.)

5      **D.  GILLIS' and WISHNER's Profits from the Fraudulent Scheme**

6      GILLIS and WISHNER profited from their fraudulent scheme by
7  living very comfortably off investor funds which they took in the form
8  of substantial annual salaries (even though their business consisted
9  of little more than churning their victims' money) and other
10 benefits.[8]  GILLIS and WISHNER received substantial amounts of
11 investor funds through NASI checks written to them personally (<u>see</u>
12 Exhs. H, I)[9]; using NASI credit cards to purchase travel, meals, and
13 consumer goods for themselves and their families and then using
14 investor funds to pay the balances on the cards  (<u>see</u> Exhs. J, K,

---

[8] NASI issued W-2s to GILLIS and WISHNER reporting "wages, tips, other compensation" of $269,829.60 for calendar year 2008.  NASI reported on its corporate tax returns (Form 1120) for 2010-2012 compensation to its officers as follows:

2010:  GILLIS -- $368,572;   WISHNER -- $368,572

2011:  GILLIS -- $369,072;   WISHNER -- $369,072

2012:  GILLIS -- $370,060;   WISHNER -- $370,060

(<u>See</u> Exh. G.)  The basis for these reported amounts is not apparent and therefore it is not clear whether they underreport the benefits received by GILLIS and WISHNER as described below and reflected in Exhibits H-N.  It should be noted that the victims sent their money to NASI to purchase specified ATM machines for leaseback to NASI, not to provide funds to defendants for their unfettered use and benefit.  The use of investor funds to pay for benefits and other operating expenses was thus another way that GILLIS and WISHNER defrauded their victims.

[9] Exhibits H and I are schedules of checks drawn on NASI bank accounts payable to GILLIS and/or WISHNER during the period July 2007 through September 2014.  The total net amount of NASI checks made payable to GILLIS and to other payees for his benefit during this period is $1,804,778; the total net amount of NASI checks made payable to WISHNER and to other payees for his benefit during this period is $1,765,108.

7

L)<sup>10</sup>; causing investor funds to be directly deposited into their personal checking accounts and brokerage accounts (see Exh. N)[11]; and using investor funds to pay for other benefits such as monthly car payments (see Chiquet Dec. ¶ 8, Exh. M), health and life insurance (see Exhs. H, I), and to fund defendants' other business ventures and investments (see Exhs. C, H, I).

GILLIS's characterization of the salaries he and WISHNER each siphoned out of the victims' money -- $300,000 annually -- as "modest" is preposterous. (Gillis Sent'g Pos. at 1, 10.)  Equally ludicrous is his claim that his Ponzi scheme differs from all other Ponzi schemes because he did not prey on others to "fund [his] own lavish lifestyle." (Id. at 18.)  By any measure, the $300,000 in payments GILLIS and WISHNER each took each year for at least thirteen years for doing nothing more than running a Ponzi scheme is egregious, far exceeding the annual compensation of the vast majority of citizens who work for a living and try, in good faith, to contribute to their

---

[10] Exhibit L includes examples of GILLIS' and WISHNER's use of NASI credit cards and funds to pay for personal expenses.  The first example is the American Express statement for NASI, Inc.'s Business Platinum Account No. 8-21007 for the 31-day period ending January 26, 2012.  The charges incurred on this account totaled $41,350.66 and were paid by NASI (check no. 10604).  This amount includes charges on WISHNER's card for, among other things, meals at many restaurants, clothing at Nordstrom's and other stores, and airplane tickets for himself and his wife for travel to Hawaii.  Exhibit K also includes the American Express statement for NASI, Inc.'s Business Platinum Account No. 1-71006 for the 29-day period ending June 21, 2013.  The charges incurred on this account totaled $17,359.64 and were paid by NASI (check no. 12102).  This amount includes charges on GILLIS's card for, among other things, a stay at the Georges V Hotel in Paris ($8,248.71) and meals at various Parisian restaurants.  Over $3 million of investor funds were used to pay for charges made on NASI credit cards.  (See Exh. C.)

[11] Between September 2007 and July 2011, investor funds totaling $1,207,800 were deposited directly into defendant GILLIS's personal bank account.  GILLIS retained $501,900; he transferred $455,900 to WISHNER and $250,000 to Fuel Doctor, a business venture in which GILLIS and WISHNER were jointly investing. (See Exh. N.)

8

communities.  Moreover, as described above, defendants were taking other valuable benefits in addition to their "salaries" which allowed them and their families to enjoy an extremely high, if not lavish, standard of living.

## III. GOVERNMENT'S PARTIAL CONCURRENCE IN THE PSRs AND RESPONSE TO DEFENDANT GILLIS' OBJECTIONS

The government concurs in the findings of the PSRs for GILLIS and WISHNER except to the extent the PSRs apply the sentencing guidelines without the amendments that went into effect on November 1, 2015, after the PSRs were prepared, and as indicated below.  The amendments affect the offense level computation as follows:

**Paragraph 46:**  The loss from defendants' offense is $134,854,230 million, which results in an enhancement of 24 levels under USSG § 2B1.1(b)(1)(M), as amended.  The appropriate loss enhancement is discussed more fully in section IV.A.2, below.

**Paragraph 47:**  The 6-level victim enhancement under USSG § 2B1.1(b)(2), as amended, applies because more than 25 victims suffered substantial financial hardship, as defined in the guidelines, as a result of the offense.  This enhancement is discussed more fully in section IV.A.3, below.

The government responds to GILLIS's objections to the PSR as follows:

**Paragraph 8**: The government agrees with GILLIS that there was no indictment in this case and GILLIS waived indictment and pled to an Information.

**Paragraph 12:** The government disagrees with GILLIS's objection to paragraph 12, because paragraph 12 addresses the period in which the scheme to defraud commenced in around 2001, and it does not purport to

describe GILLIS' activities prior to the commencement of the scheme in 2001. The government respectfully submits that the question whether NASI ever operated legally is not particularly relevant or material to the Court's sentencing determination, especially as it is not contested that GILLIS operated NASI as a Ponzi scheme for 13 years. In any event, the information referenced in GILLIS's objection is contained in other paragraphs of the PSR, as GILLIS concedes. Accordingly, the government also objects to the "Required Supplement," which is a self-serving account of the genesis of GILLIS's Ponzi scheme based principally on GILLIS's own statements. Such an account does not belong in the section of the PSR describing defendant's "Offense Conduct," as it is little more than a recitation of GILLIS' narrative of his pre-offense conduct.

**Paragraph 28**: The government substantially concurs with the PSR's loss determination, although based on the updated loss analysis submitted by FA Pinkerton, the government submits the correct loss amount is $134,854,230. The government has responded fully to GILLIS' objections to the PSR's loss determination, which are without merit, in section IV.A.2, below.

**Paragraph 32:** The government disagrees with GILLIS's objection to paragraph 32. The government is aware of no evidence that GILLIS and WISHNER invested in Fuel Doctor or Oasis Rentals on behalf of NASI investors, as opposed to seeking to personally profit from these investments. In making their investments in these entities, GILLIS and WISHNER did not execute a loan agreement with NASI, or seek to obtain a security interest in these entities on behalf of NASI. The evidence is that GILLIS and WISHNER used investors' monies as if they were their own, and they did not inform investors that their funds

were not being used either to purchase or service ATMs but rather to invest in other enterprises selected by GILLIS and/or WISHNER.

**Paragraph 45:** The government disagrees with GILLIS's objection to paragraph 45 for reasons more fully set forth in section IV.A.2, below.

**Paragraph 46:** The government disagrees with GILLIS's objection to PSR ¶ 46 for the reasons more fully set forth in section IV.A.2, below. Because the loss guideline has been amended as of November 1, 2015 to provide for a lower 24-level loss enhancement for a financial fraud scheme causing losses between $65 million and $150 million, this paragraph of the PSR should be revised to conform to this revision. It should read as follows: "Accordingly, pursuant to USSG § 2B1.1(b)(1)(M), the offense level is increased 24 levels because the loss was more than $65,000,000 but not more than $150,000,000."

**Paragraph 47:** The government disagrees with GILLIS's objection to paragraph 47, but the objection is irrelevant because the guideline for victim enhancements has been amended as of November 1, 2015 (see amended guideline § 2B1.1(b)(2)), such that enhancements for more than 50 victims (a 4-level enhancement) or more than 250 victims (a 6-level enhancement) are no longer applicable. Different requirements for victim enhancements now apply, and the government's position on the specific applicability of a 6-level victim enhancement in this case is fully set forth in section IV.A.3, below.

**Paragraphs 50-53:** The government disagrees with defendant's objections to paragraphs 50-53 involving the enhancement for use of "sophisticated means," for the reasons set forth more fully in Section IV.A.4, below.

**Paragraph 78:** GILLIS's objection to the Probation Officer's description of GILLIS's home is not well-taken. Simply put, the Probation Officer knows what he saw in visiting defendant GILLIS's home, _i.e._, he accurately identified a pool, a locked front gate, and a view of the mountains as part of GILLIS's domicile in an affluent residential neighborhood. Nothing contained in the photographs attached to GILLIS's Sentencing Position is "inconsistent" with the Probation Officer's description. Moreover, GILLIS's objection has no material bearing on the sentencing issues before this Court.

**Paragraph 87:** The government takes no position on GILLIS's objection to paragraph 87, and it does not believe the question whether GILLIS attends Gamblers Anonymous meetings regularly or occasionally is material to the sentencing issues before this Court.

**Paragraph 91:** The government takes no position on defendant GILLIS's objection to paragraph 91, although there appears to be no inconsistency between what is set forth in the PSR and defendant GILLIS's assertion that he attended Northwestern University.

**Paragraph 106:** The government disagrees with GILLIS's objection to paragraph 106, but it believes the matter should be deferred to the restitution hearing, which the government submits should be continued until approximately 90 days after the date of GILLIS's sentencing, as requested in Section V, below.

**Paragraph 125 & 127:** As set forth in section IV.B.2. below, while the government believes there are some mitigating factors in GILLIS's case, notably his age and his willingness to resolve his case pursuant to a pre-indictment disposition, the government submits that the aggravating factors significantly outweigh the mitigating factors. For this reason, the government has recommended a sentence of 204

months, in the mid-range of the advisory guideline range based on a total offense level of 36 and a criminal history category I.

**IV. GOVERNMENT'S SENTENCING RECOMMENDATION**

As explained in the following discussion, the government's recommendation that GILLIS and WISHNER each be sentenced to 204 months in custody is based on an evaluation of the advisory sentencing guidelines ("guidelines" or "USSG") and the other § 3553(a) factors.

**A. Advisory Sentencing Guidelines**

**1. The Base Offense Level is 7**

GILLIS and WISHNER's offenses of conviction (violations of 18 U.S.C. §§ 1341, 1343, and 1349) each have a statutory maximum term of imprisonment of 20 years. Thus, pursuant to USSG § 2B1.1(a)(1), the base offense level for defendant GILLIS is 7. (PSR ¶ 43.)

**2. A 24-level Enhancement Applies Because The Loss From the Offense Was In Excess of $65 Million[12]**

*a. The Government Has Established Investor Losses of Approximately $134.9 Million*

The government's forensic accountant has prepared a 32-page spreadsheet of losses sustained by individual NASI investors over the course of defendants' fraudulent scheme, which shows net losses in excess of $134 million to 1,295 investors. (Pinkerton Dec. ¶¶ 2-7, Exh. A.) This analysis is based on a review of records for bank accounts held by NASI over the course of seven years, from September 2007 through September 2014, which were obtained from the banks, as well as documents obtained from NASI's investor files, a portion of which pre-date September 2007 and go back as far as 1996, including, for example, investor contracts, copies of deposit items, and

---

[12] Under USSG § 2B1.1(b)(1)(M), a 24-level enhancement for loss applies for losses in the range of $65 million to $150 million.

1   correspondence with investors.  (Id.).  This spreadsheet has been

2   prepared by an FBI forensic accountant, with the assistance of a team

3   of FBI staff associates, and it has also been double checked for

4   accuracy by Janice Chiquet, who is an Investigative Analyst in the

5   United States Attorney's Office for the Central District of

6   California.  (Pinkerton Dec. ¶¶ 2-3; Chiquet Dec. ¶ 10.).  A copy of

7   the final version of this spreadsheet (Exh. A) shows net aggregate

8   losses of $134,854,230.05 sustained by 1,295 individual NASI

9   investors.

10      A couple of issues with respect to the loss analysis set forth on

11  the NASI loss spreadsheet are worth noting.  First, the NASI loss

12  spreadsheet prepared by FA Pinkerton includes only those investors

13  who, based on their entire investment history with NASI, were net

14  losers.  (Pinkerton Dec. ¶¶ 4, 10).  Thus, generally speaking, persons

15  whose only investments were made prior to July 2009, (i.e., five years

16  before the "time of detection of the offense")[13] were not included in

17

---

18      [13] As set forth in USSG § 2B1.1, comment. (n.3(E)(i)), defendants
    are only entitled to credits against loss for monies returned to
19  victims before the offense was detected.  Further, "the time of
    detection of the offense is the earlier of (I) the time the offense
20  was discovered by a victim or government agency; or (II) the time the
    defendant knew or reasonably should have known the offense was
21  detected or about to be detected by a victim or government agency."
    USSG § 2B1.1, comment. (n.3(E)(i)).

22      Here, the operative time of detection of the offense was around
    June 17, 2014, when the SEC served a subpoena on the NASI Custodian of
23  Records, thereby serving notice on defendants that their scheme was
    about to be uncovered.  (Exh. F.)  Accordingly, the operative date for
24  affording defendants credits against loss is any time prior to June
    17, 2014.
25
        While GILLIS and WISHNER aggressively continued to raise in
26  excess of $15 million dollars from investors after June 17, 2014, when
    they knew or should have known their offense was about to be detected,
27  they are not entitled to any credits against that loss after that date
    under the Guidelines, notwithstanding that they continued to pay back
28  investors over $18 million between early July and the middle of

(footnote cont'd on next page)

14

the analysis of net losses to NASI investors because such an investor would likely have been a net winner. This is because, hypothetically speaking, such an investor would have recovered his/her investment principal in its entirety in that NASI was paying "interest" of at least 20% annually during this time period. FA Pinkerton also confirmed that such investors would not have been net losers by making calculations of the actual net losses post 9/2007 based on her review of NASI's actual bank records during this time period.

Second, the NASI loss spreadsheet prepared by FA Pinkerton generally does not list payments to investors prior to 2007 for the overwhelming majority of investors. The reason for this is that the spreadsheet only lists investors who were net losers. Investors who received money back from NASI prior to 2007 and did not invest again after 2009 were very likely net winners since by definition their investments predated July 2009. The only pre-2007 investors who were net losers, and thus included on the spreadsheet, are those who also made additional investments after July 2009, such that their post-July 2009 losses exceeded their earlier gains and thereby turned them into net losers. For each of those investors, the spreadsheet does in fact, include the pre-September 2007 payments they received, based on the assumption that pre-September 2007 they received returns from NASI at a 30% annual rate.[14] (Id.).

_____

September 2014 in an apparently desperate effort to keep their Ponzi scheme going. (See Pinkerton Dec. ¶ 8).

[14] Because the government did not have bank records showing the actual returns paid by NASI to investors prior to September 2007, FA Pinkerton employed the conservative assumption, most favorable to NASI and GILLIS and WISHNER from a loss calculation standpoint, that NASI paid interest to these pre-September 2007 investors at an annual rate of return of 30%.

In sum, based on the most recent NASI loss analysis spreadsheet (Exh. A), the government respectfully submits that the applicable loss to individual NASI investors is $134,854,230, which warrants a 24-level enhancement for loss under the version of the Guidelines that became effective on November 1, 2015. As GILLIS correctly argues, the government has the burden of proving loss in this case,[15] and it is clear that, based on the financial analysis summarized in the spreadsheet referenced above, it has readily satisfied this burden.

> b. *The government need only prove loss by a preponderance of the evidence based on the extent of the conspiracy*

GILLIS argues that the government's burden of proof in establishing the loss amount is that of clear and convincing evidence because the loss amount will undeniably have a disproportionate impact on the overall sentence to which he will be subject. (Gillis Sent'g. Pos. at 4-5). GILLIS is wrong.

It is well-settled that where the extent of the sentencing enhancement is based on the extent of the conspiracy of which a defendant has been convicted, the facts in support of the sentencing enhancement need only be proved by a preponderance of the evidence, and need not be established by clear and convincing evidence. See

---

[15] GILLIS incorrectly argues, however, that the government has the burden to prove the loss defendant "intended to result from the offense." (Gillis Sent'g. Pos. at 4). In support of this spurious contention, GILLIS relies on United States v. Barnes, 125 F.3d 1287, 1290 (9th Cir. 1997), notwithstanding that Barnes required a determination of the actual, not the intended, loss imposed by defendant on the victims of the crime. Barnes, 125 F.3d at 1290-91. Under the Guidelines, "loss is greater of actual loss or intended loss," USSG § 2B1.1, comment. (n.3(A)), and in this case, as argued below, the actual loss in excess of $134 million is significantly greater than any readily ascertainable intended loss.

16

United States v. Treadwell, 593 F.3d 990, 1001 (9th Cir. 2010) ("[w]e have repeatedly held that sentencing determinations relating to the extent of a criminal conspiracy need not be established by clear and convincing evidence"); see also United States v. Berger, 587 F.3d 1038, 1047-49 (9th Cir. 2009) ("[A] number of our cases squarely address the factual situation presented here.  Those cases involve a defendant's fraudulent conduct where sentencing enhancements for financial loss are based on the extent of the fraud conspiracy.  They hold that facts underlying the disputed enhancements need only be found by a preponderance of the evidence.").

GILLIS himself cites Treadwell, but he seeks to discount the rule it endorses that preponderance is the correct standard of proof where sentencing enhancements are based on a conspiracy conviction by claiming that "[i]n Treadwell, those due process concerns were absent because the district court's amount-of-loss calculation was based on evidence presented at trial and found by the jury beyond a reasonable doubt." (Gillis Sent'g Pos. at 5 n.2).  GILLIS insists that in this case, in contrast to Treadwell, the Court is being asked to calculate loss for the first time,[16] and without the benefit of evidence that was relied on by a jury to establish defendant's guilt, and accordingly defendant is entitled to the heightened procedural protection of the clear and convincing standard. (Id.)

GILLIS misconstrues the due process concerns at work in Treadwell and the related Ninth Circuit authority on which it relies.  The key

---

[16] Of course, in almost every fraud case, including those that are submitted to the jury, the Court is only asked to calculate guidelines loss for the first time at sentencing.  Accordingly, that fact alone cannot justify application of a higher burden of proof, and GILLIS has cited no case that so provides.

issue is whether defendant was convicted of an extensive conspiracy that provides the basis of the sentencing enhancements, not whether that conspiracy conviction was proved to a jury or the result of defendant's voluntary admissions in his guilty plea (where he received full due process protections).

Applying a preponderance standard when determining sentencing enhancements raises due process concerns mainly where a defendant's sentence is subject to enhancements based on relevant conduct that the defendant was either not charged with, and/or not convicted of, in pre-sentencing proceedings. In such cases, the higher clear and convincing standard of proof is necessary to ensure that defendant is afforded a robust opportunity to contest his liability for conduct never established in pre-sentencing trial or plea proceedings. See, e.g., United States v. Harrison-Philpot, 978 F.2d 1520, 1524 (9th Cir. 1992). However, where sentencing enhancements based on financial loss are based on the extent of a conspiracy that defendant was charged with and knowingly and voluntarily pled guilty to, there are no due process concerns in using the usual preponderance standard to determine enhancements for loss. See Berger, 587 F.3d at 1048; United States v. Riley, 335 F.3d 919, 926-27 (9th Cir. 2003) (where enhancement for financial loss was "based entirely on the extent of the conspiracy to which Riley pled guilty," it was properly determined based on a preponderance of evidence).

Here, where both defendants pled guilty to having entered into a conspiracy to defraud victim-investors starting as early as 2001 and continuing until September 2014 and the financial losses at issue occurred within the scope of that fully admitted and uncontested conspiracy, it cannot be gainsaid that the scope of their guidelines

18

enhancements for loss rest upon the extent of the conspiracy of which they were charged and convicted. Under such circumstances, the government need only establish the loss enhancement by a preponderance of the evidence.[17]

        *c.   The Government Has Provided a Reasonable Estimate of the Amount of Loss and the Number of Victims Warranting a 24-Level Enhancement Under The Guidelines*

As set forth above, the government submits that the NASI Loss Analysis (Exh. A), which sets forth an estimated aggregate loss of $134,854,230 sustained by 1,295 victim-investors, provides a reasonable estimate of the amount of loss to NASI's victim-investors. Accordingly, this loss determination warrants a 24-level enhancement for loss under the version of the Guidelines that became effective on November 1, 2015 at USSG § 2B1.1(b)(1)(M), which provides for a 24-level enhancement for losses falling in the range between $65 million and $150 million.[18]

---

[17] Assuming <u>arguendo</u> that the clear and convincing standard applies, which the government does not concede, it is clear that the government's loss analysis provided in FA Pinkerton's summary chart readily satisfies this standard and justifies a 24-level enhancement for loss under the Guidelines.

[18] The Probation Officer determined that the actual loss was around $130 million based on the earlier version of the summary loss analysis prepared by FA Pinkerton, which is attached as Exhibit 41 to GILLIS' sentencing position. That earlier version of the NASI loss analysis showed losses of $125,063,605, and the PSR also properly declined to give defendant credit for approximately $5 million that the USPO was informed had been returned to investors only after NASI received notice of an SEC investigation in mid-June 2014, resulting to a total estimated loss of around $130 million. (PSR ¶ 45). Based on FA Pinkerton's revised summary loss analysis, which is explained above and in FA Pinkerton's declaration, the government submits that the proper aggregate loss amount is the slightly higher figure of $134,854,230. The most significant reason for the discrepancy is that FA Pinkerton has determined that $10,311,284.50 was returned to previously identified net losers after June 30, 2014 (not the previously estimated amount of $5 million), for which defendants should not receive credit because these returns occurred after the

*(footnote cont'd on next page)*

19

            d.   *GILLIS's two objections to the government's loss*
                 *calculation are without merit*

    GILLIS objects to the government's proposed loss analysis on two

different grounds, both of which he asserts generally undermine the

reliability of the government's approach to loss and establish that

the government has not satisfied its burden on this issue.  (Gillis

Sent'g Pos. at 6-8.)

    First, GILLIS argues that, in calculating returns to NASI

investors and thereby reducing losses, the government "fails to

account for investments that individual investors made via their

corporate or trust accounts."  (Id. at 6.)  Second, GILLIS asserts

(without any support) that many NASI investors purchased ATMs with the

proceeds of their net winnings, and "because an investor cannot be

said to have lost money that was never theirs to begin with" (id. at

8), the government's loss analysis is fatally flawed by failing to

distinguish between investors who lost their own investment money as

opposed to only losing their Ponzi scheme winnings.  (Id. at 8.)

    Both of GILLIS's objections fall wide of their mark.  First, FA

Pinkerton fully took account of investments individual investors made

through their corporate or trust accounts, and she also gave credit

against losses to investment returns that were paid to individuals

through their corporate or trust accounts.  (Pinkerton Dec. ¶ 9;

Chiquet Dec. ¶ 11.)  It was entirely reasonable for FA Pinkerton to do

so, because the individuals involved were the direct beneficiaries of

the corporate entities and trusts, which they were simply using as

vehicles to invest in NASI.  Indeed, as the documents submitted by

_____

time of detection of the offense.  See USSG § 2B1.1, comment.
(n.3(E)(i)); Pinkerton Dec. ¶ 8.

GILLIS himself in support of this spurious objection attest, it is evident that the individuals who are the beneficiaries of these entities are clearly identified on the contracts and checks that accompanied the individuals'/entities' investments in NASI, which were properly and fully taken into account in FA Pinkerton's financial analysis. (See Exh. 42 to Gillis Sent'g Pos. (showing that G.E. is the principal of Riviera Investments and the payor on the investment check to NASI).)[19]

Second, as explained above, in calculating net losers FA Pinkerton took account of each individual net losers' complete investment history, so that if an individual investor who was identified as a net loser based on NASI investments made after July 2009 had earned net winnings based on pre-2009 investments, those net winnings were fully taken into account by FA Pinkerton and served to reduce the aggregate amount of net losses attributed to that individual investor. (See Pinkerton Dec. ¶¶ 4, 10.) A review of the version of FA Pinkerton's spreadsheet attached to GILLIS's own Sentencing Position makes clear that, in the case of some identified net losers, FA Pinkerton took into account those investors' earlier

[19] GILLIS points to investor G.E. and his wife W.E. as investors who were counted as net losers, but who were in fact net winners because they received $469,360 through an entity called Riviera Investments LP. GILLIS asserts, with little or no support, that none of the payments through Riviera were incorporated into the government's loss analysis. (Gillis Sent'g Pos. at 7.) As the Pinkerton declaration attests, FA Pinkerton did in fact credit the repayments to these victims through their Riviera investment company, which is why the repayments to them after September 2007 are calculated to be $590,616.50, incorporating the $469,360 paid through Riviera Investments along with an additional roughly $121,000 in other repayments. In any event, FA Pinkerton removed G.E. from the net loser list in her revised spreadsheet because she also determined that G.E. received approximately $2,182,000 in commissions from NASI for selling ATMs to other investors, for which she elected to give G.E. a credit against losses. (See Pinkerton Dec. ¶¶ 9, 10 & n.1; Exh. A.)

net winnings in order to reduce the total amount of net losses attributed to those investors.

For example, on page 11 of the initial 35-page Pinkerton spreadsheet attached to GILLIS's Sentencing Position as Exh. 41, two different investors, M.Gr. & S.Gr. and L.Gg., were shown to have specific net winnings during the pre-9/2007 time period, in the amounts of $29,750 and $9,990, respectively, and those net winnings were fully credited and served to significantly reduce the aggregate net losses attributed to these investors as a result of losses sustained in the post 9/2007 time period. (Gillis Sent'g Pos., Exh. 41 at p. 11.) Accordingly, GILLIS's unsupported assertion that "the government has failed to offset losses by net winnings" (id. at 7) is simply wrong, as evidenced by a review of the spreadsheet that was provided to the defense and that defendant himself attached to his Sentencing Position.[20]

---

[20] These offsets of net winnings against net losses are reflected on pages 11 and 12 of the amended Pinkerton spreadsheet. In addition to the example on p. 11 of the initial Pinkerton spreadsheet referenced above, the crediting of earlier net winnings against subsequent net losses for individual investors in the determination of aggregate net losses are reflected on the following pages of the initialPinkerton spreadsheet: pages 8, 14, 17, 22, 25, 26, 30 and 31 of GILLIS' Exh. 41.

GILLIS also contends that the government itself admitted that, in compiling its spreadsheet of "net losers," it did not include any investors in its loss analysis who invested more than five years ago, referencing a declaration of AUSA Ranee Katzenstein that was submitted in opposition to defendants' request for a continuance of the sentencing hearing. (Gillis Sent'g Pos. at 7.)

In fact, AUSA Katzenstein made no such admission, which would have been inconsistent with the spreadsheet the government actually provided to defendants in May 2015 listing pre-9/2007 investments as part of its overall net loss analysis. When fairly construed in context, AUSA Katzenstein was simply noting that the vast majority of the investors who were identified as net losers invested with NASI after June 2009, so that the records of earlier investment activity, pre-9/2007, in the vast majority of cases would not have significantly

*(footnote cont'd on next page)*

22

Finally, GILLIS' assertion that the government's method of calculating individual net losses does not consider the possibility that an individual investor could have lost money solely with their previous winnings (and thus not genuinely qualify as a net loser) is incorrect.  As stated above, the government's method specifically provided for a reduction of net losses against net gains, so that if any individual investor, for example, made $20,000 on his earlier pre-2007 investments with NASI and then lost that same $20,000 in a subsequent investment with NASI in 2014, that individual investor would be credited with having sustained $0 in losses and would not be identified as a net loser at all.  (Pinkerton Dec. ¶ 10.)  Accordingly, GILLIS' objection to the government's net loss analysis once again fails.

For all the foregoing reasons, the government respectfully submits that the Court should find that GILLIS and WISHNER caused $134,854,230 in actual net losses[21] to 1,295 investors, resulting in a

---

impacted the government's net loss analysis.  <u>See</u> Declaration of Ranee Katzenstein, CR 75-1, at ¶8(b) (observing that "[p]ayments prior to 2007 would rarely be relevant because an investor who was receiving payments before 2007 would have, necessarily invested before 2007 and thus would be a net winner by 2012").  Of course, if that same investor also invested significantly more money later in the scheme, for example, in January 2014, he could easily become a net loser, and nothing stated by AUSA Katzenstein in her declaration precluded this possibility.

[21] GILLIS has proposed that the Court apply the standard of intended, not actual, loss in this case, and that if it does so the loss amount should be $7.8 million, warranting an 18-level enhancement under the Guidelines.  (Gillis Sent'g Pos. at 7-9.)

As noted above, the government disagrees, because in this case the amount of actual loss is greater than any ascertainable amount of intended loss, and thus provides a more reliable metric both of loss and of defendants' culpability.  <u>See</u> USSG § 2B1.1, comment. (n.3(A)), "loss is the greater of actual or intended loss."

*(footnote cont'd on next page)*

24-level enhancement for loss under the version of the Sentencing Guidelines in effect as of November 1, 2015.[22]

### 3. A 6-level Enhancement Applies Because the Offense Resulted in Substantial Financial Hardship to At Least 25 Victims

Sentencing guideline § 2B1.1(b)(2) increases a defendant's offense level based on the impact of the offense on the victims. The guideline (as amended) provides:

> (Apply the greatest) If the offense –
>
> A.  (i) involved 10 or more victims; (ii) was committed through mass-marketing; or (iii) resulted in a substantial hardship to one or more victims, increase by 2 levels;
>
> B.  resulted in substantial financial hardship to five or more victims, increase by 4 levels; or
>
> C.  resulted in substantial financial hardship to 25 or more victims, increase by 6 levels.

USSG § 2B1.1(b)(2), as amended. The guidelines instruct the Court:

> In determining whether the offense resulted in a substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim –

---

[22] Assuming _arguendo_ that the Court were to apply the standard of "intended loss," which the government does not concede is appropriate, the government respectfully submits that defendants' intended loss is at least $28,604,789.50, including the $7.8 million in admitted gains to defendants, $5,765,689.50 in commissions to third-parties to sell non-existent ATM machines, and $15,039,100 of investment funds collected by NASI after June 17, 2014, when defendant knew, or should have known, that the NASI fraud was about to be detected by the SEC and the government. (See Pinkerton Dec. ¶¶ 8-9 & Exhs. B, C.) An intended loss amount of $28.6 million, which is the minimal amount of properly calculated intended loss in this case, would warrant a 22-level enhancement under the loss guidelines effective as of November 1, 2015.

[22] The government's proffered loss amount of $134.9 million is $69,854,229.99 greater than the amount that would warrant a 24-level loss enhancement under the Guidelines. Accordingly, GILLIS' objections to the government's loss calculation can only qualify as material under the Guidelines if defendant can show that the government's net loss calculation overstates the amount of loss by nearly $70 million, which defendant has failed to do.

a)   Becoming insolvent;

b)   Filing for bankruptcy;

c)   Suffering substantial loss of a retirement, education, or other savings or investment fund;

d)   Making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and

e)   Suffering substantial harm to his or her ability to obtain credit.

USSG § 2B1.1, comment. (n.4(F)) (as amended).

The Probation Officer applied a 6-level upward adjustment under this guideline based on the fact that the offense involved more than 250 victims, which was required under the old version of the guidelines.  (PSR ¶ 47).[23]  The enhancement applies, however, under the amended guidelines as well.

Over 100 victim-investors submitted letters describing the devastating impact of GILLIS' and WISHNER's criminal scheme on their lives.[24]  The vast majority of the victims describe how their losses from the scheme will prevent them from retiring or will affect the resources they have during retirement; will affect their ability to obtain medical care for themselves or their family members; and will affect their ability to provide for themselves or their family members.  The victims also describe the impact of the scheme on their health and emotional well-being.

---

[23] GILLIS does not dispute that this 6-level enhancement applies although, like the Probation Officer, he bases its application on the pre-amendment guidelines' requirement of 250 or more victims.  (Gillis Sent'g Pos. at 11.)

[24] The victim impact letters are being filed separately concurrently herewith under seal.

Over 25 victims suffered substantial financial hardship within the meaning of USSG § 2B1.1(b)(2). Here is what some of these victims said about the financial impact of GILLIS and WISHNER's crime:

Victim P.A. invested $120,000 that was left to him by his "immigrant parents who worked and saved all their lives so they could leave something for their children." P.A. is "a 55 year old man who works as a waiter in a restaurant with a limited income." The NASI fraud "destroy[ed] mine and my wife's dreams for a secure retirement." Victim P.A. reports that the stress resulting from the fraud has affected his health.

Victim G.A. invested $24,000 and "never received anything but a bounced check and $25.00 fee." Victim G.A.'s "husband is 85 years old with dementia and macular degeneration." Victim G.A. thought her "investment" would be available to help with his care and is "so scared."

Victim W.B. suffered a severe stroke and was in the ICU for three weeks. She had "no income and a mountain of medical bills" that she expected to pay with the money from her NASI ATMs. Her stroke caused her to lose her job and many of her physical abilities. She invested $72,000. In September 2014, she overnighted a letter to GILLIS accepting his offer to buy back her ATMs but she never heard back from him. Following all of her losses from the stroke, she "couldn't bear to think of losing my home, too, in addition to losing the money [she'd] worked so hard to earn."

Victims B.A. and K.A.[25] invested $500,000. The loss of their investment "RUINED OUR LIVES." B.A. "doubt[s] [he] will ever be able to retire." The loss also affected the couple's 7 children "severely and in many ways they will suffer and never recover."

Victims G.B. and C.B. are "retired seventy-two year olds, living on social security and our savings." The wife suffered a heart attack in 2011 and the husband suffered a

_____

[25] A number of the letters are jointly signed by a husband and wife. In some cases, the spouses invested jointly; in other cases, money was separately invested by the spouses. These circumstances do not alter the fact that the spouses are separate victims for purposes of applying the upward adjustment under § 2B1.1(b)(2). United States v. Harris, 718 F.3d 698 (7th Cir. 2013) (spouses who jointly hold investments are each counted as victims because each sustains part of the loss); United States v. Ellisor, 522 F.3d 1255, 1275 (11th Cir. 2008) ("even in the case of money held jointly by a marital couple, both the husband and wife count as victims because each sustains a part of the actual loss") (citing United States v. Densmore, 210 Fed. Appx. 965, 971 (11th Cir. 2006) (internal quotation marks omitted))).

stroke in 2012.  The couple hoped that their NASI investment would help with the medical expenses.  "It seemed an answer to our prayers, but if I thought I was under a lot of duress with my heart attack, my husband's stroke and all the attendant care, worries, pressures and concerns, those were nothing compared with what we are both suffering now as we see a large chunk of our financial future gone along with the monthly income it had provided for a short time."

Victim C.B. was in a "horrible" car accident and hasn't been able to work for over four years.  She lost $96,000 which she invested in order to have an income to "stay afloat." She is in a "huge panic" trying to figure out what to do "to come back from this devastation."

Victim K.E.B. says "this nightmare will force me to work longer than I intended to work."

Victim S.C. was a self-employed house painter.  He lost $91,000.  "This was my retirement money for my future."  He is 61 years old and will not be able to earn this money again.

Victims M.C. and M.C. invested "a large percentage of our hard earned retirement income in this scheme."  They lost "over $600,000 that was to be used for our retirement and college savings for our son."  The effect is "financial ruin."

Victim K.C. says:  "I have lost my entire life savings to the NASI Ponzi scheme.  I worked for the last fifteen years to accrue this money, which was to be a major portion of my retirement. . . . I am currently living on borrowed money with steadily increasing debt."

Victim Z.F. lost $540,000 which was his retirement savings.

Victim E.F. writes that her losses "created an extreme financial burden for me, as the money was my entire life's savings.  I am 51 years old and it is unlikely that I will ever recover from the loss financially. . . . I experience suicidal thoughts regularly when trying to look at my future and realize that I will soon lose my house I am selling my family's heirlooms to try to pay my monthly bills."

Victim G.F. says that she and her husband, both in their 70s, are cancer patients.  They invested "in 112 phony ATM machines which represented a vast part of our retirement savings ($1,300,000).  Because of our financial losses due to GILLIS and WISHNER's Ponzi scheme, we are forced to dismantle and sell our condominium home of 25 years."

Victims M.F. and G.F. state that they increased their investments in NASI to make up for the income the husband would no longer have when his employer retirement payout

27

plan came to an end. He was "flat on my back and medically drugged in June of 2014 after an ankle replacement when I called [GILLIS] to move $60,000 from my IRA into more ATMs. (Unbeknownst to me, the SEC had by then begun its investigation and subpoenas had been issued to NASI.)" M.F. and G.F. lost $1.3 million and "cannot afford to remain in our current residence and maintain our lifestyle in California." They are 75 and 71 years old and now must sell their condo, where they have lived for 24 years, to move to a less expensive area.

Victim R.F. says: "[A]ll of the money I'd saved since my husband's death was totally wiped out in this crime . . . . $168,000." She is 80 years old but "[r]etirement is now not an option."

Victim S.G. is 71 years old and has Stage One Multiple Myeloma. She lives on income from social security and a small pension. She lost $36,000 "which is a great deal of money for someone in my circumstances." She now has to "question any purchase I make, even the smallest. . . I try to drive as little as possible to save money on gas . . ."

Victim L.G. is 67. He lost $67,000, which was "all my savings. I relied on the money for just about everything."

Victim L.G. is "a disabled person on social security disability. The money I invested with NASI was from my settlement award for several injuries I sustained on my job. This money was supposed to help me pay my current bills and for my retirement. Since NASI lied to me and stole my money, they also robbed me of my future and left me with no financial security for my old age."

Victim S.H. says that she invested all of her retirement account into NASI. "[M]y entire life's nest egg, $192,000, is now gone, every last penny. Because the monthly income from the original five [ATMs] is now gone, I can no longer make my home mortgage payments and have been forced to put my home on the market."

Victim W.W.H. lost $240,000. He is 73 years old and says that "the by-product of the fraud perpetrated by Mr. GILLIS and, apparently Mr. WISHNER, is that, so long as my health will allow, I will never be able to retire."

Victims S.H. and D.H. are "simple hard working people." They invested "all of our life savings with NASI." As a result of the fraud, "we had to sell our home of twenty years."

Victim K.K.J. lost over $300,000. "I lost every dime of my retirement to GILLIS and WISHNER. I will not be able to meet my retirement goals nor maintain my hoped for standard of independent living. I am too old to 'catch up' . . . I

have cried many nights trying to decide what I have to do. . . . More importantly, my husband is in stage five kidney failure. I was planning to retire so that I can fully care for him. . . . I do not know how I will be able to devote my time and attention to caring for my loving husband and trying to work to make up for some of the retirement funds I lost due to JOEL GILLIS and EDWARD WISHNER."

Victims R.P.K. and S.A.C. lost a total of $558,235. "As a direct result of the conduct of the Defendants, after nearly 40 years of the practice of medicine, I have had to defer retirement."

Victims E. K and B.K. invested $600,000, which was "most of our life savings. . . .We worked for more than 35 years for that money and we are now in our 60s. . . . We are looking into maid work to pay basic expenses. We are losing our home, which we can no longer afford. . . . Our lives have been turned upside down."

Victim E.M.L. is 83 years old. Her investment in NASI "represented nearly all of the money that I had managed to save over the years to help me into retirement. . . . Instead of that, I have returned to work . . . Unfortunately, I am forced to continue to work so I can look after my own expenses and not become a burden on my family and friends."

Victim B.L. writes that GILLIS' "theft of $504,000 of our money has resulted in my father – an 89 year old blind man – having to move from the retirement facility where he was cared for to a single apartment with no such care. This has greatly diminished both his quality of life and quality of care."

Victim P.J.P. writes: "I am 71 years old and my wife is 75 and we have both gone back to work to support ourselves since the money stolen from us by Mr. GILLIS, et al, was our life savings. We had counted on it to be able to retire in reasonable comfort and now have nothing to fall back on. . . . Our future is now bleak . . ."

Victim P.R. writes that her losses from the scheme left her "homeless. I had to move from my house, it was my dream home. With the help of relatives, I am now living in a small room . . . . Having lost all my life savings, my life has been dramatically altered. . . . They completely destroyed my dreams leaving me broke!"

Victim D.S. writes that she "lost $700,000 of my retirement funds. I am a 69 year old woman and this money represents a significant part of my savings. At my stage of life it is unlikely that I will be able to earn this money back."

<u>Victim J.E.S.</u> is 70 years old.  She lost $48,000.  She "had to move out of my apartment in Los Angeles, as the rent was high, and move out of the city to where I was able to find a home to rent for about half the amount. . . . Now I am looking for some kind of employment – not an easy job at my age and basically a very depressing thought."

<u>Victim K.T.</u> lost $120,000.  She writes: "My life savings is gone. My retirement is gone.  I am 72 years old.  I was planning on retiring as my son is in the fourth stage of cancer in NJ and I wanted to spend time with him and take care of him.  This huge loss has affected my ability to be with him.  This causes me to be more upset, more depressed and I toss and turn at night, unable to sleep.  My mental state and physical condition is suffering from this.  I can't retire and I can't afford to go back and forth to be with my son at this crucial time.  My son lives alone and has no one to take care of him."

### 4.  A 2-level Enhancement Applies Because The Offense Involved Sophisticated Means

The Probation Officer found that defendants' offense level should be increased by two levels pursuant to § 2B1.1(b)(10)(C) because defendant used sophisticated means to carry out his investor fraud scheme.  (PSR ¶¶ 48-52.)  This finding is correct.

Advisory sentencing guideline § 2B1.1(b)(10)(C) as amended applies if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  The application notes for this guideline explain that:

"sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

USSG § 2B1.1, comment. (n.9(B)).

30

In this case, there is no dispute that defendants induced their victims to make investments by creating a sale/lease-back program set out in a series of contracts and other documents that were complex and designed to hide the fact that the program was a Ponzi scheme. (Exh. E at 16-24, 29-46, 55-62, 71-80, 86-91, 147-163.) Defendants hid from their victims the fact that their money was not being used in the way that the victims were told it was being used (_i.e._, to purchase ATM machines that would generate substantial returns), and that their "returns" were not funded by the actual performance of the asset they had supposedly purchased from the defendants but by monies given to NASI by later victim-investors. The defendants created and sent victims false documents, including purchase and leasing contracts for ATM machines that were, in fact, non-existent, and fictitious monthly account statements that purported to reflect income from the ATMs the investors supposedly owned. (Exh. E at 93-115, 165, 167-171.)

Defendants took other steps calculated to conceal the fraudulent nature of their operations. Most significantly, they required investors to agree to a "non-interference clause" that defendants designed and implemented in order to prevent the victims from discovering that they had been sold a phantom ATM machine. (Exh. E at 21, 34, 59.)

Defendants' investment fraud scheme, which continued for at least 13 years and involved defendants' creation of fraudulent documents to conceal the truth from their victims and lull them into a false sense that their money was safe and invested and generating income as promised, amply supports the application of the sophisticated means enhancement. As the reported cases show, similar and even simpler conduct has resulted in the proper application of this enhancement.

See, e.g., United States v. Augare, 800 F.3d 1173, 1175-76 (9th Cir. 2015) (upholding enhancement where defendant took coordinated and repetitive steps to transfer money from victim to his personal bank account); United States v. Tanke, 743 F.3d 1296, 1307-08 (9th Cir. 2014) (upholding enhancement where defendant "created at least six false invoices and falsified carbon copies of checks in [his company's] check register on a least ten occasions to conceal the payments" even though he "did not use 'fictitious entities, corporate shells, or offshore financial accounts,' as the Sentencing Commission's commentary contemplates"); United States v. Horob, 735 F.3d 866, 872 (9th Cir. 2013) (per curiam) (upholding enhancement because, among other things, defendant "fabricated numerous documents" and "the complicated and fabricated paper trail made discovery of his fraud difficult"); see also United States v. Jennings, 711 F.3d 1144, 1145 (9th Cir. 2013) (sophisticated means enhancement in tax guideline, USSG § 2T1.1(b)(2), applies to conduct less sophisticated than the conduct listed in the accompanying application note); United States v. Garro, 517 F.3d 1163, 1169 (9th Cir. 2008) (use by defendant convicted of defrauding investors of "numerous confusing and misleading documents regarding the investors' funds," and manipulation of transactions to mask defendant's taking of victims' money warrant sophisticated means enhancement); United States v. Finck, 407 F.3d 908, 915 (8th Cir. 2005) ("While [the defendant] did not use sophisticated means to conceal his criminal activity, we find that he used sophisticated means to execute his scheme. Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme.")

32

## 5.   Advisory Guidelines Calculation

For the reasons discussed above, the government submits that the correct advisory guideline calculation is as follows:

| | | |
|---|---|---|
| Base Offense Level | 7 | (USSG § 2B1.1(a)(1)) |
| Loss over $65 million | +24 | (USSG § 2B1.1(b)(1)(M)) |
| More than 25 victims with Substantial financial Hardship | +6 | (USSG § 2B1.1(b)(2)) |
| Sophisticated Means | +2 | (USSG § 2B1.1(b)(10)(C)) |
| Acceptance of Responsibility | -3 | (USSG § 3E1.1(a), (b)) |
| TOTAL | 36 | |

## B.   Analysis of the § 3553(a) Factors

### 1.   The Factors to be Considered

The factors to be considered when imposing sentence, as set forth in 18 U.S.C. § 3553(a), include:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant . . .

(3) The kinds of sentences available;

(4) [the applicable sentencing guidelines];

(5) [the applicable sentencing guidelines policy statement];

33

1    (6)  The need to avoid unwarranted sentence disparities among

2  defendants who have been found guilty of similar conduct; and

3    (7)  The need to provide restitution to the victims of the

4  offense.

5  18 U.S.C. § 3553(a).

6      2.  DEFENDANT GILLIS:  Analysis of the § 3553A factors

7          a.  *Nature and Circumstances of the Offense*

8  The seriousness of GILLIS' offense cannot be overstated.  It

9  caused overwhelming financial harm to a massive number of victims.

10 Defendant maintained his fraud for at least 13 years and used

11 deceptive devices to conceal the fraud, including monthly account

12 statements that purported to show actual earnings from the phantom

13 ATMs, and a "non-interference clause" that the victims were required

14 to accept.

15 GILLIS contends that this Ponzi scheme is unusual because he did

16 not set out to defraud investors.  According to GILLIS, the Ponzi

17 scheme only began when a contract for which he had solicited investors

18 failed to materialize.  His motive, he says, "was to never let his

19 investors down."  He claims he engaged in the Ponzi scheme because he

20 "enjoyed being the person responsible for making other people money,

21 rather than using the scheme to make money for himself."  (Gillis

22 Sent'g Pos. at 14.)

23 This is humbug.  GILLIS was selling ATM machines that <u>did not</u>

24 <u>exist</u>.  He wasn't making money for investors.  He was just paying out

25 new investor money to old investors.  He was taking a tidy sum of the

26 investors' money for himself – at least $300,000 <u>every</u> year in salary

27 and benefits and likely a great deal more.  Whatever the motive for

28

the start of his scheme, he continued it for over a decade creating

financial havoc in the lives of almost 1300 victims.

     *b. History and Characteristics of the defendant*

  GILLIS is a 75-year old man with a loving family.  GILLIS has

worked all his life, although since at least 2001 his work has been

running the Ponzi scheme at issue in this case.

  GILLIS contends that he has shown extraordinary acceptance of

responsibility.  Not so.  GILLIS admitted his wrongful conduct only

<u>after</u> the government had already discovered it and could prove it.

The government had evidence of GILLIS' scheme beyond <u>any</u> doubt through

bank records and the documents provided by the investors.  By pleading

guilty, GILLIS helped himself by becoming eligible for the 3-point

downward adjustment for acceptance.  It is true that he spared the

government the time and expense of a trial, but this is recognized by

the acceptance of responsibility adjustment under the guidelines and

no further sentencing adjustment is warranted on this basis.

  GILLIS also contends that he has provided "Extensive" cooperation

to the government and the Receiver, and deserves a reduced sentence

for this reason.  (Gillis Sent'g Pos. at 16-17.)  GILLIS overstates

his "cooperation" and no adjustment is warranted on this ground.

GILLIS did meet with the Receiver early in the case and provided some

useful information regarding NASI's records, which the Receiver was

having trouble understanding due to the way they had been created and

stored.  This hardly qualifies as "extensive cooperation."  Although

GILLIS offered his help in connection with the Receiver subsequent

work, and met with the Receiver for that purpose, nothing particularly

useful came from the meeting.  (Fates Decl. ¶ 4.)

GILLIS also met with the prosecutors in this case.  He discussed the details of his own offense but had little information to offer regarding any criminal activity by others.  (Katzenstein Decl. ¶ 5.)  Cf. USSG § 5K1.1 (authorizing departures where "defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense).

GILLIS also seeks a variance from the applicable advisory sentencing guidelines range based on his age and health status.  (Gillis Sent'g Pos. at 22-24.)  GILLIS should not be heard to complain that he is too old to receive a lengthy sentence.  The only reason that he achieved 75 years of age before being sentenced is that he was able to successfully conceal his offense (and continue benefitting from it) for at least 13 years.

### c.   Goals of Sentencing

The government agrees with GILLIS that, given his age, he is unlikely to reoffend and therefore the need to protect the public from further crimes by GILLIS himself is low.  But that is just one of the goals of sentencing set out in § 3553(a)(2).  That section also requires this Court to fashion a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and affords adequate general deterrence to criminal conduct.

These additional goals of sentencing support a lengthy term of incarceration in this case.  GILLIS's offenses were extremely serious, resulting in vast financial and emotional harms to his victims.  The need for general deterrence is also substantial to discourage criminals from taking advantage of investors who - as the economy

1   diversifies -- are presented with more and more varied investment
2   opportunities.

3       GILLIS cites the below-guidelines sentences imposed in certain
4   cases from other districts in an effort to show that a guidelines
5   sentence here would result in unwarranted sentencing disparity.
6   Nothing can be determined from these citations, however, because the
7   facts of these cases are unknown.  Defendant provides a table of these
8   cases with "loss" figures but nowhere explains how these figures were
9   calculated, or the role of the defendant in the underlying offense, or
10  whether a § 5K motion was granted, or what special circumstances
11  existed in these cases.  Here, it cannot be reasonably contested that
12  GILLIS created and operated for at least 13 years a scheme that
13  defrauded over 1300 victims of over $134 million.  If anything, given
14  the gravity and extent of GILLIIS' crimes, granting his request for a
15  two-year custodial sentence would likely result in a sentencing
16  disparity in that it would be fairly unprecedented for a perpetrator
17  of a $134 million Ponzi scheme, causing losses to over 1000 victims,
18  to receive such a lenient sentence.

19          d.    The government recommends a 204 month sentence for
                  defendant GILLIS
20
21      As discussed above, there are significant aggravating and some
    mitigating factors in GILLIS' case.  In aggravation, GILLIS' offense
22
    was extremely serious.  It caused enormous financial losses to almost
23
    1300 victims.  GILLIS perpetrated his fraudulent scheme for over 13
24
    years.  He continued to take money from investors even after he must
25
    have known his scheme was about to collapse because the SEC had served
26
    a subpoena on NASI.  Moreover, GILLIS's 24-level loss enhancement
27
    understates the seriousness of his offense conduct because the
28

37

magnitude of the loss, $134 million, is nearly $70 million higher than the amount necessary to trigger the 24-level loss enhancement ($65 million).  The government submits that these aggravating factors far outweigh any conceivable factors in mitigation, e.g., defendant's age, his pre-indictment disposition, and his offer to assist in untangling NASI's finances.

The aggravating and mitigating factors have been taken into account by the advisory sentencing guidelines.  A sentence of 204 months — the middle of the applicable advisory sentencing guidelines range — properly balances the aggravating and mitigating factors in this case.

3.   DEFENDANT WISHNER: Analysis of the § 3553A factors

a.   *Nature and Circumstances of the Offense*

The seriousness of WISHNER's offense cannot be overstated.  It caused overwhelming financial harm to a massive number of victims. Defendant maintained his fraud for at least 13 years and used deceptive devices to conceal the fraud, including monthly account statements that purported to show actual earnings from the phantom ATMs, and a "non-interference clause" that the victims were required to accept.

b.   *History and Characteristics of Defendant*

WISHNER will be 77 at the time of sentencing.  He accepted responsibility for his offense conduct and pled guilty to an information. He has no criminal history other than the instant offense.

c.   *Goals of Sentencing*

Given WISHNER's age, he is unlikely to reoffend and therefore the need to protect the public from further crimes by the defendant is

low.  But that is just one of the goals of sentencing set out in §
3553(a)(2).  That section also requires this Court to fashion a
sentence that reflects the seriousness of the offense, promotes
respect for the law, provides just punishment for the offense, and
affords adequate general deterrence to criminal conduct.

These additional goals of sentencing support a lengthy term of
incarceration in this case.  WISHNER's offenses were extremely
serious, resulting in vast financial and emotional harms to his
victims.  The need for general deterrence is also substantial to
discourage criminals from taking advantage of investors who – as the
economy diversifies -- are presented with more and more varied
investment opportunities.

> d.   *The government recommends a 204 month sentence for*
> *defendant WISHNER*

As discussed above, there are significant aggravating and some
mitigating factors in WISHNER's case.  In aggravation, WISHNER's
offense was extremely serious.  It caused enormous financial losses to
almost 1300 victims.  WISHNER perpetrated his fraudulent scheme for
over 13 years.  He continued to take money from investors even after
he must have known his scheme was about to collapse because the SEC
had served a subpoena on NASI.  Just as in GILLIS' case, the
enhancement for loss of 24 levels understates the seriousness of
WISHNER's offense conduct because the $134 million loss amount is $70
million higher than the threshold amount necessary to trigger this
enhancement.  The government submits that these aggravating factors
far outweigh the factors in mitigation, e.g., defendant's age, his
guilty plea and his offer to assist in untangling NASI's finances.

The aggravating and mitigating factors have been taken into account by the advisory sentencing guidelines. A sentence of 204 months – the middle of the advisory sentencing guidelines range -- properly balances the aggravating and mitigating factors in this case.

**V.   RESTITUTION**

The government respectfully requests that the Court defer the final determination of restitution and schedule a restitution hearing on February 8, 2016, or such later date as is convenient to the Court, pursuant to 18 U.S.C. § 3664(d)(5).[26]

**VI.   DEFENDANTS SHOULD BE REMANDED INTO CUSTODY**

The government requests that the Court order that both defendants be remanded into custody immediately. Both defendants are flight risks. Neither can establish, as it is his burden to do by clear and convincing evidence that he is not likely to flee. 18 U.S.C. § 3143(a). Given their ages, their sentencing exposure, and the loss of all of their assets, both defendants have a strong incentive to flee. Indeed, fleeing can only benefit them: they will remain out of custody for as long as they are fugitives and – given their age and the likely length of the sentences that they will already have received — any additional sanction imposed for having fled would be meaningless. Defendants have surrendered their passports but this does not effectively address the risk of flight. Defendants could drive to Mexico or Canada, neither of which require a passport for

---

[26] Section 3664(d)(5) provides:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.

18 U.S.C. § 3664(d)(5).

ground entry from the U.S., and put themselves beyond the reach of U.S. law enforcement. Moreover, defendants could apply for another passport here (not to mention from a consulate in either Canada or Mexico), as there is no check performed before issuing a replacement passport to see if the person seeking it has any Court-ordered restrictions against that.

Both defendants entered their guilty pleas over 10 months ago and have enjoyed the benefits of pre-sentencing release for a more than sufficient period. They have had ample time to prepare to serve their sentences and should be remanded forthwith. There is no reason to delay execution of sentence.

**VII. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court:

Defendant GILLIS:

- Find that a 24- level enhancement applies under USSG § 2B1.1(b)(1)(M), as amended, because the loss was more than $65 million but less than $150 million;

- Find that a 6-level enhancement applies under USSG § 2B1.2(b)(2), as amended, because 25 or more victims suffered substantial financial harm;

- Find that a 2-level enhancement applies under USSG § 2B1.1(b)(10)(C), as amended , because the offense involved sophisticated means and defendant intentionally engaged in or caused the conduct constituting the sophisticated means;

- Find that defendant's total adjusted offense level, including a 3-level reduction for acceptance of responsibility under USSG § 3E1.1, is 36;

41

- Sentence defendant to 204 months, the middle of the applicable advisory sentencing guidelines range; and

- Order that defendant be remanded into custody to begin service of his sentence.

///

Defendant WISHNER:

- Find that a 24- level enhancement applies under USSG § 2B1.1(b)(1)(M), as amended, because the loss was more than $65 million but less than $150 million;

- Find that a 6-level enhancement applies under USSG § 2B1.2(b)(2), as amended, because 25 or more victims suffered substantial financial harm;

- Find that a 2-level enhancement applies under USSG § 2B1.1(b)(10)(C), as amended , because the offense involved sophisticated means and defendant intentionally engaged in or caused the conduct constituting the sophisticated means;

- Find that defendant's total adjusted offense level, including a 3-level reduction for acceptance of responsibility under USSG § 3E1.1, is 36;

- Sentence defendant to 204 months, the middle of the applicable advisory sentencing guidelines range; and

- Order that defendant be remanded into custody to begin service of his sentence.

Dated: November 2, 2015

Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

_____/s/ _Ranee A. Katzenstein / Paul G. Stern_____
RANEE A. KATZENSTEIN
PAUL G. STERN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA